NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |  |
|---|---|---|---|
| CSR LIMITED and RINKER MATERIALS | ) | | |
| CORP. (f/k/a CSR AMERICA, INC.), | ) | | Hon. Harold A. Ackerman |
| | ) | | |
| Plaintiffs, | ) | | Civil Action No. 95-2947 (HAA) |
| | ) | | |
| v. | ) | | **AMENDED OPINION** |
| | ) | | **AND ORDER**[*] |
| | ) | | |
| CIGNA CORPORATION, et al., | ) | | |
| | ) | | |
| Defendants. | ) | | |

_____)

Andrew T. Berry, Esq.
Gita F. Rothschild, Esq.
MCCARTER & ENGLISH LLP
Four Gateway Center, 100 Mulberry Street
Newark, New Jersey  07102-4096

Mark F. Rosenberg, Esq.
Keith McKenna, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  100004-2498
*Attorneys for Plaintiffs CSR Limited and Rinker Materials Corporation*

_____

[*]This Opinion and Order amends the initial Opinion and Order issued on October 27, 2005.  The Court has corrected minor formatting and typographical errors made in conversion of this document for filing purposes, and has also made a minor revision to Footnote 15.  The substance of the Opinion and Order, and the Court's decisions on the motions resolved therein, remain unchanged.

Furthermore, the Court instructed the parties to file any written objections to unsealing this Opinion and Order on or before November 3, 2005.  Plaintiffs informed the Court that they did not object to unsealing this document, and Defendants did not lodge any objections to unsealing.  Therefore, this Amended Opinion and Order is filed publicly and not under seal.

1

Thomas R. Curtin, Esq.
Kathleen N. Fennelly, Esq.
GRAHAM CURTIN & SHERIDAN
4 Headquarters Plaza – Box 1991
Morristown, New Jersey  07962

Paul R. Koepff, Esq.
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, New York  10036
*Attorneys for Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, and Insurance Company of North America (UK) Ltd.*

Kevin T. Coughlin, Esq.
COUGHLIN DUFFY, LLP
350 Mt. Kemble Avenue
Morristown, New Jersey  07962-2075
*Attorneys for Certain of the Australian, European, and London Market Insurer Defendants*

**<u>ACKERMAN</u>, Senior District Judge:**

This matter comes before the Court on the motions for partial summary judgment filed by Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, Insurance Company of North America, Insurance Company of North America (UK) Ltd., and Certain of the Australian, European, and London Market Insurer Defendants (collectively "Defendants"), the motion and cross-motions for partial summary judgment filed by Plaintiffs CSR Limited and Rinker Materials Corporation (collectively "CSR" or "Plaintiffs"), and the motions *in limine* filed by both Plaintiffs and Defendants.

The parties have filed a total of sixteen motions and cross-motions for partial summary judgment in this matter.  This Opinion and Order will only address Defendants' Motion for Partial Summary Judgment Declaring that the Policies are Null and Void and Plaintiffs' Cross-Motion for Partial Summary Judgment Dismissing Defendants' Counterclaims and Defenses

Based on Allegations of Fraud and Non-Disclosure.  The Court will resolve the other pending summary judgment motions in this matter in subsequent opinions.

For the following reasons, Defendants' motion for partial summary judgment declaring the policies null and void is DENIED, and Plaintiffs' related cross-motion is DENIED.

## *Background*

In their voluminous submissions in support of their sixteen motions and cross-motions for partial summary judgment, the parties have exhaustively briefed the facts and circumstances which led to the various and wide-ranging claims in this matter.  This Opinion will only discuss those facts relevant to the issues decided here regarding whether CSR's alleged actions and/or statements render the policies issued to it by Defendants null and void and whether Defendants' counterclaims and defenses on the "null and void" issue must be dismissed.  Subsequent opinions will discuss these and other facts relevant to other issues and claims in this matter.

Plaintiff CSR Limited ("CSR Ltd.") is an Australian public company headquartered in Sydney, Australia.[1]  From 1949 to 1966, CSR sold raw asbestos fiber mined by one of its subsidiaries, Midalco Pty Limited ("Midalco").  Midalco mined this asbestos fiber from a mine owned by Midalco in Wittenoom, Western Australia ("Wittenoom" or "Wittenoom mine").  CSR sold raw asbestos fiber from its Wittenoom mine to, among others, Johns-Manville Corporation ("Manville"), which operated its main plant in Manville, New Jersey.  CSR first delivered

---

[1]The parties dispute whether certain of the insurance policies at issue in this matter cover certain CSR subsidiaries.  For simplicity, in this Opinion the Court will refer to Plaintiffs generally as "CSR" unless a specific CSR entity or subsidiary is implicated.  The Court reserves decision on the parties' pending summary judgment motions regarding the status of CSR America, Inc.

Wittenoom asbestos to Manville in 1949, and its last sale of asbestos to Manville occurred in or about 1966.  In 1966, the Wittenoom mine closed and asbestos-mining activities at the mine ceased.  CSR's sales of raw asbestos fiber to Manville have resulted in the initiation of more than 100,000 asbestos-related personal injury claims in the United States against CSR Ltd. and/or its American subsidiary CSR America, Inc., presently known as Rinker Materials Corporation .  These claims have been brought by persons suffering exposure to raw asbestos fiber at or in the vicinity of Manville plants in New Jersey and elsewhere, and to finished Manville products containing asbestos mined and sold to Manville by CSR.

Defendants comprise various insurance companies who issued or subscribed to primary or umbrella excess general liability insurance policies in favor of CSR during the period of November 2, 1978 to March 31, 1989 ("post-1978 policies").  These Defendants include: Insurance Company of North America and its subsidiaries, including Insurance Company of North America (Australia) Limited, later known CIGNA Insurance Australia Ltd. ("INA" or "CIGNA"); and various other insurance companies known in this litigation as Certain of the Australian, European, and London Market Insurer Defendants (Coughlin Duffy or "CD Defendants").[2]  INA was the lead primary insurer on the post-1978 policies and also served as the

_____

[2]During the pendency of this appeal, Kemper Insurance Company, one of the CD Defendants, reached settlement with CSR and has been dismissed from this matter.  Counsel for INA/CIGNA also represent ACE Insurance Ltd. and ACE Insurance Company SA-NV ("ACE Defendants").  The extensive papers filed with the instant motions fail to reveal any information regarding the ACE Defendants, although the Court understands from prior proceedings in this matter that CIGNA Insurance Australia Ltd. is now known as ACE Insurance Company.  *CSR Ltd. v. CIGNA Corp.*, No. 95-2947, slip op. at 4 (D.N.J. Feb. 25, 2005).  For simplicity, the Court will refer to this entire group of Defendants as INA or CIGNA.  In any event, INA/CIGNA and the CD Defendants have jointly filed Defendants' various motions for partial summary judgment and have joined in all briefs relevant to these motions.  Therefore, any confusion regarding the precise identity of certain Defendants in this action does not affect the resolution of the motions

lead on some of the umbrella and excess insurance layers.  As lead insurer on a significant

portion of the policies, INA conducted the majority of the administration of, negotiations over,

and renewal of the post-1978 policies.  In 1981, CSR first notified its pre-1978 insurers of its

asbestos claims in the United States and that CSR might seek indemnity from those insurers.

CSR first presented formal notice of demand for indemnification for asbestos-related claims to

its post-1978 insurers in a letter dated November 29, 1991.  Defendants denied CSR's claim for

coverage of CSR's United States asbestos-related liabilities in a February 20, 1992 letter from

Anthony Scotford, an attorney retained by Defendants in relation to CSR's claim.

This action stems from Defendants' handling of the November 1991 claims and ultimate

denial of coverage for those claims under the post-1978 policies.  CSR also alleges a group

boycott by the Defendant insurers in which Defendants threatened denial of new or renewal

insurance for CSR unless CSR withdrew its November 1991 request for coverage.  CSR seeks

coverage from Defendants for their United States asbestos-related liabilities and brought claims

for breach of contract, bad faith claims-handling, antitrust violations, tortious interference with

contractual relations, and tortious interference with prospective economic advantage.

For many years prior to 1978, CSR had obtained its insurance coverage exclusively from

South British United Insurance Company ("SBU"), later known as New Zealand Insurance

Company ("NZI").  In or about 1977, CSR retained Marsh & McLennan Pty Limited ("Marsh"),

an insurance brokerage, to review CSR's then-existing insurance coverage and to assist in the

---

filed jointly by all Defendants.

acquisition of future coverage.[3]

Marsh solicited INA to replace SBU as CSR's lead underwriter for policies beginning in 1978. John Harold Elfverson, CSR's Deputy Risk Manager, testified at deposition that "Marsh & McLennan was instructed to make sure that the underwriters were fully aware of Wittenoom," that Wittenoom was a "major thing in local magazines at the time," and that Wittenoom was "an issue that was frequently discussed" with Marsh and INA. (Berry Certif., Ex. 13 ("Elfverson Dep.") 48:7-14.) Elfverson and Lorraine Hignett, a Marsh account executive who worked on CSR's account, have both attested that asbestos operations at the Wittenoom Mine and potential liability therefrom was discussed during the initial policy negotiations with INA in 1978. (Elfverson Aff. ¶ 8 ("I discussed with Alan May [lead negotiator for INA] the Wittenoom asbestos operation, and informed him that claims had been filed as a result of asbestos disease allegedly incurred due to exposure to Wittenoom asbestos fibre."); Hignett Aff. ¶ 50.) Indeed, according to Elfverson, CSR and INA discussed the inclusion of a Wittenoom asbestos exclusion in INA's proposed policies for CSR. (Elfverson Aff. ¶ 8.)

