FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| CSR LIMITED and RINKER MATERIALS | ) | |
| CORP. (f/k/a CSR AMERICA, INC.), | ) | Hon. Harold A. Ackerman |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 95-2947 (HAA) |
| | ) | |
| v. | ) | **AMENDED** |
| | ) | **OPINION AND ORDER**[*] |
| CIGNA CORPORATION, et al., | ) | |
| | ) | [*]Unseals Opinion and Order filed |
| Defendants. | ) | under seal on December 13, 2005. |

_____

Andrew T. Berry, Esq.
Gita F. Rothschild, Esq.
MCCARTER & ENGLISH LLP
Four Gateway Center, 100 Mulberry Street
Newark, New Jersey  07102-4096

Mark F. Rosenberg, Esq.
Keith McKenna, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
*Attorneys for Plaintiffs CSR Limited and Rinker Materials Corporation*

Thomas R. Curtin, Esq.
Kathleen N. Fennelly, Esq.
GRAHAM CURTIN & SHERIDAN
4 Headquarters Plaza – Box 1991
Morristown, New Jersey  07962

Paul R. Koepff, Esq.
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, New York  10036
*Attorneys for Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, and Insurance Company of North America (UK) Ltd.*

1

Kevin T. Coughlin, Esq.
COUGHLIN DUFFY, LLP
350 Mt. Kemble Avenue
Morristown, New Jersey 07962-2075
*Attorneys for Certain of the Australian, European, and London Market Insurer Defendants*

**ACKERMAN, Senior District Judge:**

This matter comes before the Court on the motions for partial summary judgment filed by Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, Insurance Company of North America, Insurance Company of North America (UK) Ltd., and Certain of the Australian, European, and London Market Insurer Defendants (collectively "Defendants" or "Insurers"), and the motion and cross-motions for partial summary judgment filed by Plaintiffs CSR Limited and Rinker Materials Corporation (collectively "CSR" or "Plaintiffs").

The parties have filed a total of sixteen motions and cross-motions for partial summary judgment in this matter. This Opinion and Order will only address the motions styled as Defendants' Motion for Summary Judgment Dismissing Counts III and IV for Lack of Subject Matter Jurisdiction and Plaintiffs' Cross Motion that this Court Does Have Subject Matter Jurisdiction over Plaintiffs' Federal and New Jersey Antitrust Claims. The Court will resolve the other pending summary judgment motions in this matter in subsequent opinions.

For the following reasons, Defendants' motion for summary judgment dismissing Counts III and IV for lack of subject matter jurisdiction is GRANTED in part and DENIED in part. The Court will dismiss Counts III and IV of Plaintiffs' Second Amended Complaint with regard to CSR Limited for lack of subject matter jurisdiction, and will exercise subject matter jurisdiction over Counts III and IV with regard to Rinker Materials Corporation (f/k/a CSR America, Inc.).

Plaintiffs' related cross-motion is DENIED.


### Background

Plaintiff CSR Limited ("CSR") is an Australian public company headquartered in Sydney, Australia.  From 1949 to 1966, CSR sold raw asbestos fiber mined by one of its subsidiaries, Midalco Pty Limited ("Midalco").  Midalco mined this asbestos fiber from a mine owned by Midalco in Wittenoom, Western Australia ("Wittenoom" or "Wittenoom mine").  CSR sold raw asbestos fiber from its Wittenoom mine to, among others, Johns-Manville Corporation ("Manville"), which operated its main plant in Manville, New Jersey.  CSR first delivered Wittenoom asbestos to Manville in 1949, and its last sale of asbestos to Manville occurred in or about 1966.  In 1966, the Wittenoom mine closed and asbestos-mining activities at the mine ceased.  CSR's sales of raw asbestos fiber to Manville have resulted in the initiation of more than 129,000 asbestos-related personal injury claims in the United States against CSR Limited and/or its American subsidiary CSR America, Inc., presently known as Rinker Materials Corporation (hereinafter "CSR America").  These claims have been brought by persons suffering exposure to raw asbestos fiber at or in the vicinity of Manville plants in New Jersey and elsewhere, and to finished Manville products containing asbestos mined and sold to Manville by CSR.

Defendants comprise various insurance companies who issued or subscribed to primary or umbrella excess general liability insurance policies in favor of CSR during the period of November 2, 1978 to March 31, 1989 ("post-1978 policies").  These Defendants include: Insurance Company of North America and its subsidiaries, including its Australian subsidiary, Insurance Company of North America (Australia) Limited, later known as CIGNA Insurance

Company (Australia) Ltd. ("INA" or "CIGNA");[1] and various other insurance companies known in this litigation as Certain of the Australian, European, and London Market Insurer Defendants (Coughlin Duffy or "CD Defendants").  INA was the lead primary insurer on the post-1978 policies and also served as the lead insurer on some of the umbrella and excess insurance layers. As lead insurer on a significant portion of the policies, INA/CIGNA conducted the majority of the administration of, negotiations over, and renewal of the post-1978 policies.

In 1981, CSR first notified its pre-1978 insurers of its asbestos claims in the United States and that CSR might seek indemnity from those insurers.  CSR first presented formal notice of demand for indemnification for asbestos-related claims to the Defendant post-1978 Insurers in a letter dated November 29, 1991.  (Certif. of Todd G. Cosenza ("Cosenza Certif."), Ex. 7.) Defendants denied CSR's claim for coverage of CSR's United States asbestos-related liabilities in a February 20, 1992 letter from Anthony Scotford, an attorney retained by Defendants in relation to CSR's claim.  On March 17, 1992, CSR sent a letter to the Insurers which purported to withdraw its asbestos-coverage claims and acknowledge that the policies did not cover asbestos-related claims stemming from the operation of the Wittenoom mine or the sale of asbestos mined at Wittenoom.  (Cosenza Certif., Ex. 56.)

This action results from Defendants' handling of the November 1991 claims and ultimate denial of coverage for those claims under the post-1978 policies.  CSR also alleges a group

---

[1]CIGNA Insurance Company (Australia) Ltd. has been known as named Defendant ACE Insurance Ltd. since July 1999.  (Second Am. Compl. ¶ 15.)  For simplicity, the Court will refer to the entire group of Defendants once known as or affiliated with INA or CIGNA as "INA" or "CIGNA" unless specifically referring to a specific subentity or affiliate.  In any event, the various INA and CIGNA entities have jointly filed Defendants' various motions for partial summary judgment with the other Defendants in this matter and have joined in all briefs relevant to these motions.

boycott by the Defendant Insurers in which Defendants threatened denial of new or renewal insurance for CSR unless CSR withdrew its November 1991 request for coverage. CSR's Second Amended Complaint ("SAC") alleges federal antitrust claims under Section 1 of the Sherman Act (Count III) and New Jersey state antitrust claims under N.J.S.A. § 56:9-3 (Count IV).

The instant motions do not broadly implicate the substantive merits of CSR's group boycott claim and therefore do not require this Court to revisit its prior discussion of the per se and Rule of Reason approaches, or to determine which analysis will ultimately apply in this matter. Rather, Defendants in their instant motion challenge this Court's subject matter jurisdiction over CSR's federal and state antitrust claims under the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a. As discussed in great detail later in this opinion, the FTAIA sets forth conditions on jurisdiction under the Sherman Act over claims involving trade or commerce with foreign nations and focuses primarily on the general nature of the alleged conduct and especially the geographic focus of that conduct's alleged anticompetitive effects. Because the parties do not seek summary judgment on the merits of CSR's antitrust claims, this Court need not delve into the extensive, disputed factual background produced during discovery concerning the minute details and alleged proofs of the claimed group boycott here.

However, as will be seen, the jurisdictional requirements outlined in the FTAIA may not be easily distinguished from certain substantive antitrust elements, such as antitrust injury. Therefore, the Court will briefly discuss, for background and jurisdictional purposes only, general factual allegations regarding the workings of the alleged boycott itself and the evidence

relevant to proof of concerted action.  The Court stresses that it does not purport to make conclusive factual findings on the merits in this opinion, and only discusses background facts to the extent necessary for clarity and to provide the basis for the Court's jurisdictional analysis.

CSR alleges that Defendants jointly decided to "link renewal of CSR's 1992-93 worldwide insurance coverage to withdrawal" of CSR's asbestos-related claims (Pls.' Br. 12), and that Defendants initially represented to CSR and its insurance broker that treatment of the asbestos-related claims had nothing to do with the renewal issue (*id.* 12-13).  CSR also alleges that in addition to a group boycott, Defendants made misrepresentations concerning CSR to others in the insurance market in an effort to prevent CSR from obtaining alternative coverage. (Pls.' Br. 19.)

The instant motions require particular focus on the geographic location of the alleged actions and their effects.  Defendants stress that CSR directed its insurance and risk management activities out of its Sydney headquarters, used Australian and British insurance brokers, and dealt primarily with INA/CIGNA's Australian affiliate, CIGNA Insurance Company (Australia) Limited, now known as ACE Insurance Ltd.  They claim that the parent American corporations INA and CIGNA never issued any insurance policy to CSR.

CSR emphasizes that the renewal coverage at issue was global and included coverage for risks incurred in the United States.  Plaintiffs note that several of the defendants are United States corporations or subsidiaries of American corporations, including INA, the parent company of the Australian INA affiliate with which CSR primarily dealt.  Plaintiffs further argue that officials and entities in the United States played significant roles in managing and negotiating CSR's insurance coverage and in facilitating the alleged group boycott, and that insurance officials in

6

the United States at the very least monitored and offered advice to the Australian officials.  (Pls.'
Br. 20-21 & n.10.)