In connection with CSR's effort to secure new coverage in 1978, CSR's broker Marsh prepared a Marketing Report to provide to prospective insurers. This "Public Liability Marketing Report," dated September 1978 ("1978 Marketing Report"), purported to outline the businesses and activities for which CSR sought insurance. The 1978 Marketing Report stated:

---

[3]John Harold Elfverson, CSR's Deputy Risk Manager, attested that CSR wanted to determine "whether there was a way to obtain equal or greater coverage at the same or lower cost." (Berry Certif., Ex. 11 ("Elfverson Aff.") ¶ 2.) Lorraine Hignett, a Marsh account executive who worked on this project, attested CSR instructed Marsh to "obtain cover, as wide or wider, as CSR had obtained previously from SBU, for less money." (Berry Certif., Ex. 12 ("Hignett Aff.") ¶ 29.)

>Not all of the activities that CSR is involved in are included in the blanket public liability policy.  Many subsidiary and associated companies have their own insurance arrangements in this area.  In the remainder of the report, discussion is confined to those companies and activities that seek inclusion in the CSR public liability policy.

(Sushon Decl., Ex. 24 at CSR 0002061.)  The 1978 Marketing Report contained no explicit textual reference to any activities at the Wittenoom mine.  Its only reference to asbestos-related activities whatsoever concerned not Midalco or Wittenoom but activities in Wingfield, South Australia (*id.* at CSR 0002076) and storage of asbestos from prior activities of Wunderlich, a subsidiary which had been sold before 1978 (*id.* at CSR 0002078).  The Report's only reference to asbestos-related claims against CSR may be found in a list of "Brief Claims History" which includes a 1972 claim for "Asbestos Dust Ingestion" at Wunderlich (*id.* at CSR 0002112), and a chart of "Public Risk Claims" which includes a Wunderlich claim for "Death by asbestos dust" in Sydney in 1972 (*id.* at CSR 0002117).  The 1978 Marketing Report contains no reference to asbestos operations of Midalco at Wittenoom or to claims arising out of Wittenoom activities either in Australia or elsewhere.  Similarly, Marsh issued an underwriting Marketing Report to Defendants in 1980 which again failed to include any reference to Wittenoom operations, although it did contain a claims history which included items for Wunderlich asbestos claims.

INA underwriter Brian Iles testified at deposition that during negotiations over the 1979-80 renewal of CSR's policy, Wittenoom and asbestos were discussed, at least with regard to Wittenoom employees, because they were "highlighted" in CSR's 1979 financial report.  (Berry Certif., Ex. 8 ("Iles Dep.") 84:7-14; 85:18-21.)[4]  A draft of the initial 1978-79 policy offered to

_____

[4]In its Statement of Material Facts and in its brief, CSR maintains that Alan May – the INA underwriter when INA first provided CSR insurance coverage in 1978 – discussed "Wittenoom mine operations" with CSR's Lloyd Rae in negotiating the policy.  (Pls.' Statement

CSR by CD Defendant QBE Insurance (Australia) Limited lists Midalco as a named insured subsidiary and contains the handwritten notation "not excluded" next to the Midalco listing. (Hignett Aff. ¶ 58 and QBE 209 (attached to Hignett Aff.).)[5]

Materials produced from INA's early underwriting files yield some indications of Defendants' knowledge of potential asbestos concerns (or lack thereof), their impact on Defendants' ultimate decision to extend coverage to CSR, and their views of CSR's level of disclosure.  (Pls.' Statement of Material Facts ¶ 22.)  For example, in an October 25, 1978 telex from G.H. Dixon of INA in Australia to John P. Nelson of INA in Philadelphia, Pennsylvania, Dixon proposed that INA write coverage for CSR "as a business decision . . . in view of [the] overall potential in this account" and noted that "asbestos operations [have been] sold."  (Berry Certif., Ex. 5.)  In a May 7, 1979 letter to Nelson, INA's May wrote that CSR's Elfverson and a Marsh official "were very open in their answers and enabled us to have a better understanding on the risk's exposures."  (Berry Certif., Ex. 38.)  INA's Iles wrote to Nelson on August 17, 1979 that "[t]he diversification and size of CSR operations are such that it is difficult to evaluate all of

_____

of Material Facts, Pls.' Response to Facts Alleged by Defs. ¶ 12; Pls.' Br. 12.)  However, CSR's representation and supporting citations to the record obscure the substance of May's deposition testimony.  At May's deposition, CSR's counsel asked him, "Do you recall any discussions with Lloyd Rae about the Wittenoom mine and/or Wittenoom worker claims?" and May answered, "No."  (Berry Certif., Ex. 6 ("May Dep.") 178:24-179:2.)  On follow-up, May indeed stated "I can specifically recall the mine business."  (*Id.* 179:19-20).  However, earlier in his testimony May acknowledged that he knew in 1978 that CSR faced asbestos-related risks from "[a] mining operation which was then sold" (*id.* 143:14), but could not specifically recall if that mine was the Wittenoom mine, stating that "I can't remember the name of that, but Wittenoom, if that was the mine, then that's the one" (*id.* 143:19-21).  Defendants dispute the facts CSR infers from this testimony, and this Court agrees that CSR's characterization of May's testimony in this regard is misleading.

[5]Hignett admits in her Affidavit that she did not know who wrote this handwritten notation.  (Hignett Aff. ¶ 57.)

the foreseeable exposures properly and know that one has accounted for all of their risks."

(Berry Certif., Ex. 39.)

Scotford stated at his deposition with regard to the issuance of the first policy in 1978 by

Defendants that

> there was general public awareness of CSR conducting a Blue
> Asbestos Mine in Wittenoom.  There had been a lot of publicity, an
> awareness that this was giving rise to claims, and there had been
> advertisements published in the press by CSR, notices to its
> shareholders, matters of that kind.  These were all notorious in the
> sense that they were well known in the commercial and legal
> communities.

(Berry Certif., Ex. 7 ("Scotford Dep.") 245:14-21.)  Scotford agreed that the asbestos claims

were well known prior to renewal of each policy, and stated that they were "the subject of

specific discussion between those representing my clients, like Mr. Payne in particular and Mr.

Iles from time to time, and he was constantly reassured that these matters . . . [w]ere not relevant

to the policies they had underwritten."  (*Id.* 245:22-246:8.)  However, Scotford conceded that he

did not attend any of these meetings.  Furthermore, Scotford noted that "[t]here is a world of

difference between knowing facts about the activities of insured and receiving notification in

accordance with the conditions of insurance policy."  (*Id.* 244:3-6.)

As noted, Defendants began insuring CSR in November 1978.  Prior to this time, CSR

possessed several asbestos studies, undertaken at various times between 1968 and 1978, relating

to Wittenoom.  Defendants state – supported by testimony by CSR's Elfverson, CSR's broker at

Marsh, Iles, Michael Payne, and others – that CSR did not disclose any of these studies to

Defendants.  (Defs.' Statement of Material Facts ¶ 15.)  While CSR disputes this contention in its

Statement of Material Facts (Pls.' Statement of Material Facts, Pls.' Response to Facts Alleged

9

by Defs. ¶ 15), it all but concedes in its brief that these studies were not provided, as it contends

that "[f]urther information in the form of studies of Wittenoom Mine health hazards would

constitute mere details regarding general information of which the Insurers were already aware.

If they had desired such additional details, they could and should have asked for them."  (Pls.' Br.

34-35.)  These studies identified by Defendants, in addition to providing general details regarding

the health effects of asbestos exposure and the specific circumstances surrounding Wittenoom

and its workers, also contain some information potentially related to the third-party United States

asbestos litigation at issue in this matter.[6]

In an October 11, 1978 memorandum, a CSR official discussed a proposal at that time to

liquidate Midalco.  The memorandum, in suggesting that CSR not dissolve Midalco, noted the

adverse publicity implications due to the workers' compensation claims and other potential

common-law claims by former Wittenoom employees.  The memorandum proceeded to state that

> [a] further reason not to wind up Midalco is that by eliminating it as
> a potential target for plaintiffs[,] CSR would be under additional
> moral pressure to stand behind the Wittenoom operation, a situation
> which might tend to inflate any damage claimed and any verdicts
> recovered.  At present[,] CSR can point to Midalco as the correct
> defendant, thus confining the resources legally available to satisfy
> claims to, first, Midalco's assets and, secondly, its public liability and
> workers' compensation coverage.