Plaintiffs also observe that Plaintiff CSR America is a United States corporation.
Defendants emphasize their view that CSR America was not included in the renewal proposals at
issue here and that CSR America obtained renewal for the implicated policy year on its own from
United States insurers.  While renewal of coverage for the parent company CSR forms the
primary basis for Plaintiffs' antitrust claims, the parties dispute the extent to which the boycott
also impacted CSR's ability to secure alternative coverage in the United States through its
subsidiary CSR America.  Finally, CSR emphasizes that the claimed group boycott's underlying
purpose was to avoid Defendants' alleged obligations to provide coverage for CSR's United
States asbestos-related liabilities.

CSR filed its Complaint in the instant action on June 23, 1995.  After extensive,
international discovery under the supervision of two court-appointed special masters, the parties
filed sixteen motions for partial summary judgment, including the instant motions.


## *Analysis*

### I.     **Standard of Review**

Defendants filed their motion as one for partial summary judgment, and Plaintiffs
similarly deemed their cross-motion a partial summary judgment motion.  However, this Court
may not simply accept the parties' labels and mechanically apply generic summary judgment
standards.  While the parties agree that their motions seek "summary judgment," they advance
differing positions regarding whether Defendants' motion presents a facial or factual challenge to

7

this Court's subject matter jurisdiction and relatedly whether this Court should consider only

Plaintiffs' allegations or should instead weigh the evidence in making its jurisdictional analysis.

Therefore, before assessing the impact of the FTAIA on this matter, this Court must consider the

nature of Defendants' argument and its implications for the Court's standard of review.

A.      Rule 12(b)(1) Standards, Rather Than Rule 56 Standards, Apply to the Instant
        Motions

Several courts have addressed whether the FTAIA establishes jurisdictional prerequisites

or instead provides additional substantive elements of an antitrust claim.  Our Circuit has

considered challenges under the FTAIA as questioning the court's subject matter jurisdiction.

*Turicentro, S.A. v. American Airlines Inc.*, 303 F.3d 293, 300 (3d Cir. 2002).  After extended

analysis, the Seventh Circuit agreed that the FTAIA limits a federal court's subject matter

jurisdiction and does not merely impose additional substantive elements to an antitrust claim

involving foreign conduct.  *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946-52

(7th Cir. 2003) (en banc); *see also United States v. LSL Biotechnologies*, 379 F.3d 672, 679-80 &

n.5 (9th Cir. 2004) (holding that FTAIA provides the "binding test for determining jurisdiction

over foreign restraints of trade" and citing cases from the Third, Fifth, Seventh, and District of

Columbia Circuits).

The Seventh Circuit in *United Phosphorus* observed that if the FTAIA merely created

additional substantive elements, then arguments to dismiss antitrust claims under the FTAIA

would be properly analyzed under summary judgment standards pursuant to Federal Rule of Civil

Procedure 56.  322 F.3d at 946.  However, challenges to subject matter jurisdiction properly arise

under Federal Rule of Civil Procedure 12(b)(1) and must be assessed by the different review standards Rule 12 dictates. *Id.* The Seventh Circuit therefore applied Rule 12(b)(1) to the FTAIA challenge before it. *Id.* at 952-53. Our own Circuit has similarly applied Rule 12(b)(1) standards to FTAIA challenges. *Turicentro*, 303 F.3d at 300 & n.4. Therefore, although the parties deem their motions as ones seeking partial summary judgment, Defendants' motion may only be properly construed as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

The Court surmises that Defendants might have filed their instant jurisdictional motion under Rule 56 rather than under Rule 12 to avoid filing what would be Defendants' third motion to dismiss CSR's antitrust claims.[2] This Court first denied Defendants' Rule 12(b)(6) motion to dismiss these claims, and later denied Defendants' Rule 12(b)(2) motion to dismiss this entire action for lack of personal jurisdiction or on the ground of *forum non conveniens*. However, as discussed further below, in its Rule 12(b)(6) motion, Defendants only argued that CSR had failed to allege conduct which could be deemed per se unreasonable and that Plaintiffs failed to plead antitrust injury. These contentions questioned whether Plaintiffs stated a claim upon which relief could be granted. Defendants did not advance any challenge to this Court's subject matter jurisdiction over Plaintiffs' antitrust claims, and this Court therefore did not consider any such theory. Similarly, Defendants' Rule 12(b)(2) motion had nothing to do with subject matter jurisdiction.

Defendants might have wanted to avoid filing a third Rule 12 motion, but any hesitation

_____

[2]Plaintiffs also make this inference, commenting that Defendants filed this motion under Rule 56 because they "perhaps [did] not want[] to strike out three times under Rule 12(b)." (Pls.' Br. 3.)

on that ground is unfounded.[3]  Objections to subject matter jurisdiction may not be waived, and

indeed the Court may determine whether it has subject matter jurisdiction on its own motion, sua

sponte.  *See, e.g.*, *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 346-47 (3d Cir. 2003); Fed. R. Civ.

P. 12(h)(3).  As discussed later in this opinion, this Court's holdings and reasoning in denying

Defendants' prior Rule 12 motions do not restrict the jurisdictional analysis here nor do they

somehow insulate Plaintiffs' claims from a jurisdictional attack with regard to subject matter

jurisdiction.

 For these reasons, the Court will consider the instant motions under the review standards

of Rule 12(b)(1).[4]

---

[3]While Defendants argue for the application of generic summary judgment standards (*e.g.*, Defs.' Reply Br. 2-4), their specific contentions regarding the burden of proof and the authority of this Court to consider the entire record make clear that Defendants understood that Rule 12(b)(1) standards should apply.  Defendants cite to and quote the Third Circuit's discussions of "in fact" challenges to subject matter jurisdiction in arguing that the Court may weigh jurisdictional evidence and that disputed material facts should not preclude consideration of jurisdictional claims.  (Defs.' Br. 12 n.17 (quoting *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) and citing *Turicentro*, 303 F.3d at 300 n.4.)  Both of these cases clearly apply Rule 12(b)(1) standards to FTAIA challenges.  Defendants even cite approvingly to *United Phosphorus*, which expressly rejected the notion that FTAIA challenges should be assessed under summary judgment rules.  (Defs.' Br. 12 n.17.)  As Defendants' own argument and citations illustrate, Defendants simply did not need to file their motion under Rule 56 in order for the Court to consider the entire record relevant to jurisdictional facts.

[4]Treating Defendants' motion as a motion to dismiss under Rule 12(b)(1) also requires this Court to consider the status of Plaintiffs' cross-motion for summary judgment.  Of course, CSR's motion cannot be viewed as a "cross-motion to dismiss" its own claims.  Rather, it perhaps may best be analogized to a motion for a declaratory judgment.  Plaintiffs contend that it filed its cross-motion "[t]o avoid further redundant motions on defendants' part," and that its cross-motion asks that the Court "further affirmatively hold that the Court does have subject matter jurisdiction over plaintiffs' antitrust claims."  (Pls.' Br. 6.)  However, as discussed later in this opinion, the Court rejects the notion that Defendants' instant motion is somehow redundant or moot.  Furthermore, a motion asking the court to declare that it "does have subject matter jurisdiction" makes little logical sense, and seems to this Court to be a rather transparent attempt

B.    Defendants Present a Factual Challenge to This Court's Jurisdiction

As the Third Circuit noted in considering an FTAIA jurisdictional challenge in

*Turicentro*, "[c]hallenges to subject matter jurisdiction under Rule 12(b)(1) may be 'facial' or

'factual.'"  303 F.3d at 300 n.4.  Facial attacks "contest the sufficiency of the pleadings, and the

trial court must accept the complaint's allegations as true." *Id.* "In contrast, a trial court

considering a factual attack accords plaintiff's allegations no presumption of truth.  In a factual

attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow

affidavits, documents, and even limited evidentiary hearings." *Id.* A defendant challenging

subject matter jurisdiction "in fact" "dispute[s] the existence of certain jurisdictional facts alleged

by the plaintiffs." *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d

Cir. 2000).

Defendants "strongly contest but concede <u>arguendo</u> for the purposes of this motion" that a

group boycott occurred (Defs.' Reply Br. 1-2), and argue that jurisdiction depends on where any

alleged resulting injury occurred, not whether a boycott occurred.  Plaintiffs argue that because

Defendants assume the existence of an antitrust boycott and thereby do not "dispute the existence

_____

by Plaintiffs to enjoy additional opportunities to present its argument to this Court by way of a
lengthier response brief and a reply brief.  Defendants might have opened the door to this
questionable tactic by improperly identifying its motion as one for summary judgment rather than
as a motion to dismiss.  Yet Plaintiffs themselves called Defendants' motion a "hybrid Rule
56/Rule 12(b)(1) challenge" (Pls.' Reply Br. 1) and argued for application of Rule 12(b)(1) facial
challenge standards to Defendants' motion.  Plaintiffs certainly understood that Defendants'
motion was not one for summary judgment, yet they proceeded to file a "cross-motion" for
summary judgment in any event.
     The instant motions have been pending for over a year, and it would therefore be
inequitable at this late date to reject Plaintiffs' reply brief due to the suspect nature of its "cross-
motion."  However, the Court will focus its analysis on Defendants' motion, and reiterates that
Plaintiffs' cross-motion for summary judgment is procedurally dubious at best.

of certain jurisdictional facts alleged by the plaintiffs," *Carpet Group*, 227 F.3d at 69,

Defendants' challenge is a facial attack, and the Court therefore need only consider "'whether the

allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the

jurisdiction of the district court.'" *Turicentro*, 303 F.3d at 300 (quoting *Licata v. United States

Postal Serv.*, 33 F.3d 259, 260 (3d Cir. 1994)).  However, *whether* a boycott occurred is not a

*jurisdictional* fact.  The FTAIA, which establishes jurisdictional limits on foreign antitrust

claims, focuses on the particular kind of trade or commerce involved in the alleged antitrust

conduct and the geographic impact of the alleged effects of such conduct.  Defendants may

concede, for purposes of this motion, the *existence* of a group boycott while still heatedly

contesting, based on the record, the impact of that boycott.  Although they argue for facial

standards to apply, Plaintiffs nonetheless also argue extensively from the evidentiary record as

well as the allegations of their SAC, suggesting that the instant motion presents a factual

challenge.