(Sushon Decl., Ex. 33 at 1-2.)  Iles and others testified at deposition that CSR did not provide

this memorandum to Defendants or otherwise discuss the deliberations regarding a potential

---

[6] For example, a "discussion paper" entitled "Asbestos - Wittenoom" prepared by CSR
stated that "any person who worked or lived at Wittenoom, or handled Wittenoom blue asbestos,
or came in contact with it, may get mesothelioma (and CSR-ABA may be liable to civil claim)."
(Sushon Decl., Ex. 28 at 4.)  However, similar to other studies identified by Defendants, the
report appears primarily to address liability in Australia to Wittenoom workers and others who
handled Midalco asbestos in Australia.  (*Id.* 7-8.)

10

Midalco liquidation with Defendants.  (*E.g.*, Sushon Decl., Ex. 2 ("Iles Dep.") 1226:4-1227:7.)

However, several CSR officials stated that while they did not provide this memorandum to

Defendants, they had no knowledge of its existence either.  (*E.g.*, Sushon Decl., Ex. 22

("Burridge Dep.") 55:14-56:24.)

According to Michael Payne, a representative of certain Lloyd's, London underwriting

syndicates,[7] CSR, during initial underwriting negotiations with Payne prior to November 1978,

told him that CSR had no assets in the United States and only exported raw sugar to the United

States.  (Sushon Decl., Ex. 32 ("Payne Dep.") 355:15-23.)  CSR disputes this fact and notes that

even if true, CSR's representation was accurate in 1978, as CSR ceased asbestos exports in 1966.

For the purposes of this motion, the parties do not dispute that United States asbestos

claims were first filed against CSR in mid-1980.  Documentary evidence suggests that in the

early to mid-1980s, several post-1978 insurers declined to renew CSR's coverage due to

expressed concerns over potential asbestos liabilities.  (Berry Certif., Exs. 40-42.)  In negotiating

retroactive liability coverage in September 1981, CSR advised INA (through Marsh, CSR's

broker) that while no losses had been incurred by the insurers from any claim reported more than

two years after occurrence,

> [y]ou will be aware, however, of actions recently brought against
> Midalco Pty. Ltd. (formerly Australian Blue Asbestos Pty. Ltd.)/CSR
> Limited by third parties in Western Australia and the U.S.A. as a
> result of operations at Wittenoom W.A./shipments of blue asbestos
> to U.S.A. which occurred prior to the sale of the operation in

---

[7]The Lloyd's Defendants, consisting of certain underwriters at Lloyd's, London, Excess
Insurance Company Limited and Stronghold Insurance Company, have reached a settlement with
CSR and have been dismissed from this case.  However, the conduct of the Lloyd's Defendants,
documents and other evidence created by them, and deposition testimony from officials of the
Lloyd's Defendants, remain relevant to this matter and will be discussed where appropriate.

> December, 1966.  These actions have or are being contested.
> Reference to current suits is included in the financial and statutory
> reports of the CSR Group (page 73) for YEM 1981.

(Berry Certif., Ex. 43 at 3.)

William McMurdy of NZI held a conference with a manager at INA in 1982 "to establish what the I.N.A. know of any claims made against CSR by any party afflicted with Asbestosis or Mesothelioma."  (Berry Certif., Ex. 9 at 1.)  In a September 24, 1982 memorandum, McMurdy memorialized the highlights of the meeting.  McMurdy stated that INA "was very knowledgeable of the general insurance position with regard to these types of claims and in particular to CSR's involvement."  (*Id.*)  McMurdy noted that INA was also the "major insurer" of Manville and therefore was "so involved in the American claims" that it had seven attorneys working on them, had taken over case management for many co-insurers, and seemed "confident of success in their defence" in the United States.  (*Id.*)  After observing that CSR at that point in 1982 had not made any "official application" to INA regarding any asbestos claims (*id.*) McMurdy commented that

> [i]t is obvious, however, that CSR could, at any time in the future
> plead that I.N.A. had full knowledge of the litigation in which they
> were involved in the U.S.A. re claimants attempting to connect their
> conditions with the raw material supplied ex the Wittenoom Mine to
> Johns-Manville.  This information was clearly made available when
> CSR sought the retroactive cover.  CSR also informed I.N.A. that
> they were allowing for and reporting a contingent liability relative to
> any Asbestosis and/or Mesothelioma litigants which I think was
> incorporated in their Annual Report for the year ending March, 1982?

(*Id.* at 1-2.)

The Annual Report to which McMurdy alludes was provided to Defendants and stated that "the parent company has been joined as an additional defendant in forty five pending court actions in the USA involving groups of individual plaintiffs seeking damages for alleged asbestos

related diseases" and referenced a "subsidiary"(Midalco) which "sold asbestos to US buyers between 1948 and 1965."  (Berry Certif., Ex. 44.)  INA's Iles testified in his deposition that he was fully aware of the contents of CSR's annual reports prior to each policy renewal, and that the reports "became more interesting as each year came along with the reference to third-party liability claims."  (Iles Dep. at 154:13-19.)

INA's Iles attended a meeting with representatives of Defendant CGA (now Zurich Insurance (Australia) Ltd.) on February 5, 1982.  CGA's file note for this informational meeting listed under "Major Claims":

> Asbestos – CSR is involved in a class action in USA for the supply of blue Asbestos which took place prior to the sale of the operation in December, 1966.  However, according to the US Lawyer of CSR, the liability of CSR as supplier is very remote.

(Berry Certif., Ex. 47 at 2.)  In response to CSR's November 1991 claim for coverage, Iles – who served as underwriter on CSR's account since 1979 – prepared a Position Paper based on his review of the underwriting files.  Aside from concluding that INA/CIGNA bore no exposure to CSR's claims, Iles's review detailed INA's knowledge of potential CSR asbestos issues:

> Our first knowledge of C.S.R.'s potential liability arising out of the Wittenoom mine was gleaned from the Financial Reports for year end March 31, 1979, 1980 and 1981 when reference was made to litigation involving C.S.R. in the U.S.A.  Midalco had exported the blue asbestos in its raw state to manufacturers of asbestos products, ie Johns Manville Inc and others in U.S.A. and claimants obviously had joined the supplier to the manufacturer of asbestos products used in the building industry and in steampipe lagging.  References have been made also in Financial Reports subsequent to 1981, as per extracts attached.

(Berry Certif., Ex. 46 at 2.)

During each annual renewal of CSR's policies from 1979 to 1989, lead insurer

INA/CIGNA prepared so-called "loss runs," which are lists identifying claims against CSR. These reports were provided to CSR, and CSR would review the loss run and report any inaccuracies, omissions, or discrepancies to INA.  In this fashion, the parties "agreed upon" the loss runs.  Various witnesses stated that CSR never identified any asbestos-related claims or suits in any of the loss runs from 1979 to 1989.  (*E.g.*, Iles Dep. 1232:2-8, 1233:7-13.)  The parties dispute the scope of these loss runs, however.  CSR contends that the loss runs simply listed all claims against CSR which CSR presented to its insurers.  Defendants allege that the loss runs, once agreed upon by CSR, comprised the entire universe of claims against CSR, regardless of whether the claims were actually presented to the insurers for coverage or not.  Defendants further aver that these loss runs formed a substantial basis for the insurers' decision whether to renew coverage, and that the specificity and accuracy of the loss runs were crucial.  Thus, Defendants see any omission of claims against CSR from the loss run, whether such claims were presented for coverage or not, as a misrepresentation.

In or about 1987, CSR formed a wholly-owned captive insurance company named CSR Insurance Pte. Limited ("CSRI") to allow CSR to self-insure.  CSRI issued excess layer or umbrella asbestos policies to CSR that were expressly excess over, or in addition to, any potential coverage from Defendants.  In other words, the Defendants' policies at issue were expressly named as the primary layer coverage over which the self-insured CSRI policies were in excess.  (*E.g.*, Sushon Decl., Ex. 40.)  Several witnesses testified at deposition that CSR did not disclose the existence of CSRI to Defendants.  (Iles Dep. 1225:2-1226:3; Payne Dep. 760:10-

18.)[8]

The Umbrella Liability Insurance Proposals issued by various Defendants to CSR for the policy years 1985-86, 1986-87, 1987-88, and 1988-89 all asked the following as Question 14(a): "Provide full details of ALL LOSSES paid or now reserved (whether or not resulting in claims) occurring during the past five (5) years.  Include description of loss and amount paid and/or outstanding."  (Sushon Decl., Ex. 41 at CAPNSW 000006, Ex. 42 at ACEA 002693.)[9] According to Defendants, CSR did not disclose any information concerning its asbestos-related liabilities in its answers to these proposals.  CSR claims that it interpreted "losses" in Question 14(a) as not including asbestos claims submitted to other (non-Defendant) insurers which it believed it would successfully defend and had not resulted in any payments or judgments.  (Pls.' Br. 42.)  Furthermore, CSR alleges that it suffered no "losses" on any asbestos claims until 1989, after the last policy implicated in this case was issued.  (*Id.*)

Question 14(b) in these same forms asked, "Are there any claims currently pending against the Proposer [CSR]; or is the Proposer aware, AFTER INQUIRY, of any circumstances which could give rise to a claim under the proposed insurance?  If so, provide details."  (Sushon Decl., Ex. 41 at CAPNSW 000006, Ex. 42 at ACEA 002693.)  CSR checked the "NO" box after

---

[8]In an opinion dated May 2, 2003, Magistrate Judge Hedges denied the CD Defendants' motion to join or implead CSRI as a party in this matter.