       This Court concludes that Defendants' challenge to this Court's subject matter

jurisdiction constitutes a "factual" attack, because Defendants dispute jurisdictional facts

regarding the effects of their alleged antitrust conduct and go well beyond merely accepting

Plaintiffs' allegations in the SAC.  This Court will therefore "weigh the evidence relating to

jurisdiction" and not accord CSR's allegations any "presumption of truth."  *Turicentro*, 303 F.3d

at 300 n.4.[5]  "In addition, the burden of proving the existence of subject matter jurisdiction lies

_____

     [5]In arguing for application of these "in fact" standards, Defendants necessarily inform this
Court that "the existence of disputed material facts will not preclude the trial court from
evaluating for itself the merits of jurisdictional claims."  (Defs.' Br. 12 n.17 (quoting *Carpet
Group*, 227 F.3d at 69 (internal quotation omitted)).)  This argument only fortifies the Court's
conclusion that Rule 56 summary judgment standards, which indeed preclude the Court from

with the plaintiff[s]."  *Carpet Group*, 227 F.3d at 69 (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

## II.    This Court's Prior Decisions Regarding Dismissal of Antitrust Claims Do Not Dictate the Result of the Instant Motions

Plaintiffs strenuously argue that this Court's prior decisions denying Defendants' motions to dismiss, particularly its decision denying Defendants' Rule 12(b)(6) motion to dismiss the antitrust claims for failure to state a claim, dictate that Defendants' current effort to dismiss the antitrust claims must fail.  Plaintiffs contend that in the instant motion, Defendants merely reiterate previously rejected arguments or "recast" them as pertaining to subject matter jurisdiction, and even suggest that Defendants have shown "[o]bstinate persistence" and "disregard for this Court's prior rulings."  (Pls.' Br. 1.)

However, as suggested earlier in this Opinion, this Court's prior decisions have no controlling effect on the issues raised by the instant motion.  This Court previously denied Defendants' motion to dismiss Plaintiffs' antitrust claims, as alleged in the First Amended Complaint, under Federal Rule of Civil Procedure 12(b)(6).  *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559 (D.N.J. 1998).  In its motion to dismiss, Defendants argued that CSR failed to allege conduct which could be deemed per se unreasonable and that Plaintiffs failed to plead antitrust injury.  This Court held that it could not determine at that stage whether it would apply a per se analysis or the Rule of Reason in evaluating Defendants' conduct, *id.* at 564-65, and similarly concluded that Plaintiffs did not need to plead antitrust injury separately to survive a

---

granting summary judgment in the face of disputed material facts, do not apply here and that Defendants' motion must be construed as one arising under Rule 12(b)(1).

motion to dismiss, *id.* at 566.  This Court stated that analysis with regard to both issues would be more properly conducted after discovery.  *Id.* at 565, 566.  Contrary to Plaintiffs' assertions, this Court did not decide whether Plaintiffs had sufficiently alleged or proven requisite antitrust injury; rather, the Court merely ruled that "an analysis of antitrust injury would be more properly conducted after discovery."  *Id.* at 566.

Therefore, while Defendants' first motion to dismiss might have been premature, the Court's denial of that motion did not preclude determination of any of the issues raised by the instant motion.  A party may raise the issue of subject matter jurisdiction at any time, and, as previously discussed, courts in this Circuit and elsewhere have clearly established that the FTAIA establishes *jurisdictional* prerequisites for foreign antitrust claims, and does not merely impose additional substantive elements which would properly form the subject of a Rule 12(b)(6) motion.

This Court indeed found that the conduct alleged by Plaintiffs "appears to have eliminated competition within the market for general and products liability insurance with respect to plaintiffs."  *CSR*, 40 F. Supp. 2d at 565.  Plaintiffs read this statement to mean that "if plaintiffs prove their allegations, plaintiffs will have established that defendants' challenged conduct had a substantial effect on competition in the general and products liability insurance market *in the United States*."  (Pls.' Br. 31 (emphasis added).)  However, the Court made no *geographical* finding whatsoever, and therefore Plaintiffs' gloss on the Court's reasoning lacks support.  Defendants' instant motion arises under the FTAIA and requires an analysis, in part, of the geographic nature of Plaintiffs' antitrust injury.  Not only did this Court expressly decline to undertake *any* analysis of antitrust injury prior to discovery, *CSR*, 40 F. Supp. 2d at 566, the

Court simply has not previously considered the geographic arguments under the FTAIA raised by the instant motion.

Furthermore, Plaintiffs complain that this Court again rejected Defendants' efforts to dismiss the antitrust claims in its opinion denying Defendants' motion to dismiss for lack of personal jurisdiction or based on the doctrine of *forum non conveniens*. *CSR Ltd. v. Fed. Ins. Co.*, 146 F. Supp. 2d 556 (D.N.J. 2001). Yet, again, the Court did not consider any FTAIA subject matter jurisdiction arguments on this prior motion. Indeed, that motion dealt exclusively with matters of personal jurisdiction and the appropriateness of Plaintiffs' chosen forum. The Court's opinion did not address the substance of Plaintiffs' antitrust claims, and any suggestion by Plaintiffs that the Court's denial of the personal jurisdiction and *forum non* motion somehow dictates denial of the instant motion is unfounded.

Defendants have not shown any "lack of respect for the value of this Court's time and resources" by "substantially resubmit[ting] legal arguments already rejected by this Court." (Pls.' Br. 28) or "regurgitat[ing]" arguments in "grabb[ing] at Rule 12 again" (*id.* 3). Rather, the instant motion arises in a different, post-discovery procedural context, and presents new issues for this Court to resolve. These issues of subject matter jurisdiction go to the heart of this Court's authority, as this Court must at all times ensure that it has the jurisdiction to hear claims brought before it. For these reasons, the Court rejects Plaintiffs' argument that the Court's two prior decisions on Defendants' earlier motions to dismiss control the instant motion.

## III.   The Foreign Trade Antitrust Improvements Act

Defendants' motion contends that the FTAIA deprives this Court of subject matter

15

jurisdiction over Plaintiffs' antitrust claims[6] because those claims do not meet the specific

jurisdictional requirements the FTAIA imposes.  Plaintiffs' federal antitrust claims arise under

Section 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Section 15 of the Sherman

Act grants a private right of action for injuries "by reason of anything forbidden in the antitrust

laws," and allows treble damages, costs, reasonable attorneys' fees, and prejudgment interest.  15

U.S.C. § 15.

        In enacting the FTAIA, Congress sought to "facilitate domestic exports and to clarify the

application of United States antitrust laws to foreign conduct."  *Turicentro*, 303 F.3d at 299.  In

addition to "intend[ing] to exempt from the Sherman Act export transactions that did not injure

the United States economy," *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 n.23 (1993),

the FTAIA also seeks to "fix the problem that arose because 'courts differ in their expression of

the proper test for determining whether United States antitrust jurisdiction over international

transactions exists.'"  *LSL Biotechnologies*, 379 F.3d at 678 (quoting H.R. Rep. No. 97-686

(1982), *reprinted in* 1982 U.S.S.C.A.N. 2487, 2487).  In so doing, the FTAIA "promotes []

'certainty in assessing the applicability of American antitrust law to international business

transactions and proposed transactions.'"  *Turicentro*, 303 F.3d at 299 (quoting H.R. Rep. No.

97-686 (1982), *reprinted in* 1982 U.S.S.C.A.N. 2487, 2494)).

        The FTAIA, provides, in relevant part:

_____

        [6]Unless otherwise noted, reference in this Court's FTAIA analysis to Plaintiffs' "antitrust claims" concerns Plaintiffs' federal antitrust claims under the Sherman Act.  The Court will address Plaintiffs' state-law antitrust claims in Section VII, *infra*.

16

> [The Sherman Act] shall not apply to conduct involving trade or
> commerce (other than import trade or import commerce) with foreign
> nations unless--
> (1) such conduct has a direct, substantial, and reasonably foreseeable
> effect--
>> (A) on trade or commerce which is not trade or
>> commerce with foreign nations, or on import trade or
>> import commerce with foreign nations; or
>> (B) on export trade or export commerce with foreign
>> nations, of a person engaged in such trade or
>> commerce in the United States; and
> (2) such effect gives rise to a claim under the provisions of [the
> Sherman Act] other than this section.

15 U.S.C. § 6(a). This statute "remov[es] from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004). As our Circuit noted in *Turicentro*, the FTAIA's requirements, particularly with regard to geographical effect, accord with the "longstanding antitrust principle[]" that "[a]bove all, the United States antitrust laws strive to maintain competition in our domestic markets." *Turicentro*, 303 F.3d at 305 (citing 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 4 (2000)).

Our Circuit in *Turicentro* explained that the FTAIA provides two general requirements for a federal court to exercise subject matter jurisdiction under the Sherman Act over "'conduct involving trade or commerce . . . with foreign nations.'" 303 F.3d at 300 (quoting 15 U.S.C. § 6a). First, the court must focus on defendants' conduct and determine whether the alleged conduct in fact involves "'trade or commerce (other than import trade or import commerce) with foreign nations,' as those terms are understood under the statute." *Id.* at 300-01 (quoting 15

17

U.S.C. § 6a).  Second, the court must analyze the "geographical effect of that conduct" in determining whether that conduct has a "'direct, substantial, and reasonably foreseeable' anticompetitive effect on United States commerce and whether that conduct 'gives rise' to a Sherman Act claim."  *Id.* at 301 (quoting 15 U.S.C. § 6a(1)-(2)).