[9]These two exhibits are the Umbrella Liability Insurance Proposals issued by CIGNA for the policy years 1985-86 and 1986-87.  CSR agrees that the quoted language appears in the exhibits, and fails to dispute that the language also appears in the documents – not submitted to the Court on this motion – for policy years 1987-88 and 1988-89.  (Pls.' Statement of Material Facts, Pls.' Response to Facts Alleged by Defs. ¶ 38.)

Question 14(b) in each of the proposals.[10]

In Scotford's February 20, 1992 letter to CSR denying CSR's claims on behalf of Defendants, Scotford identified CSR's alleged misrepresentations as a basis for denial and invalidation of the policies. In a March 3, 1992 letter from Reginald Thomas Thoroughgood, then-New South Wales Claims Manager for CIGNA, to McMurdy of NZI, Thoroughgood wrote that "[c]learly, CIGNA as well as NZI knew the general background of this account and was alert to the asbestos exposure." (Berry Certif., Ex. 4.)

CSR filed its Complaint in the instant action on June 23, 1995. CSR seeks coverage from Defendants for their United States asbestos-related liabilities and brought claims for breach of contract, bad faith claims-handling, antitrust violations, tortious interference with contractual relations, and tortious interference with prospective economic advantage. Defendants later filed counterclaims against CSR, including claims that the insurance policies under which CSR seeks coverage are null and void due to CSR's alleged misrepresentations and omissions of material fact in obtaining and renewing the policies. In 2004, after extensive, international discovery under the supervision of two court-appointed special masters, the parties filed sixteen motions for partial summary judgment on various issues, including the instant motions. In the instant motions, both CSR and Defendants cross-move for partial summary judgment on the validity of the insurance policies in light of Defendants' allegations of misrepresentations and omissions.

_____

[10]CSR agrees that the quoted language appears in the exhibits, and fails to dispute that the language also appears in the documents – not submitted to the Court on this motion – for policy years 1987-88 and 1988-89. (Pls.' Statement of Material Facts, Pls.' Response to Facts Alleged by Defs. ¶ 40.) CSR also agrees that it checked the "NO" box for Question 14(b) in the two exhibits provided, and does not dispute that it checked "NO" in the two documents not submitted to the Court on this motion. (*Id.* ¶ 41.)

*Analysis*

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987). Summary judgment may be granted only if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248; *see also Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).

The substantive law will identify which facts are "material." *Anderson*, 477 U.S. at 247-48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.* A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994). It is inappropriate for a

district court to resolve factual disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Indeed, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Id.*

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. Am. Tel. & Tel. Co.*, Civ. A. No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249). Therefore, to raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

## I.      Choice of Law

At the outset, this Court must determine whether New Jersey law or Australian law applies to the issues regarding the validity of the policies and Defendants' right to rescission raised by the instant motions. CSR urges this Court to apply New Jersey law, while Defendants

contend that the law of Australia should apply.[11]

      As the parties agree, this Court must apply New Jersey choice-of-law rules in this matter. *See, e.g.*, *Woessner v. Air Liquide Inc.*, 242 F.3d 469, 472 (3d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  New Jersey applies the "governmental interest" test.  Under this standard, a court must apply the law of the jurisdiction "with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes v. Kason Corp.*, 145 N.J. 478, 484, 679 A.2d 106, 109 (1996).  The governmental-interest test involves a two-step inquiry.  "The first step in the analysis is to determine whether a conflict exists between the law of the interested states." *Veazey v. Doremus*, 103 N.J. 244, 248, 510 A.2d 1187, 1189 (1986); *see also, e.g.*, *Woessner*, 242 F.3d at 472.  "If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Veazey*, 103 N.J. at 248, 510 A.2d at 1189; *see also, e.g.*, *Woessner*, 242 F.3d at 472.  New Jersey choice-of-law analysis applies on "an issue by issue basis." *Veazey*, 103 N.J. at 248, 510 A.2d at 1189; *see also Woessner*, 242 F.3d at 472.  As one New Jersey court has observed, "[t]he evaluation of significant relationships and governmental interests takes place issue by issue and can lead to the application of different bodies of law." *Johnson Matthey Inc. v. Pa. Mfs. Ass'n Ins. Co.*, 250 N.J. Super. 51, 65, 593 A.2d 367, 374 (App. Div. 1991).

---

      [11]Earlier this year, in its Opinion affirming Magistrate Judge Hedges's May 2, 2003 Order, this Court held that Magistrate Judge Hedges's choice-of-law analysis in his May 2 Order applied only to the motions resolved in that Order and did not constitute a case-wide, final choice-of-law ruling. *CSR Ltd. v. CIGNA Corp.*, Civ. No. 95-2947, Opinion and Order (D.N.J. May 17, 2005).  This Court reserved judgment on choice-of-law issues and stated that it would decide choice-of-law matters "on the complete record before it in the[] pending motions" for partial summary judgment. *Id.* at 9.

Therefore, this Court must begin its analysis by determining whether an actual conflict exists between the law of New Jersey and the law of Australia with regard to the issue presented in the instant motions: whether and under what conditions may an insurance policy may be rendered null and void due to alleged fraud, misrepresentation, or non-disclosure by the insured to its insurer.

        *a.*      *Conflict between New Jersey and Australian law on Rescission*

New Jersey law allows rescission of a contract on the basis of equitable fraud. To show equitable fraud, a party must establish "'(1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party.'" *First Am. Title Ins. Co. v. Lawson*, 177 N.J. 125, 136-37, 827 A.2d 230, 237 (2003) (quoting *Liebling v. Garden State Indem.*, 337 N.J. Super 447, 453, 767 A.2d 515, 518 (App. Div. 2001)). "Rescission voids the contract *ab initio*, meaning that it is considered 'null from the beginning' and treated as if it does not exist for any purpose." *Id.* at 137, 827 A.2d at 237 (quoting Black's Law Dictionary 1568 (7th ed. 1999)). A party seeking rescission must prove its right to that remedy by clear and convincing evidence. *Farris v. County of Camden*, 61 F. Supp. 2d 307, 336 (D.N.J. 1999).

In the insurance context, "[t]he prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy." *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 347, 634 A.2d 74, 84 (1993). An insured's representation, "whether contained in the policy itself or in the application for insurance," may serve as the basis for rescission "if it is untruthful, material to the particular risk assumed by the insurer, and actually

and reasonably relied upon by the insurer in the issuance of the policy." *First Am.*, 827 A.2d at

237 (quoting *Allstate Ins. Co. v. Meloni*, 98 N.J. Super 154, 158-59, 236 A.2d 402, 405 (App.

Div. 1967)). The insured's duty to not misrepresent material information extends to providing

truthful answers to specific questions by the insured. *Progressive Cas. Ins. Co. v. Hanna*, 316

N.J. Super. 63, 70, 719 A.2d 683, 687 (App. Div. 1998). However, where an insured provides a

"truthful answer to questions asked on an application that does not elicit material facts to guide

the prospective insurer's decision to accept or reject the prospective risk," *id.*, 719 A.2d at 687,

New Jersey law does not impose an obligation on the insured to volunteer information not sought

by the insurer. The Appellate Division in *Progressive* quoted favorably the consensus view that

an insurance applicant "is not answerable for an omission to mention the existence of facts about

which no inquiry is made of him, although they may turn out to be material for the insurer to

know in taking the risk." *Id.* at 73, 719 A.2d at 689 (quoting 43 Am. Jur. 2d § 1008); *see also*

*Fid. & Deposit Co. v. Hudson United Bank*, 653 F.2d 766, 775 n.11 (3d Cir. 1981) ("New Jersey

law provides that when an insurance company issues a policy on an application that contains

unanswered or incompletely answered questions, that policy cannot be rescinded on the grounds

of concealment or the incompleteness of answers 'in the absence of clear proof of a fraudulent or

intentional suppression of a fact.'") (quoting *Goldstein v. Met. Cas. Ins. Co.*, 14 N.J. Super. 214,

218, 81 A.2d 797, 799 (App. Div. 1951)).

Furthermore, New Jersey law draws a distinction between objective and subjective

inquiries by an insurer, and New Jersey courts "have been more lenient when reviewing an

applicant's misrepresentation when made in response to a subjective question rather than an

objective question." *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 636, 651 A.2d 92, 96

(1995); *see also Liebling*, 337 N.J. Super. at 454, 767 A.2d at 518 (defining an objective question as "one calling for information within the applicant's knowledge" and a subjective question as "one that seek[s] to prove the applicant's state of mind") (quotations and citations omitted).  An answer to a subjective question from an insurer is not a misrepresentation and therefore may not rise to the level of equitable fraud if "'the question is directed toward probing the knowledge of the applicant and determining the state of his mind and . . . the answer is a correct statement of the applicant's knowledge and belief.'" *Ledley*, 138 N.J. at 636, 651 A.2d at 96 (quoting *Ettelson v. Met. Life Ins. Co.*, 164 F.2d 660, 665 (3d Cir. 1947)).  Finally, rescission is an equitable remedy and is therefore left to the discretion of the court and "will not be granted where the claimant has not acted within a reasonable time or where there has been substantial performance.'" *Farris*, 61 F. Supp. 2d at 336 (quoting *Notch View Assocs. v. Smith*, 260 N.J. Super 190, 197, 615 A.2d 676, 680 (Law Div. 1992)).