Although "inelegantly phrased," *Carpet Group*, 227 F.3d at 69, the FTAIA nonetheless imposes specific limitations on the ability of federal courts to hear Sherman Act claims involving foreign conduct, and excludes from jurisdiction much conduct that causes only foreign injury. After parsing the "rather convoluted language" of the FTAIA, *Turicentro*, 303 F.3d at 300, the Court reads the FTAIA's restrictions to apply only to conduct involving non-import trade or non-import commerce with foreign nations.  Import trade and import commerce are exempt from the FTAIA's provisions.  Courts may exercise subject matter jurisdiction over Sherman Act claims involving such foreign conduct only if such conduct has a direct, substantial, and reasonably foreseeable anticompetitive effect upon domestic trade or domestic commerce or upon export trade or export commerce.  Finally, subject matter jurisdiction may only be exercised over claims involving non-import foreign conduct if that conduct's direct, substantial, and reasonably foreseeable anticompetitive effect forms the basis of the Sherman Act claim.  In other words, the Sherman Act claim must be based on independent domestic injury.  A court has no jurisdiction over a claim specifically arising from foreign injury independent of any adverse domestic effect. *Empagran*, 542 U.S. at 159.[7]

_____

[7] The United States Supreme Court in *Empagran* usefully translated the "technical language" of the FTAIA into an understandable form:

> [The FTAIA] initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach.  It then brings such conduct back within the

**IV.    Defendants' Challenged Conduct Involves Trade or Commerce with Foreign Nations**

As is readily apparent from the above analysis, the FTAIA's restrictions are complex and application of the FTAIA requires careful scrutiny.  The Court will first assess Defendants' alleged conduct to determine whether that conduct in fact falls within the broadest scope of the FTAIA, i.e. whether that conduct involves non-import trade or non-import conduct with foreign nations.

To implicate the FTAIA's limitations, the challenged conduct must involve "trade or commerce . . . with foreign nations."  15 U.S.C. § 6a.  This phrase "includes transactions between foreign and domestic commercial entities, not just transactions involving a foreign sovereign."  *Turicentro*, 303 F.3d at 301-02.  Such conduct generally involves a United States purchaser or seller.  *Id.* at 302.  However, it also includes "commerce that did not involve American exports but which was wholly foreign."  *Empagran*, 542 U.S. at 163; *see also* H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.S.C.A.N. 2487, 2494-95 (legislative history indicating that "wholly foreign transactions as well as export transactions are covered by the amendment").[8]

_____

Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Id.* at 162 (quoting 15 U.S.C. §§ 6a(1), (2)) (emphasis in original).

[8]*Turicentro* also identified conduct "directed at the competitiveness of a foreign market" as conduct involving foreign trade or commerce under the FTAIA.  *Turicentro*, 303 F.3d at 302 (citing *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002)).  However, the Supreme Court in *Empagran* reversed the essential holding of *Kruman* and held that under the FTAIA, jurisdiction may not be exercised over claims arising from wholly foreign anticompetitive effect, even if the challenged conduct also had an independent, adverse domestic

19

The instant matter concerns conduct by largely foreign insurers and transactions which occurred in Australia and other foreign nations and were coordinated primarily by CIGNA in Australia and by other Defendants in other foreign nations.  While some of the alleged actions have at least some connection to activities in the United States, this Court may easily conclude that the alleged antitrust boycott involved trade or commerce with foreign nations.  Indeed, Plaintiffs appear to concede that their antitrust claims implicate foreign trade or commerce by arguing that the FTAIA does not apply because the alleged conduct constitutes "import trade or import commerce."  Such argument necessarily assumes that the conduct involves trade or commerce with foreign nations.[9]  The FTAIA clearly applies to Plaintiffs' antitrust claims.

## V.   Defendants' Alleged Conduct Does Not Constitute Import Trade or Import Commerce

### A.   Meaning of "Import Trade or Import Commerce"

Having concluded that the challenged conduct here involves foreign trade or foreign commerce, this Court must next determine whether the alleged conduct amounts to "import trade

---

anticompetitive effect.  *Empagran*, 542 U.S. at 159.  For present purposes, it is only necessary to observe that wholly foreign transactions qualify as "conduct involving trade or commerce . . . with foreign nations" under the FTAIA.  *Id.* at 163.

[9]Section One of the Sherman Act prohibits restraints of trade "among the several States, or with foreign nations."  15 U.S.C. § 1.  In *Turicentro*, plaintiffs based their antitrust claims on Section One of the Sherman Act and did not and could not argue that their complaint alleged trade or commerce "among the Several States."  Therefore, the Third Circuit observed that Plaintiffs could not argue that "their allegations do not encompass 'trade or commerce . . . with foreign nations' for Foreign Trade Antitrust Improvements Act purposes without sacrificing their ultimate statutory claim under the Sherman Act."  *Turicentro*, 303 F.3d at 302 n.9.  The same logic applies here and supports the Court's conclusion that Plaintiffs' allegations involve foreign trade or foreign commerce under the FTAIA.

or import commerce" under the FTAIA.  The FTAIA expressly excludes such import conduct from its restrictive scope, and therefore if the alleged group boycott involved import trade or commerce, than the Sherman Act applies to that conduct and this Court may exercise subject matter jurisdiction over Plaintiffs' antitrust claims.  *See, e.g.*, *Turicentro*, 303 F.3d at 301, 302; *Carpet Group*, 227 F.3d at 69.

While the FTAIA does not explicitly define the term "import," "the term generally denotes [that] a product (or perhaps a service) has been brought into the United States from abroad."  *Turicentro*, 303 F.3d at 303 (citing various dictionary definitions).  The Third Circuit has narrowly interpreted the term "involving" with regard to import trade or commerce under the FTAIA:

> Admittedly, the FTAIA differentiates between conduct that 'involves' such [import] commerce, and conduct that 'directly, substantially, and foreseeably' affects such commerce.  To give the latter provision meaning, the former must be given a relatively strict construction.

*Carpet Group*, 227 F.3d at 72.  Our Court of Appeals has instructed that the "proper inquiry" is "whether the alleged *conduct by the defendants* 'involved' import trade or commerce, not on whether the *plaintiff's* conduct, which is not being challenged as violative of the Sherman Act, 'involved' import trade or commerce."  *Carpet Group*, 227 F.3d at 71 (emphasis in original); *see also Turicentro*, 303 F.3d at 305 n.13 (noting that "import" analysis "focuses *exclusively* on defendants' conduct") (emphasis added); *id.* at 303.

Our Court of Appeals has applied a common-sense interpretation of "import trade or import commerce."  The Third Circuit held in *Carpet Group* that "a course of activity designed to ensure that only United States importers, and not United States retailers, could bring oriental

21

rugs manufactured abroad into the stream of American commerce" constituted import trade or commerce.  227 F.3d at 72.  Defendant in *Carpet Group* "self-identified as an association of 'rug importers.'"  *Id.*  Based on the clear facts before it, the court made a straightforward finding that the alleged conduct involved import trade or import commerce.

However, in *Turicentro*, our Court of Appeals reached the opposite conclusion regarding the alleged conduct before it where that conduct did not self-evidently involve imports in the ordinary usage of that term.  *Turicentro* concerned an alleged conspiracy by air carriers and their trade association to fix commission rates paid to plaintiffs, foreign travel agents based outside the United States.  The Third Circuit found that the purchase by United States customers of some of the foreign plaintiffs' services was immaterial, and that Defendants allegedly only "unlawfully set[] extra-territorial commission rates."  *Turicentro*, 303 F.3d at 303.  The court also rejected plaintiffs' argument that plaintiffs' mere access to a United States-based computer system transformed foreign commerce into import commerce, as the analysis focuses solely on *defendants'* conduct.  *Id.* at 304.  Payment of commissions by defendants in United States currency also did not render the conduct import trade or commerce, because "neither the payments nor their calculations on computers based in the United States are properly considered 'imports.'"  *Id.*  Crucially, because "[d]efendants did not directly bring items or services into the United States" and "did not directly increase or reduce imports into the United States," the court in *Turicentro* held that defendants were not involved in import trade or commerce.  303 F.3d at 303-04.

B.    Application to Defendants' Alleged Conduct

Here, Defendants contend that Plaintiffs fail to allege or demonstrate that Defendants'
conduct involved any products or services being brought into the United States from a foreign
nation.  They further argue "[t]he only product involved – liability insurance – was sought and
purchased by an Australian company in Australia or London." (Defs.' Br. 14.)  Because this
Court must focus on *Defendants'* conduct, Defendants' latter argument is immaterial.  However,
they more appropriately argue that their conduct as alleged was "directed at the sale of liability
insurance to an Australian company in Australia." (*Id.* 15.)  Because Defendants' alleged
conduct was not "directed at any import market" (*id.* 14), Defendants advance that their alleged
conduct did not involve import trade or import commerce.

Plaintiffs respond that Defendants' alleged conduct indeed involves imports, namely the
importation of insurance coverage services into the United States because Defendants sold
insurance to Plaintiffs that covered global risks, including United States risks.  They observe that
payments of judgments or settlements under the policies subject to the alleged group boycott
"would have been made to United States claimants and would have addressed United States
harms." (Pls.' Br. 40.)  Thus, Plaintiffs argue that Defendants' conduct harmed the "products
liability market in the U.S." (*id.* 42), and involved importation of liability coverage services into
that market.  As Plaintiffs state their contention, "[t]he sale of [the] policies constituted a promise
on the part of defendants to indemnify and defend CSR if and when CSR were sued in the United
States.  That promise, made abroad, to render services within the United States constituted"
import trade or import commerce. (Pls.' Reply Br. 10.)