Australian insurance policy rescission law, which stems from a complex and shifting mix of decisional and statutory law, differs in several material aspects from New Jersey law.[12]   The parties agree that the common law of Australia applies to insurance contracts issued up until at least April 1, 1984.  At common law, Australian law imposes a duty of "utmost good faith" which includes a duty of disclosure.  *See, e.g.*, *Barclay Holdings (Austl.) Pty Ltd. v. British Nat'l Ins. Co.* (1987) 8 N.S.W.L.R. 514, 515-16 (Ct. App.).  The common law imposes an affirmative

---

[12]Both Plaintiffs and Defendants submitted competing Declarations containing expert reports on the law of Australia.  While not necessary to the Court's analysis, the Court has consulted these Declarations of the Honourable Gerald Edward Fitzgerald for Plaintiffs and of the Honourable Terence Rhoderic Hudson Cole for Defendants.  The Court particularly relied upon the volumes of supporting authority  – including Australian caselaw, statutes, and secondary material – provided by the parties in conjunction with these reports and the parties' briefs.

duty on an insured to disclose all material facts, even if the insurer did not specifically ask about a particular issue.  *See, e.g.*, *State Ins. Gen. Manager v. McHale*, [1992] 2 N.Z.L.R. 399, 409 (C.A.) (observing that this rule differs from the approach adopted in the United States).  *McHale* states that "given that a fact is within the knowledge, actual or presumed, of the assured, it must be disclosed if the prudent insurer would regard it as material."  *Id.*

Thus, common law in Australian law includes a "positive duty, so that it is no answer to the allegation of non-disclosure in a proposal that there was no question specifically directed to the particular point."  *Id.*  It is "immaterial" whether the omission of a material fact by an insured "arises from intention, or indifference, or a mistake, or from it not being present to the mind of the assured that the fact was one which it was material to make known."  *Bates v. Hewitt*, (1867) 2 QB 595, 607.  Australian common law defines a fact as material "if it would have reasonably affected the mind of a prudent insurer in determining whether he would accept the insurance, and if so, at what premium and on what conditions."  *Barclay*, 8 N.S.W.L.R. at 516 (quoting *Mayne Nickless Ltd v. Pegler* (1974) 1 N.S.W.L.R. 228, 239 (Ct. App.)).  Materiality in this context is a question of fact.  *McHale*, 2 N.Z.L.R. at 409.

Australian common law thus differs from applicable New Jersey law both with regard to the "prudent insurer" test and the insurers' duty to disclose facts even if not asked specifically about such facts by the insured.  Australia has also adopted several relevant insurance statutes which codify elements of the common law.  Both the New South Wales Act, which arguably applies to policies issued between April 1, 1984 and January 1, 1986, and the Insurance Contracts Act,  which the parties concede applies to all policies issued after January 1, 1986, codify the standard of "utmost good faith" and the duty of the insured to disclose all material

facts known to it.  The statutes operate differently in some respects than the common law; for example, the ICA provides a more detailed definition of a "material fact" and shifts the focus of the inquiry to examine whether a reasonable person in the circumstances of the *insured* could be expected to know that the matter would be relevant to the insurers' decision to accept the risk and on what terms.  (Cole Decl. ¶¶ 52, 68.)  In addition, the ICA specifies that the duty of disclosure does not require disclosure of matters of common knowledge or that the insurer knows or should know in the ordinary course of the insurer's business.  (*Id.* ¶ 52.)

At this time, this Court need not explicate at great length the various, complex workings of the ICA.  For present purposes, it is sufficient to conclude that an actual conflict exists between the New Jersey law and the Australian law (no matter which controlling source) which would apply to all of the policies implicated in the instant motions.  Faced with an actual conflict between New Jersey and Australian law, this Court must proceed to assess, under New Jersey choice-of-law principles, whether New Jersey or Australia has the greater governmental interest in the issues here, based on "the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."  *Veazey*, 103 N.J. at 248, 510 A.2d at 1189.

> b.    *Framework for Choice-of-Law Analysis*

In arguing for the application of Australian law, Defendants strongly emphasize the fact that almost all of the policies at issue in this case were "prepared, reviewed, executed, delivered and paid for" in Australia.  (Defs.' Br. 4.)  Plaintiffs concede that no liability policy invoked in this matter was ever "prepared, reviewed, executed, delivered or paid for in New Jersey."  (Defs.'

Statement of Material Facts ¶ 6; Pls.' Statement of Material Facts, Pls.' Response to Facts

Alleged by Defs. ¶ 6.)  However, while New Jersey previously followed the traditional rule that

"the law of the place where the contract, including an insurance contract, was entered into

determined the rights of the parties under the contract," the New Jersey Supreme Court now

applies a more "flexible" approach to choice-of-law issues involving liability insurance contracts.

*Gilbert Spruance Co. v. Pa. Mfrs.' Assoc. Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993)

(rejecting *lex loci contractus* rule).[13]  "[B]ecause the law of the place of contract 'generally

comport[s] with the reasonable expectations of the parties concerning the principal situs of the

insured risk'. . . that forum's law should be applied 'unless the dominant and significant

relationship of another state to the parties and the underlying issue dictates that this basic rule

should yield." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 37,

417 A.2d 488, 493 (1980)); *see also State Farm*, 84 N.J. at 37, 417 A.2d at 493 (observing that

rule favoring place of contract "should not be given controlling or dispositive effect").

    Therefore, this Court must look beyond merely the place of contract to examine the

relationship the parties and transactions in this matter have with New Jersey and Australia, the

governmental interests underlying the law of each state, and each law's application to the issues

---

[13]Defendants rely on contract cases in making their choice-of-law argument.  CSR
similarly cites contract cases but observes that, in the instant motion, Defendants seek to nullify
the contracts on the basis of alleged misrepresentation and fraud, which are tort claims.  This
Court views the issues in the instant motion as arising under contract law because they deal with
the validity of a contract and the right of a party to avoid that contract.  In any event, New Jersey
applies the governmental-interest standard to tort cases as well.  *Veazey*, 103 N.J. at 247-48, 510
A.2d at 1189-90.  Just as New Jersey courts have rejected the *lex loci contractus* rule, they have
also discarded the *lex loci delicti* rule requiring application of the law of the place where the
wrong occurred in favor of a more flexible approach based upon which state has the "greatest
interest in governing the particular issue."  *Id.* at 248, 510 A.2d at 1189.

raised in the instant motions.  In so doing, the New Jersey Supreme Court requires that courts consider the guidance of the Restatement.  *See, e.g.*, *Gilbert Spruance*, 134 N.J. at 102, 629 A.2d at 88 (stating that "courts should rely on the factors set forth in Restatement sections 6 and 188").  The Restatement offers general several factors for courts to assess in making choice-of-law decisions, including:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (f) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971); *see also Gilbert Spruance*, 134 N.J. at 103, 629 A.2d at 888; *State Farm*, 84 N.J. at 34, 417 A.2d at 491.  In the context of contract matters, the Restatement provides that "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied" unless the principles stated in § 6 dictate a different result.  Restatement (Second) of Conflict of Laws § 188(3) & cmt. f.  Section 188 offers various contacts for courts to consider in applying the principles of § 6 to contract issues, including: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  *Id.* § 188(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.*  Finally, the Restatement further refines the standard applicable to insurance contracts:

> The validity of a contract of fire, surety or casualty insurance and the

> rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Id.* § 193; *see also Gilbert Spruance*, 134 N.J. at 103, 629 A.2d at 888-89.

In applying these Restatement rules to the choice-of-law determination in insurance contracts, the New Jersey Supreme Court has instructed courts to follow § 193 of the Restatement and thereby choose the law of the state understood by the parties to be the principal location of the insured risk unless the "subject matter of the insurance is an operation or activity and when that operation or activity is predictably multistate." *Gilbert Spruance*, 134 N.J. at 112, 629 A.2d at 893 (quotations omitted). In the latter instance, "the significance of the principal location of the risk diminishes" and "the governing law is that of the state with the dominant significant relationship according to the principles set forth in Restatement section 6." *Id.* (quotations and citations omitted); *see also General Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 655 (3d Cir. 1995).

This standard echoes the approach outlined in the Restatement. The Restatement defines the principal location of risk as "the state where it will be during at least the major portion of the insurance period." Restatement (Second) of Conflicts of Laws § 193 cmt. b. However, "where the policy covers a group of risks that are scattered throughout two or more states," the location of risk bears lesser significance. *Id.* The fundamental dispute between the parties in this matter regarding the insurance policies – a dispute that forms the basis of several other pending motions for partial summary judgment – concerns whether the various policies issued by Defendants

27

cover the United States asbestos-related liabilities for which CSR seeks coverage.  Determining

the "principal location of the insured risk" touches upon some of the central questions in dispute

in this matter.  CSR's contracts claims proceed based on the theory that Defendants' policies

cover CSR's United States asbestos-related liabilities and therefore the insured risk is

"predictably multistate," indeed multi-nation.  Defendants' primary defense to CSR's contract

claims rests on the notion that coverage for these American asbestos-related liabilities was

unavailable and unforeseeable, and therefore the principal location of the *insured* risk is certainly

not anywhere in the United States, let alone New Jersey.