From this basis, however, Plaintiffs make increasingly attenuated and indirect

23

connections between the alleged conduct and import trade or commerce.  Citing the principle that coverage of risks necessarily entails agreeing to send representatives into states to defend the insured (*id.* 40-41), Plaintiffs claim that the services imported into the United States under Defendants' policies include "employment of United States lawyers, court reporters, claims handlers, and others, as well as the consumption, in the United States, of transportation, lodging, food and other commodities, in connection with the Insurers['] obligation to defend New Jersey and other U.S. product liability claims" (*id.* 40.)  Under the Third Circuit's common-sense interpretation of "import" under the FTAIA, however, Defendants' ancillary requirement under the policies to employ, house, and feed attorneys and other personnel cannot amount to importation of those services into the United States.  The Third Circuit has parenthetically recognized that "import" could potentially include a service brought into the United States from abroad.  *Turicentro*, 303 F.3d at 303.  Yet it cannot be said that Defendants "brought" employment of United States lawyers and personnel into the United States, or "brought" into the United States various commodities to support those personnel.  Such a reading would stretch the meaning of "import" to the breaking point and extend it far beyond the ordinary meaning given to that term by our Court of Appeals.

Defendants' insurance coverage indeed might have required the employment of various attorneys and others in the United States and the purchase of services in support of these employees.  But such employment and purchases constitute at most secondary activities incident to provision of Defendants' primary alleged "service": insurance coverage.  In *Turicentro*, the Third Circuit found that the alleged conduct before it was not import trade or commerce because the defendants did not *directly* bring items or services into the United States or *directly* increase

or decrease United States imports.  303 F.3d at 303.  Similarly here, Defendants did not directly import services or directly affect importation of services by their conduct.  Furthermore, these service imports cited by Plaintiffs most likely would have involved conduct by Plaintiffs themselves.  As Defendants correctly observe, "because *third parties* sued CSR in the United States and *Plaintiffs* incurred defense costs here, does not mean that *Defendants* directly imported a service or product into the United States."  (Defs.' Reply Br. 15.)  No matter how one construes Plaintiffs' argument in this regard – whether it concerns Plaintiffs' hiring and provision of support or Defendants' – it cannot form the basis for a finding that Defendants' alleged antitrust conduct involved import trade or commerce.

Plaintiffs additionally contend that this case involves not just importation of the "risk-bearing services for U.S. claims provided by the Insurers," but, incredibly, the initial importation of the "underlying products," namely raw asbestos fiber.  (Pls.' Br. 41.)  While at root this case stems from the importation by Plaintiffs of asbestos into the United States, the very fact that such importation was due to *Plaintiffs'* conduct renders this argument irrelevant, as Defendants are not alleged to have imported asbestos into the United States.

Plaintiffs further argue that the alleged group boycott "involved products liability, as well as other, coverage for imports into the United States," and absent Plaintiffs' agreement to Defendants' alleged demands, would have "adversely affected United States imports of products by CSR and its insured subsidiaries."  (Pls.' Br. 42.)  Again, however, Defendants' alleged conduct did not directly target imports of products by Plaintiffs or others; rather, it directly targeted the sale of insurance coverage to Plaintiffs.

Thus rejecting Plaintiffs' other contentions, the Court returns to Plaintiffs' fundamental

argument: that Defendants' alleged conduct involved the importation of insurance coverage into the United States.  The extent to which this argument relies on the "importation" of employees and support services, rather than "coverage" generally, is unclear.  To the extent it depends on the former, the Court must reject it for the reasons stated above.  More generally, Plaintiffs appear to argue that Defendants' conduct targeted the importation of coverage for United States risks, and therefore, that coverage itself was "imported" into the United States.  This Court declines to adopt this extremely broad and extraordinary view of "import trade or import commerce."

Furthermore, viewing this case as involving importation of insurance services stems from an inappropriate focus on Plaintiffs' actions rather than Defendants' conduct.  Defendants allegedly engaged in a group boycott, or threatened a group boycott, of new or renewal insurance for CSR, a company headquartered in Australia.  The record demonstrates that Defendants primarily directed this alleged operation from Australia.  It is true that while specific coverage for asbestos-related coverage forms the heart of this litigation, the parties do not dispute that the policies in question covered global risks of CSR's including some that could arise in the United States.  However, even though Defendants could have expected to have to indemnify CSR and provide services for CSR in the event of covered United States liabilities, in that instance Plaintiffs *themselves* would have "brought" the coverage into the United States.  Defendants sold insurance primarily in Australia and the United Kingdom to an Australian entity.  Just as in *Turicentro*, where "[n]o items or services were brought into the United States by [defendants'] payments alone," *Turicentro*, 303 F.3d at 304, here no services were brought into the United States by Defendants' issuance of coverage alone.  More fundamentally, any "importation" of coverage into the United States, even if not imported by Plaintiffs' conduct, would not be a *direct*

result of Defendants' actions.  *Turicentro* makes clear that such *direct* importation by Defendants or *direct* effect on imports is required for a finding that the alleged conduct involved import trade or commerce under the FTAIA.  Based on the allegations and the record in this case, this Court cannot conclude that these conditions have been met.

C.      Relevance of CSR America to Import Question

Finally, CSR argues that "the insurers interfered directly with CSR America's ability to purchase its own separate insurance program in the United States for the 1992-93 period, and with CSR's ability to purchase its worldwide program through CSR America in the United States."  (Pls.' Br. 22.)  In support of this contention, Plaintiffs rely on a February 18, 1992 fax memorandum from CIGNA's Brian Iles to Michael Payne, a representative of certain Lloyd's, London underwriting syndicates,[10] in which Iles states "I have instructed our people in the U.S. to withdraw from quoting the U.S. programme through J & H who have been called in to compete against the existing programme handled by Corroon and Black."  (Cosenza Certif., Ex. 44 at 2.) Payne responded the same day, writing:

> I am pleased to note the final paragraph of your fax as I was
> somewhat concerned lest your U.S. colleagues went ahead and did
> anything that could prejudice our position.  I am informed (probably
> not reliably) that they have already quoted for the renewal of the U.S.
> end of the business, in which event hopefully the quote has been
> withdrawn.  More importantly, we must ensure that the idea of a
> global programme written out of the U.S.A. is not revived as I am

----

[10]The Lloyd's Defendants, consisting of certain underwriters at Lloyd's, London, Excess Insurance Company Limited and Stronghold Insurance Company, have reached a settlement with CSR and have been dismissed from this case.  However, the conduct of the Lloyd's Defendants, documents and other evidence created by them, and deposition testimony from officials of the Lloyd's Defendants, remain relevant to this matter and will be discussed where appropriate.

certain that this has been considered at the last couple of renewals.

(Cosenza Certif., Ex. 46 at 2.)  Also on the same day, a CIGNA official in the United States sent

a memorandum to Iles in Australia in which he stated that "[w]e have our copy of your memo . . .

on the U.S. portion of this account" and noting that Iles "ha[s] declined renewal unless the

asbestos situation is resolved."  (Decl. of Andrew T. Beirne ("Beirne Decl."), Ex. 25.)  The

memo further asked Iles whether the "other carriers on the account [were] taking the same

attitude."  (*Id.*)

In another memorandum, dated February 25, 1992, Peter King of Richard Oliver

International Pty Ltd., CSR's insurance brokerage, wrote:

> Cigna locally will be most reluctant having gone in (heavy handed)
> to reverse their previous request to Cigna HO to have Cigna withdraw
> from J & H quote . . . Nevertheless I believe that the overriding
> consideration in this whole issue is the fact that Cigna wish to
> preserve a uniform approach to CSR in total given the difficulties
> with the renewal here in Australia as a result of asbestos claims.

(Cosenza Certif., Ex. 45.)  Finally, Iles also sent a memorandum to CSR's insurance brokerage in

which he stated:

> I now confirm that CIGNA Worldwide has informed C.S.R. America
> Inc that the quotation released by CIGNA Domestic Atlanta has been
> withdrawn.  This action was prompted by your approach to me of
> February 18 and my subsequent request to our H.O. to have CIGNA
> maintain a common approach towards all entities of the C.S.R. Group
> including subsidiaries in the U.S.A.

(Cosenza Certif. Ex. 47.)

Defendants contend that Iles simply was mistaken and that in fact the quote by CIGNA's

domestic subsidiary was not withdrawn.  Defendants point to a February 24, 1992 fax from

Nancy Turner of CIGNA in Atlanta (the office referenced by Iles six days earlier in his

memorandum to the Richard Oliver brokerage) to Iles in Australia.  In this fax, which was

headed "Re: CSR America Inc.," Turner stated that CIGNA in Atlanta had received a submission

from J & H, the entity referenced in Iles's memo to Payne.  (Beirne Decl., Ex. 27.)  Turner

further reported to Iles that "J & H's quote deadline was 2-7-92 and we sent our quote to them on

that date."  (*Id.*)  Turner finally stated that "J & H delivered their quotes to Oliver on 2-14-92."

(*Id.*)  Defendants cite this memorandum as support for their contention that CIGNA U.S.'s quote

to CSR America was never withdrawn.  However, while this fax was dated February 24, the

quote referenced was sent to CSR America's broker on February 14, and Iles did not send his

memoranda regarding withdrawing the quote until February 18.  Crucially, Iles's memorandum

to Oliver confirming that the quote was withdrawn lacks a clear date.  The apparent date "25/2"

is handwritten on the document, along with "For Douglas Tobiason 3 pages, but it is unclear

whether this denotes the date of the fax or the date the fax might have been forwarded to

Tobiason, an official with the Richard Oliver brokerage.