However, the policies at issue undoubtedly concern various of CSR's operations or

activities, even though the parties dispute coverage for the particular "operation or activity"

regarding CSR's United States asbestos-related liabilities.  This Court finds that the nature of the

policies at issue in this matter, and the centrality to this matter of the principal location of the risk

and whether that risk is "predictably multistate," requires a more searching analysis under the

factors outlined in § 6 of the Restatement.  The New Jersey Supreme Court has held that where

the "knotty problem of how to determine where the insured 'risk' is located" proves difficult, "'a

more extended analysis pursuant to § 6(2) is appropriate to determine whether, apart from or in

addition to § 193 significance,'" one of the competing states "'has a more significant relationship

to the transaction and parties.'"  *Gilbert Spruance*, 134 N.J. at 112-13, 629 A.2d at 894

(discussing situation where principal location of risk could not be easily determined due to

transient nature of the risk) (quoting *A. Johnson & Co., Inc. v. Aetna Cas. & Sur. Co.*, 741 F.

Supp. 298, 301 (D. Mass. 1990)).  Prudence dictates that this Court undertake a fuller analysis.

c.       *Analysis of Relevant Choice-of-Law Factors*

As the Third Circuit has observed, Section 6 of the Restatement urges courts to scrutinize five different categories of interests: "the purposes and policies behind each of the competing rules of law and the interests of each respective state in having its particular rules govern," "the desirability of promoting mutually harmonious relationships between governmental entities," "the protection of justified expectations of the parties and to their needs for predictability of result," "the basic policy underlying the particular field of law involved," and "the concerns of judicial administration, such as which of the competing rules will simplify the determination and application of the applicable law." *Gen. Ceramics*, 66 F.3d at 656. The New Jersey Supreme Court has endorsed this interpretation of the Restatement. *Pfizer, Inc. v. Employers Ins. of Wausau*, 154 N.J. 187, 197-98, 712 A.2d 634, 639 (1998). Importantly, "the qualitative, not the quantitative, nature of a state's contacts [to the litigation and to the parties] ultimately determines whether its law should apply." *Veazey*, 103 N.J. at 248, 510 A.2d at 1190.

In its opinion denying Defendants' motion to dismiss on the grounds of *forum non conveniens*, this Court discussed factors also potentially relevant to a choice-of-law analysis. *CSR Ltd. v. Fed. Ins. Co.*, 146 F. Supp. 2d 556, 568-71 (D.N.J. 2001). However, due in part to both the procedural context at that time and the limited record before it, the Court "ma[de] no finding on choice of law considerations" at that time. *Id.* at 571. Therefore, CSR's argument that the Court's prior reasoning somehow controls the Court's current inquiry is incorrect. However, Defendants' effort to persuade this Court to overlook or ignore the Court's own prior comments proves equally unavailing. This Court will take its prior reasoning in this matter into account, fully cognizant of the non-binding nature of the Court's *forum non conveniens* analysis.

29

In its prior Opinion, in the context of weighing the public interests to determine in which

forum CSR's claims should be litigated, this Court observed that the underlying products liability

claims for which CSR seeks reimbursement stem from asbestos contamination at Manville's

New Jersey plant, and "therefore New Jersey has a strong interest in prompt payment of injury

claims for its residents." *CSR*, 145 F. Supp. 2d at 570.  The Court further commented that

"Australia does have an interest in the enforcement of contracts formed in Australia, but New

Jersey's interest in the prompt payment of liability claims is a significant counterweight to

Australia's interests."  *Id.*

These competing state interests  – Australia's interest in governing contracts formed in

Australia and New Jersey's interest in compensation to its injured residents – also inform the

instant decision regarding choice of law.  "New Jersey has a clearly recognized interest in the

compensation of its domiciliaries." *Pine v. Eli Lilly & Co.*, 201 N.J. Super. 186, 192, 492 A.2d

1079, 1082 (App. Div. 1985).  While this "strongly declared" interest may obviously be found in

products liability cases involving "tortious conduct of others regardless of where that conduct

occurs," *id.*, 492 A.2d at 1082-83, this Court previously recognized that interest also attaches in

this contract action because underlying this contract dispute is CSR's effort to obtain

reimbursement for claims brought in significant part by New Jersey Manville employees and

others in New Jersey and elsewhere who were exposed to asbestos products produced and

distributed by Manville.  *CSR*, 146 F. Supp. 2d at 569-70.

Defendants strenuously argue that New Jersey law cannot govern the validity of the

insurance policies here because nearly all of the relevant factual contacts point toward

application of Australian law.  Defendants emphasize that

> (1) not a single act or event relating to the formation of the insurance policies took place in New Jersey, (2) not a single person involved in the formation of the insurance policies came from New Jersey or did anything in New Jersey, [and] (3) none of the misrepresentations and omissions made by CSR Australia were made in New Jersey.

(Defs.' Reply Br. 4.)[14]  CSR responds that several Defendants are United States corporations, two former Defendants who have settled with CSR were New Jersey companies, other Defendants may be found in countries besides Australia, and United States entities played some role in negotiating and managing the policies.  (Pls.' Br. 25-26.)  Yet, CSR does not seriously argue that New Jersey's contacts with the litigation and parties quantitatively outweigh Australia's contacts, and do not dispute that the alleged misrepresentations and omissions which are the subject of the instant motions were made largely in Australia by Australian parties.  However, "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflicts of Law § 188(2).

Defendants also repeatedly argue that all of the relevant parties and witnesses in this matter – those who negotiated, issued, and obtained the post-1978 policies – expected Australian law to apply, and none of these people expected New Jersey law or any other United States law to apply.[15]  CSR contends that "had the Insurers wished to have Australian law apply, they could

---

[14]Although Defendants fail to cite to the Restatement or the extensive body of New Jersey case law interpreting and applying the Restatement's standard, Defendants' explication of the facts supporting application of Australian law mirrors the contacts that § 188(2) of the Restatement urges courts to consider.  More generally, the Court finds puzzling the failure of all parties to cite to or address the relevant sections of the Restatement, given New Jersey's adoption of the Restatement for its choice-of-law analysis.

[15]This Court notes with disappointment that Defendants included a collection of deposition testimony supporting this argument as an Appendix to its brief.  Defendants placed this statement in an Appendix in a rather transparent attempt to avoid the page limitations set forth in Local Civil Rule 7.2(b).  The Court also observes that both CSR and Defendants have

and should have inserted a choice of law provision." (Pls.' Br. 26.)  However, CSR otherwise

fails to dispute that "the protection of justified expectations of the parties and . . . their needs for

predictability of result," *Gen. Ceramics*, 66 F.3d at 656, supports application of Australian law.

Balanced against Australia's interest in enforcing contracts negotiated and formed in

Australia, the quantitative weight of Australian contacts, and the parties' expectations, this Court

must consider the qualitative nature of the contacts between this litigation and New Jersey, and

New Jersey's strong interest in this matter.  New Jersey's interest in compensating its

domiciliaries is "paramount" and may prevail even if there is "little doubt that application of the

'factual contacts' prong of the governmental interest test alone would require" application of

conflicting foreign law.  *Pine*, 201 N.J. Super. 186, 193, 492 A.2d 1079, 1083 (noting, however,

that plaintiff himself was domiciled in New Jersey).  This Court must assess the "the qualitative,

not the quantitative, nature of a state's contacts" to the litigation and to the parties.  *Veazey*, 103

N.J. at 248, 510 A.2d at 1190.  Here, New Jersey's exceedingly strong interest in compensation

of its residents, if CSR prevails on the merits, outweighs the strong interest Australia has in

applying its law to this issue and the quantitatively high number of contacts Australia has with

this litigation.  While the contracts at issue were negotiated and formed primarily in Australia by

Australian parties, the coverage CSR seeks under these policies is for United States claims, and

particularly for many New Jersey claims.  No underlying Australian insurance claims are at issue

_____

placed lengthy paragraphs of argument, in the briefs on the instant motions and other pending
motions, into bullet-pointed, single-spaced text in obvious attempts to circumvent the intent of
Rule 7.2(b)'s page limitations.  The Court expects all parties to adhere strictly to the limitations
of the Local Rules in all future submissions and avoid artificial ruses designed to expand the
length of briefs.

in this matter.[16]

Defendants object that "CSR Australia . . . has paid millions in claims and settlements to New Jersey domiciliaries, none of whom stand to benefit should CSR Australia prevail in this motion or proceeding."  (Defs. Reply Br. 10 n.7.)  In its *forum non conveniens* opinion, this Court addressed this argument in the context of deciding whether New Jersey was an appropriate forum for this matter.  The Court stated that "[d]eclining CSR jurisdiction because its subsidiary has already paid a large proportion of the claims owed against it could discourage prompt payment of the remaining claims, and could also inhibit prompt payment of claims in future cases."  *CSR*, 146 F. Supp. 2d at 570.  Of course, denying CSR *jurisdiction* is a far different matter than applying the law of the jurisdiction that CSR properly chose.  Yet the same policy concern motivates the court here: reimbursement to CSR for compensation it has paid to New Jersey residents allegedly injured by CSR underlies this insurance contract dispute.  New Jersey has an exceedingly strong interest in ensuring prompt compensation where warranted for its residents when they are injured by dangerous materials.