      The Court cannot therefore fully determine whether this memorandum communicates a

fact or, in light of Turner's fax, a mistaken understanding of the status of the CSR America

quote.  Defendants claim that the fax is dated February 18, 1992, but that date cannot be found on

the face of the document. Defendants also claim that CSR America used CIGNA U.S.'s non-

withdrawn quote "to pressure its existing insurers for a lower premium before declining the quote

and renewing with its existing insurers."  (Defs.' Br. 8 n.14; Beirne Decl., Ex. 12 at 2 (memo

from Tobiason to CSR America stating, under "Alternative Markets" heading, that "[l]ast year's

renewal quotes indicated that CIGNA was very aggressive and provided the closest

competition").)

"[B]ecause, in the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the claim, 'it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage.'" *Carpet Group*, 227 F.3d at 72 (quoting *Mortensen*, 549 F.2d at 892). Based on the record as submitted by the parties, the Court cannot easily determine whether the alleged antitrust boycott targeted CSR America. Plaintiffs correctly observe, based on Iles's memoranda, that at least "attempts were made to withdraw the CSR America quote." (Pls.' Reply Br. 12 n.11.) It is unclear whether such attempts were successful, or whether Iles's intent was ever effectuated. For example, Turner's memorandum suggests that CIGNA changed its mind about withdrawing its CSR America quote.

However, no matter whether this Court accepts Plaintiffs' or Defendants' rendering of the facts regarding CSR America, Defendants' conduct did not involve import trade or import commerce. Under both Plaintiffs' and Defendants' rendering of the facts, Defendants allegedly threatened to withdraw a quote to CSR America *from CIGNA U.S.* in Atlanta, by way of communications and directives from abroad. Such conduct did not target *importation* of insurance coverage into the United States, because the coverage in question originated from a United States entity. Therefore, any alleged involvement of CSR America as a target of the alleged group boycott, based on Plaintiffs' allegations and the evidentiary record before the Court, fails to remove Plaintiffs' antitrust claims from the scope of the FTAIA.[11]

For the above reasons, this Court holds that Defendants' alleged foreign antitrust conduct did not involve import trade or import commerce, and therefore the restrictions of the FTAIA

---

[11]The Court will further consider the issues regarding CSR America with regard to assessment of anticompetitive effect under the FTAIA later in this Opinion.

apply to Plaintiffs' antitrust claims.

VI.    **Defendants' Alleged Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on Domestic Trade or Commerce Only with regard to CSR America, and Domestic Effect Gave Rise Only to the Claims of CSR America**

The FTAIA allows a court to hear Sherman Act claims involving non-import trade or non-import commerce with foreign nations only if the challenged conduct "*both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Empagran*, 542 U.S. at 162 (quoting 15 U.S.C. §§ 6a(1), (2)) (emphasis in original).

Consistent with the purpose of the antitrust laws, the effects examined by the Court must be anticompetitive ones. With regard to subsection (2) of the FTAIA, the Ninth Circuit has held that a plaintiff "must allege antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 815 (9th Cir. 1988). *Turicentro* evinces a concentration on anticompetitive effect on domestic *markets*. 303 F.3d at 305 (stating that "[g]enerally, federal antitrust laws do not extend to protect foreign *markets* from anticompetitive effects") (emphasis added); *id.* at 307 ("Plaintiffs' injuries occurred exclusively in foreign *markets*. They are not of the type Congress intended to prevent through the Foreign Trade Antitrust Improvements Act or the Sherman Act.") (emphasis added).

Courts have also attempted to provide more specific definitions for "direct, substantial, and reasonably foreseeable effect." In defining "direct" under the FTAIA, the Ninth Circuit analogized to a "nearly identical" term in the Foreign Sovereign Immunities Act ("FSIA"), which

states that "immunity does not extend to commercial conduct 'outside the territory of the United

States . . . that [ ] causes a direct effect in the United States." *LSL Biotechnologies*, 379 F.3d at

680 (quoting 28 U.S.C. § 1065(a)(2)). The Supreme Court defined "direct effect" under the

FSIA as one that "follows as an *immediate* consequence of the defendant's activity." *Id.* (citing

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)) (emphasis added).

      The Supreme Court in *Empagran* held that some domestic "direct, substantial, and

reasonably foreseeable effect" under subsection (1)(a) of the FTAIA, rather than merely an

independent foreign effect, must "give rise" to plaintiff's claim pursuant to subsection (2) of the

FTAIA for a court to exercise jurisdiction. *Empagran*, 542 U.S. 159. In other words, some

domestic foreign effect sufficient to satisfy subsection (1)(a) must give rise to plaintiff's specific

Sherman Act claim for a federal court to exercise jurisdiction. *See Turicentro*, 303 F.3d at 305

n.14 ("'[T]he 'effect' providing the jurisdictional nexus must also be the basis for the injury

alleged under the antitrust laws.'") (quoting H.R. Rep. No. 97-686, *reprinted in* 1982

U.S.S.C.A.N. 2496-97). Because of this required nexus between domestic effect and a plaintiff's

claim, analysis of subsections (1)(a) and (2) are necessarily intertwined to an extent.


    A.    <u>Location of Defendants' Conduct Irrelevant</u>

      As our Court of Appeals noted in *Turicentro*, Congress sought to build upon existing

antitrust law in passing the FTAIA. *Id.* at 304. The House Judiciary Committee Report on the

FTAIA demonstrated Congress's awareness and approval of a focus on geographical effects:

"Since Judge Learned Hand's opinion in *United States v. Aluminum Co. of America*, 148 F.2d

416, 443-44 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects, as

opposed to the conduct, that determines whether United States antitrust law applies."  H.R. Rep.

No. 97-686, *reprinted in* 1982 U.S.S.C.A.N. 2490, *quoted in Turicentro*, 303 F.3d at 305.

The FTAIA thus requires analysis exclusively of the "geographic *target* of the alleged

anticompetitive conduct."  *Turicentro*, 303 F.3d at 305 (emphasis added).  "That certain activities

might have taken place in the United States is *irrelevant* if the economic consequences are not

felt in the United States economy."  *Id.* (emphasis added).  This focus on geographical effects

comports with basic American antitrust principles, as our antitrust laws "strive to maintain

competition in our *domestic* markets."  *Id.* (citing 1 Areeda & Hovenkamp, *Antitrust Law* 4

(2000)).  The Sherman Act only applies to foreign conduct "that was meant to produce and did in

fact produce some substantial effect in the United States."  *Hartford Fire*, 509 U.S. at 796.

At the outset, therefore, the Court must reject any implication that the FTAIA's "direct,

substantial, and reasonably foreseeable effect" requirement is met because certain of Defendants'

actions were taken or overseen in the United States.  As support for their argument that the

alleged group boycott "directly extend[ed] to the United States," Plaintiffs observe that "several

of the defendants are United States corporations or subsidiaries of United States corporations

whose key decisions were controlled here, the initial policies were issued by INA, a United States

corporation, and United States entities played a major role in negotiating and managing the

Policies throughout the years and in coordinating the anticompetitive boycott."  (Pls.' Br. 20-21;

*see also id.* 9 ("INA, from its United States home office, played a major role in providing

insurance services to CSR under the post-1978 program.").)  No matter whether these factual

allegations are true, this Court must examine the location of the *effects* of Defendants' alleged

decisions and actions, rather than the location of the decisions and actions themselves.

**B.**   Parties' Arguments Regarding Direct, Substantial, and Reasonably Foreseeable
Anticompetitive Effect on Domestic Commerce

Defendants contend that Plaintiffs have failed to allege or support any "general market

effect on the availability of liability insurance anywhere, and certainly not in the United States."

(Defs.' Br. 16.)  They argue that Australia, where CSR was located and where it purchased the

insurance at issue, was the geographic target of the alleged group boycott and any effects from

that boycott were "felt in the Australian liability insurance purchase market."  (*Id.* 17.)

According to Defendants, no domestic market exists for asbestos coverage claims or United

States asbestos claims.  Defendants conclude that Plaintiffs "have asserted . . . an individual

consumer harm in Australia, not a market effect in the United States" because any injury was

suffered directly by CSR alone and there was no injury to competition in the United States

liability insurance market.  (*Id.* 18.)  Any effects on CSR's future Australian exports or the

viability of CSR America, are irrelevant as secondary or collateral rather than direct effects.  (*Id.*

20.)  Defendants urge that "[t]he injury Plaintiffs allege – liability payouts and defense costs – is

simply an expense incurred as a result of a competitive restraint in the Australian insurance

purchase market.  It is not an effect of any reduction in competition in any U.S. market."  (*Id.*)

Finally, Defendants argue that CSR America was not part of the alleged group boycott because it

was not a purchaser in the Australian insurance market.