---

[16]The Third Circuit's decision in *NL Industries, Inc. v. Commercial Union Insurance Co.*, 65 F.3d 314 (3d Cir. 1995), is distinguishable. In *NL Industries*, Judge Becker for the court held that New York law, rather than New Jersey law, should apply to an insurance contract negotiated and entered into in New York and where the parties reasonably expected New York law would control. *Id.* at 325-29.  However, the only contact between New Jersey and the litigation was the fact that plaintiff was incorporated in New Jersey. *Id.* at 325.  Therefore, the Third Circuit found New Jersey to have a negligible interest in the matter, which concerned compensation for claims paid by plaintiff in lead paint litigation governed by Pennsylvania and Louisiana law. *Id.* at 316 (finding that "New Jersey has none of the contacts with or interests in the litigation" and "[s]ignificantly, none of the underlying tort claims involved New Jersey plaintiffs"); *see also id.* at 326.  Here, however, the underlying claims seek reimbursement for a substantial number New Jersey claims governed by New Jersey law.  Far from having no interest in the contracts or underlying claims, as in *NL Industries*, New Jersey here enjoys a substantial interest in the ultimate compensation of its own residents.

This Court takes seriously, as required by New Jersey choice-of-law principles, the expectations of the parties urged on the Court by Defendants.  However, after careful consideration, this Court concludes that the justified expectations of many parties, while a significant concern, do not outweigh New Jersey's "paramount" interest in fostering prompt compensation of its residents through reimbursement for such claims.[17]  Indeed, as CSR contends, Defendants could easily have included an Australian choice-of-law provision in its CSR policies.  The lack of a choice-of-law provision alone does not require application of New Jersey law.  But in the face of the strong interest New Jersey has in this matter, the reasonable expectations of the parties must yield, however important they might be.[18]

Based on the foregoing analysis, this Court concludes that New Jersey law applies to the

---

[17]CSR places significant emphasis on this Court's prior finding in its *forum non conviens* opinion that "residents of Wittenoom do not have a public interest in this litigation" because this litigation "does not impact residents of Wittenoom, but only addresses the insurance claims of the New Jersey employees who were exposed to CSR's asbestos."  *CSR*, 146 F. Supp. 2d at 570.  CSR appears to argue based on these statements that Australia has little interest in this matter.  However, Defendants do not argue that Wittenoom in particular has an interest in application of Australian law here, or that Australia's interest stems from the "great harm to the community" caused by CSR's Wittenoom mine.  *Id.*  Rather, Defendants contend that Australia's significant interest in enforcement of contracts formed within its borders requires application of Australian law.  While this Court disagrees, the Court notes that it will apply New Jersey law not because Australia has little or no interest in this matter, but because New Jersey's strong interest outweighs Australia's interest.

[18]In addition, CSR's claims rest in part on the notion that Defendants, even though they "expected" Australian law to apply, nonetheless should have known that their policies covered the New Jersey and other United States claims CSR presented to them.  As intimated earlier, many factors of the choice-of-law analysis are intertwined with the substantive merits of this matter, no matter which law governs the merits.  The Court expresses no opinion at this time on substantive issues not raised by the instant motions.

contract issues raised in this motion.[19]

## II.     Defendants' Motion for Partial Summary Judgment Declaring the Policies Null and Void

Turning to the merits of the instant motions, Defendants argue that this Court should

grant summary judgment on its defense that the policies under which CSR sues are invalid due to

CSR's alleged misrepresentations to and omissions from Defendants of material facts in

obtaining and renewing the policies.  As discussed above, Defendants' argument amounts to a

claim for rescission of the policies.[20]

_____

[19]The Restatement urges courts to consider the "ease in the determination and application of the law to be applied" in making choice-of-law determinations.  Restatement (Second) of Conflict of Laws § 6(2)(f).  The Third Circuit has commented that this factor "requires the court to consider the concerns of judicial administration, such as which of the competing rules will simplify the determination and application of the applicable law."  *Gen. Ceramics*, 66 F.3d at 656.  The New Jersey Supreme Court has described the inquiry under this factor as "whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen" and "what choice of law works best to manage adjudication of the controversy before the court."  *Pfizer*, 154 N.J. at 199, 712 A.2d at 640.

This Court concludes that the exceedingly strong interest New Jersey has in this litigation compels this Court to apply New Jersey law to the instant issues.  While not necessary to its analysis, the Court additionally finds that judicial administration concerns also weigh in favor of applying New Jersey law.  Application of New Jersey law will "simplify the determination and application of the applicable law" in this case and foster "[e]fficient administration" of this matter, *id.*, far more than would the awkward exercise of a New Jersey court finding, interpreting, and applying Australian law.  The Court stresses that absent New Jersey's strong interest in this matter, the Court would apply Australian law, and the burden on judicial administration would be unavoidable and not outweigh Australia's significant interests in and contacts with this action.  This Court declines to "overemphasize[]" this factor, because "it is obviously of greater importance that choice-of-law rules lead to desirable results."  Restatement (Second) of Conflict of Laws § 6 cmt. j (noting that this interest still "provide[s] a goal for which to strive").  In light of the New Jersey resident compensation interest, however, concern for judicial administration fortifies this Court's conclusion that New Jersey law should apply.

[20]The Court recognizes, as CSR notes multiple times in its briefs in the instant motions, that Defendants primarily argue in this litigation that "the policies do not (and were never

35

As discussed above, New Jersey law provides that to rescind the insurance policies here on the basis of misrepresentation, Defendants must prove equitable fraud by CSR, which requires establishing "'(1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party.'" *First Am.*, 177 N.J. at 136-37, 827 A.2d at 237 (quoting *Liebling*, 337 N.J. Super at 453, 767 A.2d at 518). Because rescission involves equitable fraud, rather than legal fraud, no proof of scienter, or "'knowledge of the falsity and an intention to obtain an undue advantage therefrom,'" is required. *Farris*, 61 F. Supp. 2d at 339 (quoting *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 609, 560 A.2d 555 (1989)). An insured's representation, "whether contained in the policy itself or in the application for insurance," may serve as the basis for rescission "if it is untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in the issuance of the policy." *First Am.*, 177 N.J. at 137, 827 A.2d at 237 (quoting *Allstate Ins. Co. v. Meloni*, 98 N.J. Super at 158-59, 236 A.2d at 405). The insured must provide truthful answers to specific questions by the insured but generally does not have an affirmative obligation to volunteer material information if the insurer does not specifically ask for that information. *Progressive*, 316 N.J. Super. at 70, 719 A.2d at 687. Furthermore, an answer by an insured to a subjective question, as opposed to an objective one, may not rise to the level of a material

---

intended to) cover Wittenoom asbestos claims." (Defs.' Br. 3 n.1.) They further urge that CSR's alleged "failure . . . to disclose material facts" and CSR's alleged "affirmative representations . . . that there was no coverage for such claims and suits constitutes powerful evidence that no such coverage was intended or was in fact provided." (Defs.' Br. 32 n.21.) The Court expresses no opinion on the coverage issues, which are the subject of other pending motions for partial summary judgment. The Court merely notes its understanding that Defendants' argument regarding the *validity* of the policies does not amount to any concession regarding the scope of coverage under those policies.

misrepresentation if that answer is "'a correct statement of the applicant's knowledge and belief.'" *Ledley*, 138 N.J. at 636, 651 A.2d at 96 (quoting *Ettelson*, 164 F.2d at 665).

Finally, rescission is an equitable remedy left to the discretion of the court. *Farris*, 61 F. Supp. 2d at 336. Because it is an equitable remedy, a court granting rescission should strive "in so far as practicable" to return the parties to their original position. *Notch View Assocs.*, 260 N.J. Super. at 197-98, 615 A.2d at 680. The remedy also may not be granted "'where the claimant has not acted within a reasonable time or where there has been substantial performance.'" *Farris*, 61 F. Supp. 2d at 336 (quoting *Notch View Assocs.*, 260 N.J. Super at 197, 615 A.2d at 680). The parties inexplicably fail to address the equitable nature of the remedy Defendants seek and fail to discuss whether this issue is one for a jury or for the Court. In *Farris*, the court denied defendant's motion for summary judgment on plaintiff's rescission claim and concluded that "although this Court sits in equity in resolving [plaintiff's] claim for rescission or reformation on the basis of fraud, given these factual disputes, I cannot determine, without taking testimony and assessing the credibility of the witnesses, whether [certain parties] made material misrepresentations of a presently existing fact." *Id.* at 339.