Plaintiffs interpret the alleged group boycott far differently.  They look beyond

Defendants' actual alleged actions and claim that the boycott sought to avoid Defendants' alleged

obligations to cover Plaintiffs' United States asbestos-related liabilities, and that therefore the

United States was a target of the antitrust conduct.  They also contend that Defendants

34

"restrained competition in the market for coverage of United States risks, both with respect to the sale of new insurance policies and the exercise of rights under previously issued policies" and harmed not only Plaintiffs but other insurers and, ultimately, United States asbestos claimants. (Pls.' Br. 44.) Plaintiffs further rely on New Jersey's significant interest, previously recognized by this Court, in compensation of its domiciliaries and by extension in reimbursement of insurance claims paid to its citizens. *CSR, Ltd. v. CIGNA Corp.*, Civil No. 95-2947, 2005 U.S. Dist. LEXIS 29319, at \*52-53, \*56-57 (D.N.J. Nov. 21, 2005); *CSR*, 146 F. Supp. 2d at 570. Plaintiffs argue that this interest "strongly suggests that insurance covering New Jersey, and likewise [ ] United States, risks" have the requisite effect on United States commerce. (Pls.' Br. 46.) Plaintiffs also contend that Defendants "were doing their best to impact CSR America's ability to purchase insurance in the United States" (Pls. Reply Br. 12), and "at least attempted to impact CSR America's ability to purchase insurance in the United States" (Pls.' Br. 44 n.23). Finally, Plaintiffs argue that Defendants sought to persuade other non-Defendant insurers to deny coverage to CSR by way of spreading alleged misrepresentations regarding Plaintiffs' asbestos-related claims and Plaintiffs' conduct in submitting those claims to Defendants.

C.    *Hartford Fire* Does Not Dictate that the FTAIA Allows This Court to Exercise Jurisdiction over CSR's Antitrust Claims

Plaintiffs rely heavily on the United States Supreme Court's opinion in *Hartford Fire*. In *Hartford Fire*, the Supreme Court considered antitrust claims against domestic and foreign insurance and reinsurance companies in which consolidated plaintiffs alleged that defendants "conspired in violation of § 1 of the Sherman Act to restrict the terms of coverage of commercial

general liability (CGL) insurance available in the United States" by "forc[ing] certain primary

insurers (insurers who sell insurance directly to consumers) to change the terms of their standard

CGL insurance policies to conform with the policies the defendant insurers wanted to sell."

*Hartford Fire*, 509 U.S. at 770-71.  Of particular relevance here, plaintiffs brought antitrust

claims against a "group of London reinsurers and brokers," charging them with a conspiracy "to

coerce primary insurers in the United States to offer CGL coverage only on a claims-made basis"

by "collectively refus[ing] to write new reinsurance contracts for, or to renew longstanding

contracts with, 'primary insurers unless they were prepared to switch from the occurrence to the

claims-made form.'" *Id.* at 776 (quoting one of the consolidated complaints).  Another

conspiracy charge against a "somewhat different group of London reinsurers" alleged that this

foreign group conspired "to withhold reinsurance for pollution coverage."  *Id.*

        Defendants' challenges in *Hartford Fire* to these claims involving foreign conspiracies

focused on whether the district court should have declined to exercise jurisdiction under the

principle of international comity because the claims involved the "conduct of a foreign insurance

market regulated abroad."  *Id.* at 779 n.9.  In a footnote, the Court recognized the FTAIA and

stated that "it is unclear how [the FTAIA] might apply to the conduct alleged here."  *Id.* at 796

n.23.  The Court commented that it need not address this question and stated, in dicta, that

"[a]ssuming the FTAIA's standard affects this litigation . . . the conduct alleged plainly meets its

requirements."  *Id.*  The Court provided no further specific analysis under the FTAIA, although

the Court did observe generally that "it is well established by now that the Sherman Act applies

to foreign conduct that was meant to produce and did in fact produce some substantial effect in

the United States" and that such conduct was alleged in *Hartford Fire* in that plaintiffs claimed

36

that "the London reinsurers engaged in unlawful conspiracies to affect the market for insurance in the United States and that their conduct in fact produced substantial effect." *Id.* at 796.

Plaintiffs here allege a conspiracy against a group of foreign insurers to collectively refuse to write new insurance contracts or renew longstanding insurance contracts for Plaintiffs unless they withdrew their asbestos-related claims. Plaintiffs conclude from *Hartford Fire* that the Court "firmly establishe[d] that an antitrust boycott in the insurance industry impacts the United States where that boycott affects the coverage of United States risks, regardless of where, or to whom, the insurance in question is sold." (Pls.' Br. 34.) Plaintiffs thus rely quite strongly on *Hartford Fire* in arguing that the United States Supreme Court has essentially declared that all antitrust boycotts in the insurance industry which somehow impact the United States pass muster under the FTAIA.

The Court in *Hartford Fire* primarily addressed Defendants' arguments under the principle of international comity and that doctrine's application to the Sherman Act, not the FTAIA specifically. *Hartford Fire* indeed addressed "the extraterritorial applicability of the Sherman Act to wholly foreign conduct," *Carpet Group*, 227 F.3d at 75, but its comments regarding the FTAIA, even viewed as highly persuasive dicta, may not be applied outside of their factual context. *Hartford Fire* may be distinguished because the foreign defendants in that case directly targeted multiple United States insurance companies and their conduct therefore affected the market for insurance in the United States. Plaintiffs cite the Ninth Circuit's reading of *Hartford Fire* as holding that "an agreement among foreign reinsurers and domestic insurers, under which the foreign reinsurers would refuse to cover certain American domestic insurance policies, met the effects test" of the FTAIA. *United Phosphorus*, 322 F.3d at 947. Yet in

37

*Hartford Fire*, the foreign defendants forced United States insurers to change the terms of CGL

coverage these insurers offered in the United States, and thereby restricted competition in the

market for CGL insurance in the United States.  Here, however, Defendants forced Plaintiff CSR,

an Australian company, to withdraw previously filed claims and accept allegedly altered liability

insurance going forward.  Defendants thereby refused to cover certain American *risks*,[12] but did

not restrict the market for insurance policies available in the United States, except with regard to

CSR America as discussed further below.  Plaintiffs' read *Hartford Fire* far too broadly, and that

case alone does not establish jurisdiction here.


    D.    CSR Limited

        As noted, the Supreme Court in *Empagran* held that the requisite domestic effect under

subsection (1)(A) of the FTAIA must also give rise to the particular plaintiff's claim under

subsection (2) of the FTAIA.  Therefore, the Court must assess separately the claims of CSR

Limited ("CSR") and CSR America, and the effects of Defendants' alleged conduct, with regard

to each Plaintiff.

        With regard to CSR, the Australian company, whether Defendants' conduct had the

required domestic effect under the FTAIA depends in part on whether the Court considers the

market for liability insurance in Australia, as Defendants urge, or the market for coverage of risks

in the United States, as Plaintiffs insist.  The FTAIA requires that Defendants' conduct have a

direct, substantial, and reasonably foreseeable anticompetitive effect on domestic trade or

───────────────

        [12]Of course, the extent to which the policies covered Plaintiffs' American asbestos-related
risks forms the central issue in this case, and the Court expresses no opinion on the merits of the
parties' arguments in this regard at this time.

commerce. Therefore, a domestic market must be affected. Defendants' alleged conduct here certainly affected the Australian liability insurance market. Plaintiffs purchased the policies at issue in Australia, and the alleged group boycott limited competition in Australia for liability insurance. CSR analogizes to *Hartford Fire*, but in *Hartford Fire*, the foreign defendants boycotted United States insurance companies. Here, Defendants allegedly refused to cover certain American *risks* for CSR,[13] but did not restrict the market for insurance policies available in the United States for CSR.

This Court cannot conclude that a market exists for "coverage of U.S. risks," and even if it did, Defendants' conduct did not *directly* affect such a market. Finding such a market for U.S. risks would subject nearly any insurance policy with any relationship whatsoever to the United States to American antitrust law. The specific limitations of the FTAIA belie such an overly broad international scope for the Sherman Act. Similarly, there can be no market for "coverage of United States risks. . . with respect to . . . the exercise of rights under previously issued policies." (Pls.' Br. 44.) Such a market definition represents an effort to transform individual injury to CSR into a market harm, and no competition could exist in this indefinable market.[14]

Furthermore, even allowing for the existence of such a market, any effect on a market for "U.S. risks" was felt by CSR *in Australia*, because CSR itself did not participate in a United

_____

[13]Of course, the extent to which the policies covered Plaintiffs' American asbestos-related risks forms the central issue in this case, and the Court expresses no opinion on the merits of the parties' arguments in this regard at this time.

[14]Although this Court's prior Rule 12(b)(6) opinion is not determinative, even in that opinion the Court only recognized that Defendants' conduct, on its face, harmed competition "within the market for general and products liability insurance with respect to plaintiffs." *CSR*, 40 F. Supp. 2d at 565. The market at issue here is the one for insurance policies, not for coverage for risks.

States insurance market.  As Defendants contend, "[w]hile that might arguably raise an antitrust claim in the insurance purchase market in Australia, there neither is nor can be an antitrust effect in any market for historic asbestos coverage claims, because there is no such competitive market."  (Defs.' Br. 18.)  Plaintiffs complain that Defendants' theory focuses on "where the relevant insurance policy was purchased, [rather than] the risks covered under that policy."  (Pls.' Reply Br. 7.)  Yet the situs of the direct market effects must be examined, and such direct effects were only felt in the Australian insurance market in which CSR participated.  Impact on any "market" for coverage of U.S. risks or asbestos claims was at best secondary.

In addition, this Court rejects as irrelevant CSR's argument for finding the requisite domestic effect under the FTAIA based on New Jersey's strong interest in the underlying asbestos-related claims that gave rise to the instant dispute.  While this interest did compel this Court to apply New Jersey law to Plaintiffs' contract claims, the FTAIA does not speak of United States interests.  It requires a *direct*, substantial, and reasonably foreseeable market effect on United States commerce.  The Court cannot locate any "market" for reimbursement of United States asbestos claimants or any competition in such a market.  Even if Defendants' group boycott could be said to have ultimately have had an effect on a market involving claims brought by New Jersey residents and other Americans against Plaintiffs, such effect is not direct or immediate but rather far removed.