Similar concerns dictate the Court's decision on the instant motion. Defendants' allegations supporting their claim for rescission may be divided into two general types: omissions to disclose certain information, and misrepresentations regarding information provided to Defendants. Alleged omissions of material fact by CSR and advanced as grounds for rescission by Defendants include: 1) failure to disclose Wittenoom asbestos studies produced between 1968 and 1978; 2) failure to disclose the October 1978 memo regarding CSR's deliberations over liquidating Midalco; 3) failure to disclose Wittenoom claims in the "loss

runs"; and 4) failure to disclose the existence of CSR's captive insurance coverage from CSRI. Misrepresentations alleged by Defendants include: 1) misrepresentations in the 1978 and 1980 Marsh Marketing reports; 2) misrepresentations concerning the scope of CSR's exports to the United States; 3) misrepresentations in the 1985-88 umbrella liability insurance proposal forms; and 4) miscellaneous misrepresentations by CSR officials to officials of the insurers regarding CSR's understanding of the scope of coverage.  This Court concludes that summary judgment is inappropriate with regard both to the alleged omissions and alleged misrepresentations.

> a.    *Omissions*

Under New Jersey law, omission of material facts from an insurer does not amount to equitable fraud absent "'clear proof of a fraudulent or intentional suppression of a fact." *Fid. & Deposit Co.*, 653 F.2d at 775 n.11 (quoting *Goldstein*, 14 N.J. Super. at 218, 81 A.2d at 799).  An omission of this type may be found where the insurer's inquiries fail to elicit the particular facts, even if they later prove material to the insurer's decision whether to extend coverage. *Progressive*, 316 N.J. Super. at 70, 719 A.2d at 687.  Therefore, while equitable fraud as a basis for rescission does not require scienter with regard to *misrepresentations*, a court must find proof of intent to rescind a contract on the basis of *omissions*.

To find that any of the alleged omissions could serve as the basis for rescission, this Court must be able to hold that no genuine issues of material fact exist as to: 1) whether Defendants inquired with requisite specificity about the various facts allegedly omitted; and 2) if not, whether CSR engaged in fraudulent or intentional suppression of a fact.  On the record before the Court at this time, this Court simply cannot make such findings.

The parties vigorously contest the content and materiality of the various omissions by CSR allegedly relevant to Defendants' decision whether to extend coverage, and such disputes alone would be sufficient to deny summary judgment. For example, the parties debate at length the content of the asbestos studies. Because this case involves United States asbestos-related liabilities, CSR contends that information regarding conditions at the Wittenoom mine – the primary subject of the identified studies – is "wholly immaterial" to this matter. (Pls.' Br. 34.) According to CSR, then, "[f]urther information in the form of studies of Wittenoom Mine health hazards would constitute mere details regarding general information of which the Insurers were already aware." (*Id.* 34-35.) Defendants, of course, dispute this categorization of the studies and their materiality.

However, Defendants fail to demonstrate to this court that no genuine issue of material fact exists, either regarding the asbestos studies or any other asserted omission, with respect to the issues identified above: the specificity of inquiry and proof of fraud or intentional suppression.[21] CSR's briefing also largely fails to illuminate these points. Defendants argue

---

[21]Defendants' briefing on the substantive merits of their motion relies entirely on Australian law, and does not include any alternative argument concerning the merits of their motion under New Jersey contract law. For example, Defendants claim that CSR's failure to provide the asbestos studies violated their duty of "utmost good faith," which is an Australian law standard, not a New Jersey one. (Defs.' Br. 15.) Defendants do not account, for example, for New Jersey law's lack of an affirmative obligation for insureds to disclose material information unless asked by the insurer. As discussed, Defendants also do not provide specific argument on the relevant facts required for rescission under New Jersey law. CSR takes this mode of argument to indicate that Defendants "essentially concede[] they have no hope of succeeding on their avoidance claims under New Jersey law." (Pls.' Br. 26.) This Court certainly does not construe Defendants' briefs as amounting to a concession. However, the Court notes that Defendants unfortunately did not provide the Court any guidance on how to assess their motion under New Jersey law, despite their filing of two otherwise exhaustive, arguably overlong briefs on the instant motions.

generally that "this information was specifically requested during the renewals."  (Defs.' Br. 35 (emphasis omitted).)  However, while Defendants provide some evidence that the insurers would have found the allegedly omitted information material, they do not provide undisputed factual support for the charge that this information was specifically requested.  Furthermore, disputed facts remain regarding whether Defendants' inquiries in this regard, if any, were subjective or objective in nature.

On the record before the Court, "given these factual disputes, [the Court] cannot determine, without taking testimony and assessing the credibility of the witnesses," whether rescission is required as a matter of law on the basis of the alleged omissions.  *Farris*, 61 F. Supp. 2d at 339.  Accordingly, the Court declines to grant Defendants' motion for partial summary judgment on the grounds of rescission arising from alleged omissions.

b.   *Misrepresentations*

As with the omissions, the parties heatedly dispute the content and materiality of the alleged misrepresentations.[22]  For example, the parties contest whether the specific matters identified in the 1978 Marsh Marketing Report constituted the entire universe of risks Defendants agreed to cover and whether some covered risks were unable to be identified at that time or unnecessary to include in the report.  In addition, with regard to CSR's misrepresentations regarding the scope of their United States exports, Defendants rely upon the deposition of Payne and his memory of a conversation regarding exports.  CSR disputes the

---

[22]To the extent that grounds classified as misrepresentations also include allegations of omissions, such as with regard to the alleged non-disclosures on the umbrella liability proposal forms, summary judgment is denied for the same reasons as stated previously.

substance of what Payne was told by CSR and/or its representatives.  The same faulty reliance on

disputed testimony by Defendants' witnesses may be found with respect to the alleged

misrepresentations in various letters from CSR and particularly certain conversations between

Defendants and CSR officials.  With regard to CSR's responses to Questions 14(a) and (b) on the

various umbrella liability insurance proposals, disputed factual issues exist regarding veracity

and scope of CSR's responses, the understanding of these answers by CSR and the insurers, and

the degree to which CSR's Annual Reports were considered and may be deemed responsive.

In summary, these issues are simply inappropriate for resolution in favor of either

Plaintiffs or Defendants on summary judgment and require the elicitation of testimony and

assessment of credibility.  Additionally, the parties fail to address the equitable concerns this

Court must consider in weighing whether to grant rescission, including the ability to return the

parties to their original position and whether there has been substantial performance.  For these

reasons, Defendants' motion for partial summary judgment is denied.


III.     **CSR's Cross-Motion for Partial Summary Judgment on Defendants' Rescission Claims on Grounds of Statute of Limitations, Waiver, and Laches**

CSR cross-moves for partial summary judgment on Defendants' claims that the policies

are null and void.  CSR argues that because Defendants knew of CSR's asbestos exposure by

1981 at the latest, and did not seek the remedy of rescission until the filing of its defenses and

counterclaims in this action, the defenses and counterclaims are barred by New Jersey's six-year

statute of limitations and the doctrines of waiver and laches.  The same governmental-interest

test which governs the determination of the substantive law that will apply also dictates whether

41

Australian or New Jersey law on limitations, waiver, and laches will apply. *See, e.g.*, *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 472-73 (D.N.J. 1999). For the reasons stated above, this Court will apply New Jersey law to the additional issues raised by CSR's cross-motion.

CSR argues that because Defendants knew of their exposure on CSR's United States asbestos-related claims well before filing their claims and defenses in this action, Defendants' counterclaims and defenses are time-barred. New Jersey law provides a six-year statute of limitations for contract actions and for fraud actions. N.J.S.A. § 2A:14-1. Defendants observe that CSR did not tender any asbestos claims to Defendants until the November 1991 demand, and Defendants first gave notice of possible rescission claims in their February 1992 letter denying coverage. After CSR withdrew its claim for coverage in a March 17, 1992 letter, the validity of which is the subject of separate pending motions, Defendants had no reason to proceed with any rescission claims. Defendants raised their rescission claims in this action upon resumption of litigation in New Jersey after the High Court of Australia ruled that the issues raised in Defendants' Australian suit must be litigated in this action.

This is not a case where Defendants clearly knew of their exposure on CSR's United States asbestos-related claims and simply, as CSR suggests, "sat on the sidelines" and raised their counterclaims "long after [they] knew of [their] exposure." *Aetna Cas. & Sur. Co. v. Columbia Cas. Co.*, No. 95-C-4367, 1996 WL 182562, at *2 (N.D. Ill. Apr. 15, 1996). When Defendants became aware of the specific exposure alleged here forms a central disputed question in this matter, and therefore this Court will not deem Defendants' actions untimely and foreclose fair resolution of that central issue. This Court is satisfied at this time that Defendants filed their counterclaims timely in this action.

Similarly, the doctrines of waiver and laches do not bar the rescission claims.  Defendants did not knowingly relinquish their right to rescission such that the doctrine of waiver would bar the claims.  The court also declines to exercise its equitable power to dismiss these claims on the basis of laches as there has been no unreasonable delay by Defendants in raising their claims.

For these reasons, CSR's cross-motion for summary judgment dismissing Defendants' counterclaims and defenses is denied.


### *Conclusion*

For the foregoing reasons, Defendants' motion for partial summary judgment declaring the policies null and void is DENIED, and Plaintiff's related cross-motion is DENIED.

Newark, New Jersey
Dated: November 21, 2005                                    /s Harold A. Ackerman
                                                           U.S.D.J.