Finally, CSR alleges that in addition to coordinating a boycott, Defendants made misrepresentations to others in the insurance market in an effort to "render CSR uninsurable by companies not directly participating in the boycott," thereby "creat[ing] bars to new coverage even from potential alternative insurers that might not have participated in the boycott

otherwise." (Pls.' Br. 19.) For example, they cite an internal memorandum between officials at non-Defendant Sedgwick Insurance in which Toby Foster, a Sedgwick official, states that he had "pick[ed]-up information on CSR 'through the back door'" and related Defendants' views of CSR's asbestos-related claims and Michael Payne's appraisal of CSR as related by some unknown person to Foster. (Cosenza Certif., Ex. 32 at 2.) Plaintiffs also rely upon a memorandum from Michael Payne to Rod Waites of non-Defendant C.E. Health relating Payne's views regarding CSR's "'scatter gun' Writ" issued "despite the specific exclusions of the policy" and CSR's "total breach of good faith." (Cosenza Certif., Ex. 20 at 1.)[15]  However, the Court's review of the record before it reveals that none of the non-Defendant insurance entities implicated by CSR were United States entities. As with Defendants' own boycott, any alleged pressure brought to bear upon or misinformation spread to non-United States entities – even if "substantial" enough under the FTAIA – did not have a direct effect on the American market for insurance. Rather, this misinformation allegedly prevented CSR in Australia from seeking alternative insurance from other foreign insurers. CSR has not met its burden to establish jurisdiction on this basis because such conduct does not meet the requirements of the FTAIA.[16]

---

[15]Plaintiffs cite several other examples of alleged misrepresentations (Pls.' Br. 19 n.6), but two of these appear to involve communications between CIGNA and Richard Oliver, CSR's broker (Cosenza Certif., Exs. 33, 34), not with other insurers. The Court is unable to determine whether an additional cited document, a memorandum from Michael Payne to Steve Nicholson of P.W.S. advising of CSR's withdrawal of its claims (Cosenza Certif., Ex. 29), represents communication to a non-participating insurance company.

[16]CSR additionally points to subsection (1)(B) of the FTAIA, which allows for jurisdiction where Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on "export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States." 15 U.S.C. § 6a(1)(B). CSR argues that because the alleged boycott "had a substantial effect on the ability of U.S. insurance companies to insure CSR's 'worldwide' risks, *i.e.*, the exportation of insurance services, the FTAIA cannot bar CSR's

E.    CSR America

Plaintiff CSR America's claims stand on a different footing, however.  CSR America

claims that Defendants' group boycott extended to CSR America through various Defendants'

attempts to "impact CSR America's ability to purchase insurance in the United States."  (Pls.'

Reply Br. 12.)  As discussed previously with regard to the "import trade or commerce" prong of

the FTAIA, the Court cannot easily determine whether the alleged antitrust boycott targeted CSR

America based on the record before the Court.  The parties dispute the interpretation of various

documents and differ over whether, for example, Brian Iles of CIGNA attempted to have CIGNA

U.S. withdraw its quote to CSR America or whether Iles merely expressed a mistaken

understanding in his various memoranda.

If CSR America was a target of Defendants' alleged conduct, then Defendants' conduct in

this regard could be said to have had a direct, substantial, and reasonably foreseeable effect on

United States commerce.  In that event, Defendants' alleged conduct restricted the availability of

insurance coverage in the United States for United States companies (and, indeed, provided by a

United States insurer).  As the Third Circuit has held with regard to Sherman Act claims under

the FTAIA, because "jurisdictional facts are often closely intertwined with the merits of the

claim, 'it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than

would be appropriate at a trial stage.'"  *Carpet Group*, 227 F.3d at 72 (quoting *Mortensen*, 549

F.2d at 892).  Jurisdictional facts and the merits are certainly closely intertwined here, as whether

CSR America was a target of the alleged boycott comprises a jurisdictional question and also

---

United States antitrust claims."  (Pls.' Reply Br. 13.)  However, CSR has provided no evidence
to support its assertions.  Furthermore, CSR's argument in this regard undercuts and contradicts
its argument that Defendants' conduct here involved *import* commerce.

goes to the heart of CSR America's substantive antitrust claims.

Although Defendants present a factual challenge to Plaintiffs' antitrust claims, and therefore the Court may weigh the evidence pertaining to jurisdiction, the Court takes seriously the Third Circuit's admonition to demand less proof for jurisdictional purposes. At this stage, and in the face of murky and disputed evidence, this Court finds for jurisdictional purposes only that CSR America has met its burden and has satisfactorily alleged and supported its contention that Defendants target it as part of their alleged boycott. In no way does the Court's jurisdictional ruling control or otherwise impact any ultimate decision, if required, on the merits of CSR America's antitrust claims.[17]

F.      Application of Subsection (2) of the FTAIA

Subsection 2 of the FTAIA requires that a direct, substantial, and reasonably foreseeable effect on United States trade or commerce from a defendant's conduct "give[] rise to a claim under [the Sherman Act]." 15 U.S.C. § 6a(2). The Supreme Court in *Empagran* construed subsection 2 to require that the requisite independent domestic effect of the alleged conduct give rise to a plaintiff's specific claim. Here, as the Court concluded above, CSR Limited's claims do not arise from an independent, direct, substantial, and reasonably foreseeable effect on domestic trade or commerce from Defendants' alleged conduct. Therefore, this Court cannot exercise

───────────────

[17]In another pending summary judgment motion, Defendants argue that CSR America was not an "additional insured" under some of the policies at issue. Nothing in this Opinion should be interpreted as deciding this issue. For present purposes, Plaintiffs allege involvement of CSR America in the purported boycott, supported by some disputed record evidence. These allegations are sufficient to demonstrate, for jurisdictional purposes only, a direct, substantial, and reasonably foreseeable effect on domestic commerce with regard to CSR America.

subject matter jurisdiction over CSR Limited's antitrust claims, and Count III of the SAC will be dismissed with regard to CSR Limited.[18]  However, as discussed above, the Court finds that CSR America's claims *do* arise from the requisite domestic effect from Defendants' alleged conduct. Therefore, this Court has subject matter jurisdiction over CSR America's antitrust claims under Count III of the SAC.[19]

**VII.    This Court Must Dismiss CSR Limited's State Antitrust Claims But Retain Jurisdiction over CSR America's State Antitrust Claims**

New Jersey courts follow federal law under the Sherman Act in interpreting New Jersey antitrust law.  The New Jersey antitrust statute itself states that "[t]his act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it."

---

[18]The Supreme Court in *Empagran* only held that the FTAIA denies jurisdiction where the defendant's alleged anticompetitive conduct causes an adverse foreign effect independent of the domestic effects of the conduct.  *Empagran*, 542 U.S. at 164.  The Court declined to address the situation in which the foreign injury was *not* independent of but rather "linked to" the domestic effects of defendant's alleged anticompetitive conduct.  *Id.* at 175 (explicitly refusing to resolve issue because Court of Appeals did not address this argument).  Plaintiffs in *Empagran* argued that without an adverse domestic effect, defendants could not have maintained the alleged international price-fixing conspiracy that inflicted foreign injury on the foreign plaintiffs.  542 U.S. at 175.  Here, however, the domestic and foreign effects of Defendants' alleged conduct are independent and easily separable.

[19]In a footnote, Defendants suggested to the Court that if it "were to determine, incorrectly, that CSR America had demonstrated the U.S. domestic antitrust injury necessary to survive summary judgment, under Empagran, that would only permit retention of the Sherman Act claims of CSR America and still require dismissal of the claims of CSR Australia."  (Defs.' Reply Br. 12 n.7.)  Although the Court rejects Defendants' argument that CSR America has not shown the requisite domestic anticompetitive effect under the FTAIA, it agrees with Defendants that under these circumstances, the Court must dismiss CSR Limited's (or, in Defendants' terminology, CSR Australia's) antitrust claims but retain jurisdiction over those of CSR America.

N.J.S.A. § 56:9-18.  The New Jersey Supreme Court has stated that

> consonance between the federal and state enactments is required.
> Courts in assessing state antitrust acts patterned after the federal
> Sherman Act, as is the New Jersey act, have concluded that federal
> court interpretations of federal law constitute persuasive authority as
> to the meaning of the particular state enactments.

*Pomanowski v. Monmouth County Bd. of Realtors*, 89 N.J. 306, 313 (1982) (quoting *State v. Lawn King*, 84 N.J. 179, 192 (1980)); *see also, e.g.*, *Sickles v. Cabot Corp.*, 379 N.J. Super. 100, 107 (2005) ("We follow federal antitrust law in interpreting our own antitrust statute.")  This Court has so observed earlier in this litigation.  *CSR*, 40 F. Supp. 2d at 566.  Therefore, this Court must also dismiss CSR's state-law antitrust claims in Count IV of the SAC.  The Court may exercise subject matter jurisdiction over CSR America's state antitrust claims.[20]

---

[20]This Opinion only addresses whether the Court may exercise subject matter jurisdiction over CSR America's New Jersey state antitrust claims.  The Court expresses no opinion on the merit of these claims.

*Conclusion*

For the foregoing reasons, Defendants' motion for summary judgment dismissing Counts III and IV for lack of subject matter jurisdiction is hereby GRANTED in part and DENIED in part.  Counts III and IV of Plaintiffs' Second Amended Complaint with regard to CSR Limited are hereby DISMISSED with prejudice for lack of subject matter jurisdiction.  This Court will exercise subject matter jurisdiction over Counts III and IV with regard to Rinker Materials Corporation (f/k/a CSR America, Inc.).  Plaintiffs' related cross-motion is DENIED.

Newark, New Jersey
Dated: December 13, 2005

/s Harold A. Ackerman
U.S.D.J.