NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| CSR LIMITED and RINKER MATERIALS | ) | |
| CORP. (f/k/a CSR AMERICA, INC.), | ) | Hon. Harold A. Ackerman |
|  | ) | |
| Plaintiffs, | ) | Civil Action No. 95-2947 (HAA) |
|  | ) | |
| v. | ) | **AMENDED** |
|  | ) | **OPINION AND ORDER**[*] |
| CIGNA CORPORATION, et al., | ) | |
|  | ) | [*]Unseals Opinion and Order filed |
| Defendants. | ) | under seal on February 10, 2006 |

_____

Andrew T. Berry, Esq.
Gita F. Rothschild, Esq.
MCCARTER & ENGLISH LLP
Four Gateway Center, 100 Mulberry Street
Newark, New Jersey  07102-4096

Mark F. Rosenberg, Esq.
Keith McKenna, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
*Attorneys for Plaintiffs CSR Limited and Rinker Materials Corporation*

Thomas R. Curtin, Esq.
Kathleen N. Fennelly, Esq.
GRAHAM CURTIN & SHERIDAN
4 Headquarters Plaza – Box 1991
Morristown, New Jersey  07962

Paul R. Koepff, Esq.
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, New York  10036
*Attorneys for Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, and Insurance Company of North America (UK) Ltd.*

Kevin T. Coughlin, Esq.
COUGHLIN DUFFY, LLP
350 Mt. Kemble Avenue
Morristown, New Jersey  07962-2075
*Attorneys for Certain of the Australian, European, and London Market Insurer Defendants*

**<u>ACKERMAN</u>, Senior District Judge:**

This matter comes before the Court on the motions for partial summary judgment filed by Defendants ACE Insurance Ltd., ACE Insurance Company SA-NV, Insurance Company of North America, Insurance Company of North America (UK) Ltd., and Certain of the Australian, European, and London Market Insurer Defendants (collectively "Defendants" or "Insurers"), and the motion and cross-motions for partial summary judgment filed by Plaintiffs CSR Limited and Rinker Materials Corporation (collectively "CSR" or "Plaintiffs").

The parties have filed a total of sixteen motions and cross-motions for partial summary judgment in this matter.  The Court has previously resolved four of these motions.  This Opinion and Order will only address the motions styled as Defendants' Motion for Partial Summary Judgment on Late Notice (Docket No. 573) and Plaintiffs' Cross-Motion for Partial Summary Judgment on Late Notice (Docket No. 574).  The Court will resolve the other pending summary judgment motions in this matter in subsequent opinions.

For the following reasons, Defendants' motion for partial summary judgment on late notice is DENIED, and Plaintiffs' related cross-motion is DENIED.

### *Background*

Plaintiff CSR Limited is an Australian public company headquartered in Sydney, Australia.  From 1949 to 1966, CSR sold raw asbestos fiber mined by one of its subsidiaries,

Midalco Pty Limited ("Midalco").  Midalco mined this asbestos fiber from a mine owned by

Midalco in Wittenoom, Western Australia ("Wittenoom" or "Wittenoom mine").  CSR sold raw

asbestos fiber from its Wittenoom mine to, among others, Johns-Manville Corporation

("Manville"), which operated its main plant in Manville, New Jersey.  CSR first delivered

Wittenoom asbestos to Manville in 1949, and its last sale of asbestos to Manville occurred in or

about 1966.  In 1966, the Wittenoom mine closed and asbestos-mining activities at the mine

ceased.  CSR's sales of raw asbestos fiber to Manville have resulted in the initiation of more than

129,000 asbestos-related personal injury claims in the United States against CSR Limited and/or

its American subsidiary CSR America, Inc., presently known as Rinker Materials Corporation

(hereinafter "CSR America").  These claims have been brought by persons suffering exposure to

raw asbestos fiber at or in the vicinity of Manville plants in New Jersey and elsewhere, and to

finished Manville products containing asbestos mined and sold to Manville by CSR.

  For many years prior to 1978, CSR had obtained its insurance coverage exclusively from

South British United Insurance Company ("SBU"), later known as New Zealand Insurance

Company ("NZI").  In 1978, CSR entered into a new liability program with various Defendants.

Defendants here comprise various insurance companies who issued or subscribed to primary,

umbrella, or excess general liability insurance policies in favor of CSR during the period of

November 2, 1978 to March 31, 1989 ("post-1978 policies").  These Defendants include:

Insurance Company of North America and its subsidiaries, including its Australian subsidiary,

Insurance Company of North America (Australia) Limited, later known as CIGNA Insurance

3

Company (Australia) Ltd. ("INA" or "CIGNA");[1] and various other insurance companies known

in this litigation as Certain of the Australian, European, and London Market Insurer Defendants

(Coughlin Duffy or "CD Defendants").  INA was the lead primary insurer on the post-1978

policies and also served as the lead insurer on some of the umbrella and excess insurance layers.

As lead insurer on a significant portion of the policies, INA/CIGNA conducted the majority of

the administration of, negotiations over, and renewal of the post-1978 policies.

In 1981, CSR first notified its pre-1978 Insurers of its asbestos claims in the United States

and that CSR might seek indemnity from those Insurers.  CSR first presented formal notice of

demand for indemnification for United States asbestos-related claims to the post-1978 Insurers in

a letter dated November 29, 1991.  Defendants denied CSR's claim for coverage of CSR's

United States asbestos-related liabilities in a February 20, 1992 letter from Anthony Scotford, an

attorney retained by Defendants in relation to CSR's claim.  On March 17, 1992, CSR sent a

letter to the Insurers which purported to withdraw CSR's asbestos-coverage claims and to

acknowledge that the policies did not cover asbestos-related claims stemming from the operation

of the Wittenoom mine or the sale of asbestos mined at Wittenoom.

This action results from Defendants' handling of the November 1991 claims and ultimate

denial of coverage for those claims under the post-1978 policies.  Plaintiffs, seeking coverage

from Defendants for their United States asbestos-related liabilities, brought claims for breach of

---

[1]CIGNA Insurance Company (Australia) Ltd. has been known as named Defendant ACE
Insurance Ltd. since July 1999.  (Second Am. Compl. ¶ 15.)  For simplicity, the Court will refer
to the entire group of Defendants once known as or affiliated with INA or CIGNA as "INA" or
"CIGNA" unless specifically referring to a specific subentity or affiliate.  In any event, the
various INA and CIGNA entities have jointly filed Defendants' various motions for partial
summary judgment with the other Defendants in this matter and have joined in all briefs relevant
to these motions.

contract, bad faith claims-handling, antitrust violations, tortious interference with contractual relations, and tortious interference with prospective economic advantage.  Count I of Plaintiffs' Second Amended Complaint ("SAC") alleges breach of contract, and Count II seeks declaratory relief regarding Defendants' obligations under the implicated policies.

In its prior Opinion denying the parties' motions for partial summary judgment on the issue of rescission, this Court discussed relevant facts regarding information concerning asbestos-related liabilities provided to Defendants by CSR or otherwise known by Defendants prior to CSR's November 1991 request for coverage.  *CSR Ltd. v. CIGNA Corp.*, Civil Action No. 95-2947, 2005 WL 3132188, at *2-7 (D.N.J. Nov. 21, 2005).  The parties reiterate many of these factual allegations here with regard to the separate but related issue of late notice.  The Court assumes familiarity with its prior factual recitation, incorporates that discussion by reference, and will only discuss below those factual allegations by the parties that this Court did not previously detail in its prior Opinion.

A.      The Notice Provisions

All of the post-1978 policies between CSR and Defendants implicated in this action contain some form of a notice provision.[2]  The initial 1978-79 primary general liability policy

---

[2]In their Local Civil Rule 56.1 Statement of Material Facts, Defendants state that "[a]ll primary, umbrella and excess policies invoked by Plaintiffs in this case contain that as a precondition to any coverage, timely and appropriate notice be given to the insurer."  (Defs.' Statement of Material Facts ¶ 1.)  Plaintiffs dispute this assertion, stating simply that "[t]he terms of the policies speak for themselves."  (Pls.' Statement of Material Facts at 19 ¶ 1.)  The Court takes Plaintiffs' statement to mean that Plaintiffs dispute Defendants' claim that the policies undisputedly require "timely and appropriate notice," as the parties differ over the interpretation of the relevant notice provisions.  However, in subsequent paragraphs of their Statement of Material Facts, Defendants quote the relevant notice provisions (Defs.' Statement of Material

provides in a section entitled "Conditions":

> Notice in writing shall be given as soon as possible to the Company of: (a) every occurrence, claim, writ summons, proceedings, impending prosecution inquest and all information in relation of which there may arise liability under the Policy.

(Beirne Decl. Ex. 1 at CSR000016.)  The parties agree that beginning with the 1979-80 policy year, the primary policies contained a provision entitled "Notification of claims" identical or substantially similar to the following:

> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy, notice shall be:
> > sent forthwith to the Lead Insurer, either directly by the Insured or by the intermediary of the Insured provided, however that:-
> > (a) failure to give notice of any occurrence which at the time of its happening did not appear to involve this Policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
> > (b) where the Insured has received notice in writing on the intermediary notice shall be deemed to have been given to the Lead Insurer.

(Beirne Decl. Ex. 2 at CSR 000114; Defs.' Statement of Material Facts ¶ 3; Pls.' Statement of Material Facts 19 ¶ 3.)  The parties further agree that in "later years," the primary policies included the following provision, entitled "Notification of Claims (U.S.A. and/or Canada)":

> (a) Upon receipt by or on behalf of the insured of notice whether written or oral of intention by any person or body to make a claim

---

Facts ¶¶ 2-6), and Plaintiffs do not dispute the literal terms quoted by Defendants, subject to one caveat and the "limitations" found in Paragraph 1 of their own Statement (Pls.' Statement of Material Facts at 19 ¶¶ 2-6).  Reviewing the submissions in total, the Court concludes that the parties do not dispute the *existence* of notice provisions in all of the post-1978 policies implicated in this action, but do obviously dispute the interpretation and application of these notice provisions.

against the Insured or of any allegation of legal liability for bodily injury or property damage which might give rise to such a claim or on the discovery of any act which might give rise to such a legal liability notice shall be sent to the Insurer either directly by the Insured or by the intermediary of the Insured as soon as practicable.

(b) If during the Period of Insurance hereof the Insured shall become aware of any occurrence which may subsequently give rise to a claim against them by reason of legal liability for bodily injury or property damage and shall during the subsistence hereof give notice either directly to the Insurer or by the intermediary of the Insured, any claim which may subsequently be made against the Insured arising out of that occurrence shall be deemed for the purpose of this insurance to have been made during the Period of Insurance hereunder.

(Beirne Decl. Ex. 3 at CAP 000228; Defs.' Statement of Material Facts ¶ 4; Pls.' Statement of

Material Facts 19 ¶ 4.)  CSR alleges that this provision was inserted into the primary policies

beginning September 30, 1985.  (Pls.' Statement of Material Facts 19 ¶ 4.)

The umbrella liability policies at issue also contain notice provisions.  The 1978-79

through 1985 umbrella policies contained a notice provision similar to that found in the 1979-80

to 1985 primary policies:

Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy, notice shall be sent as stated in Item 4 of the Declarations as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

(Beirne Decl. Ex. 5 at CSR 000031.)  Beginning with the 1985-86 umbrella policy, the notice

provision contained language identical in all material aspects to that found in the post-1985

primary policies.  (Beirne Decl. Ex. 4 at 683 LDN 0956551.)

7

Finally, the 1978 to 1989 excess liability policies generally "follow form" to the umbrella policies and require excess insurers to indemnify CSR in accordance with the terms of the umbrella policies.  The parties dispute whether particular excess policies "followed form," and CSR observes that the policies that "follow form" do so subject to certain other conditions in the excess policies,[3] but the parties appear to agree that no matter the minute details, the excess policies effectively incorporated some form of notice provision similar to those quoted above. (Defs.' Statement of Material Facts ¶ 7; Pls.' Statement of Material Facts 20 ¶ 7.)

B.    Evidence Regarding Notice Given by CSR to Defendants

The first United States asbestos suits naming CSR as a defendant were filed in mid-1980. By early 1982, CSR had retained several American law firms to defend the increasing number of asbestos lawsuits filed against it.  Over the course of the next nine years, the number of United States asbestos-related claims against CSR grew substantially, the sources and scope of those claims expanded, and CSR changed litigation defense strategies on several occasions.  For example, after changing its strategy from "appearing to not appearing" sometime around 1983 (Beirne Decl. Ex. 11 ("Mutton Dep. I") at 143:15-16), CSR began seeking settlement of claims against it in New Jersey in 1989.  In 1989, CSR entered into an approximately $12 million settlement of certain asbestos-related claims in New Jersey.  CSR did not pay any settlements for the United States asbestos-related claims until this time.

---

[3]Defendants allege that all of the 1978 to 1989 excess policies "followed form" to the umbrella policies.  (Defs.' Statement of Material Facts ¶ 7.)  Plaintiffs counter that "[s]everal of the 1980-81 excess policies are not written on a 'follow form' basis'" and that "the other excess policies 'follow form' to the umbrella policies except as otherwise stated in the excess policies." (Pls.' Statement of Material Facts 20 ¶ 7.)

Defendants allege that CSR did not give them notice of these specific claims. Defendants identify several manners of notice in which they claim CSR failed to engage, including: provision of copies of pleadings, provision of status reports to Defendants regarding the abestos claims, consultation with Defendants regarding defense strategies or retention of defense counsel, demand for defense or reimbursement of defense costs, advisement of proposed settlements, and request for consent to such settlements.

The record makes clear that Plaintiffs first provided "formal notice," as defined by Defendants, in CSR's November 29, 1991 demand letter. This letter specifically identified United States asbestos-related claims against CSR and its subsidiaries and stated "We formally notify you of these claims." (Beirne Decl. Ex. 23 at 1.) While Plaintiffs dispute Defendants' factual allegations and characterizations regarding the various forms of requisite notice, the documentary evidence in the record fails to establish that CSR took any of the specific steps advanced by Defendants in relation to the United States asbestos claims prior to CSR's demand for coverage in November 1991.[4]

Plaintiffs dispute Defendants' factual allegation of late notice. CSR asserts that it gave sufficient notice of the asbestos-related claims in September 1981 at the latest. Based on the record on this motion and as outlined in this Court's previous Opinion, the parties dispute the extent to which Defendants allegedly knew of these claims by "allegedly non-traditional notice" (Pls.' Br. 28) rather than by the specific types of notice raised by Defendants. The parties particularly dispute, for example, whether provision by CSR to Defendants of CSR's annual

---

[4]For example, Ian Mutton, a CSR in-house attorney, conceded at his deposition that he did not advise or seek consent from the post-1978 Insurers for the 1989 $12 million settlement. (Mutton Dep. I at 276:20-277:5.)

reports constituted sufficient notice under the policies, and debate the intent behind the provision

of those reports to Defendants.[5]  According to Plaintiffs, the annual reports "detail[ed] the

number and type of U.S. Asbestos Claims against [CSR, and] that is all that CSR's policies

required."  (*Id.* 27.)

Beyond dismissing the information contained in the Annual Report as "conclusory"

(Defs.' Br. 28), Defendants highlight deposition testimony by several officials of CSR and Marsh

& McLennan ("Marsh"), CSR's insurance broker, concerning CSR's intentions in providing

these reports to Defendants.  For example, Richard Burridge, a Marsh executive at one time

responsible for CSR's account and who provided an annual report to Defendants on CSR's

behalf, was asked whether he was "intending to communicate a demand for coverage or a notice

of coverage asbestos claims and suits from the insurers to whom" he sent the annual report.

(Beirne Decl. Ex. 28 ("Burridge Dep.") at 99:3-7.)  Burridge responded that "[t]he report was

sent not specific to any one element of information in that report" and later stated that he could

not recollect CSR instructing him to send the report for the purpose of giving notice.  (*Id.* at

99:10-11, 18-20.)  During follow-up questioning, Burridge elaborated, observing that "[t]he

_____

[5]As discussed in this Court's prior Opinion, one typical annual report provided to
Defendants stated that
> "the parent company has been joined as an additional defendant in
> forty five pending court actions in the USA involving groups of
> individual plaintiffs seeking damages for alleged asbestos related
> diseases" and referenced a "subsidiary"(Midalco) which "sold
> asbestos to US buyers between 1948 and 1965."  (Berry Certif., Ex.
> 44.)  INA's Iles testified in his deposition that he was fully aware
> of the contents of CSR's annual reports prior to each policy
> renewal, and that the reports "became more interesting as each year
> came along with the reference to third-party liability claims."  (Iles
> Dep. at 154:13-19.)

*CSR*, 2005 WL 3132188, at *6.

10

provision of the annual report was not intended per se to be notification of a particular claim"

and that provision of the report "was meant to provide them with a broad swath[] of pertinent

information relative to the company they were insuring.  In that sense, it was not intended to be

notification of a claim or claims."  (*Id.* at 407:14-16, 408:1-5.)  Finally, Burridge responded "No"

to the question "[i]n your tenure at Marsh, did you ever have a situation where Marsh or one of

Marsh's clients tried to satisfy a claims notification provision by handing an insurer an annual

report at the time of renewal?"  (*Id.* at 408:19-24.)  Gordon Montgomery, another Marsh

executive who handled the CSR account from 1978 to 1981, repeatedly stated that he had no

recollection when asked about the reasons that he provided CSR annual reports to Defendants.

(Beirne Decl. Ex. 29 at 344-47.)


C.      Defendants' Alleged Prior Knowledge of CSR's United States Asbestos-Related Claims

        Plaintiffs contend generally that "Defendants had requisite notice of an occurrence under

their policies and the U.S. Asbestos Claims from CSR and other sources."  (Pls.' Statement of

Material Facts 22 ¶ 19.)  Plaintiffs support this position with documentary evidence regarding the

extent of Defendants' knowledge of CSR's American asbestos-related liabilities as partially

discussed in this Court's prior Opinion.  In addition to the documentary evidence previously

discussed by this Court, other items in the record pertain to Defendants' alleged knowledge.

        In an October 13, 1982 letter from INA/CIGNA lead underwriter Brian Iles to an official

at non-party Vigilant Insurance Company, Iles stated:

                In regard to their involvement in an asbestos mine, CSR informed us
                that a subsidiary of the Group owned and operated a blue asbestos
                mine at Willenoom [*sic*], Western Australia and sold it in 1966.  Prior

11

> to that date raw material was exported to the U.S.A. for refining and
> manufacture of asbestos sheets.  Various litigants in U.S.A. have
> joined CSR in suits as a result of diseases allegedly contracted from
> exposure to asbestos products and/or material handled by U.S.A.
> supplies [*sic*] and manufacturers.  The special retrospective cover
> given last year (refer page 6) excludes claims arising out of CSR's
> involvement in the Wittenoom mine.

(Berry Certif. Ex. 26.)  Defendants observe that this letter was written in connection with

retrospective cover under the 1981-83 umbrella and excess liability policies, and that this

retrospective cover allegedly expressly excluded coverage for asbestos-related claims.  INA's Iles

further observed in an April 24, 1984 letter to a claims manager at non-party Pearson Webb

Springbett that in 1981 it was "well known to CSR, their shareholders per medium of the 1981

Financial Report and to INA, that suits in the USA against manufacturers and distributors of

asbestos products had joined CSR as original owner and supplier of the raw materials from the

old Wittenoom Mine."  (*Id.* Ex. 27 at 1.)  Defendants again stress that this letter arose in

connection with retrospective coverage.

Documentary evidence suggests that several Defendant Insurers declined to renew

insurance coverage for CSR and withdrew from CSR's insurance program at various times

perhaps due at least in part to concerns about asbestos issues.  An internal file memorandum

produced from the files of CD Defendant Zurich International indicates that the "existing policy

wording is no longer acceptable due to," among other listed reasons, "asbestos exclusion not

acceptable," and concluded that "renewal of policy will not be invited."  (Berry Certif., Ex. 22.)

A handwritten underwriting note entitled "CSR Ltd." and produced from the files of CD

Defendant Landmark Insurance Company states "declined to renew" and lists four reasons for

denial, including "Asbestos – CSR were involved with asbestos up to 1983 – required

exclusion." (*Id.* Ex. 23.)  Finally, an official at former CD Defendant Kemper Insurance

Company Limited sent a letter to Marsh stating that Kemper would not invite renewal "due to the

doubt that exists in relation to the abestos [*sic*] exposure." (*Id.* Ex. 22.)[6]  Defendants construe

these documents as establishing that these particular insurers were *not* concerned about prior

asbestos exposure, and contend without direct support that Zurich and Landmark withdrew from

the CSR insurance program in part because "the existing policy wording contained an asbestos

exclusion that was different from the industry exclusion." (Defs.' Reply Br. 18-19.)

Scotford's February 20, 1992 letter to CSR denying coverage for CSR's asbestos-related

claims stated that CSR's November 1991 demand constituted the first notification of these claims

by CSR to the post-1978 Insurers.  Following receipt of Scotford's letter, NZI's William

McMurdy wrote a letter to Reginald Thomas Thoroughgood, then-New South Wales Claims

Manager for CIGNA, in which Thoroughgood expressed his "concern[]" that "Cigna may have

been effectively put on notice by our company in 1982 . . . . I now recall at the time I was

concerned that the coinsured period policies may be claimed on by CSR and was surprised at the

time that they were not." (Berry Certif. Ex. 19 at 1.)  In response to this letter, Thoroughgood

wrote to McMurdy on March 3, 1992 that while "[c]learly, CIGNA as well as NZI knew the

general background of this account and was alert to the asbestos exposure," "[d]isclosure of

asbestos related claims on the various proposals submitted would be relevant and such disclosure

was not made." (*Id.* Ex. 29 at 2.)  At deposition, McMurdy testified that he did not believe that

his various correspondence with CSR in the 1980s constituted notice under the post-1978

_____

[6]Kemper Insurance Company has reached settlement with Plaintiffs and has been
dismissed from this matter.

policies and that he did not provide these letters to Defendants.  (Beirne Supp. Decl. Ex. 6 at 377:11-378:13.)


D.    Evidence Regarding Justification for Reasonableness of CSR's Actions

As justification for the reasonableness of the manner of notice Plaintiffs allege they gave Defendants, Plaintiffs proffer, among other items, the alleged structure of the pre-1978 and post-1978 insurance programs and the relationship between the programs, as well as the extent of CSR's asbestos-related liability up until CSR's November 1991 request for coverage.  Plaintiffs cite documents produced from Defendants' files which suggest that Defendants viewed CSR's pre-1978 insurance program with SBU in some manner as the "primary" cover to be looked to by CSR before seeking coverage from the post-1978 Insurers.  For example, Iles wrote on April 24, 1984 to a claims manager at Pearson Webb Springbett that

> Firstly, we will deal with the circumstances surrounding the Retrospective Cover given to CSR at 30th September, 1981, and since withdrawn on the 30th September, 1983." . . . [W]e advise that whilst CSR was fully aware of suits brought against them in early 1981, it was not until renewal time ie., September 1981, that they informed us of such claims in the USA on the understanding that no coverage would attach to our insurances.  However, I understand they informed the *Primary Insurers i.e., South British United Insurance* in early 1981 who carried the Liability programme prior to INA.

(Berry Certif. Ex. 27 at 1 (emphasis added).)  In asserting that Defendants "instructed CSR to seek cover for any such claims from that earlier insurer first" (Pls.' Br. 15), Plaintiffs rely on this evidence and their interpretation of a letter from Iles to John Evans which discussed "the possible application of an insurance policy held by another underwriter prior to the 2nd November 1978 when CSR's Liability program commenced with INA" (Berry Certif., Ex. 31).  Iles proceeded to

14

state that for "any injury manifested prior to the 1st October 1985," if the pre-1978 insurance "was issued on the old 'exposure' wording basis i.e. an occurrence happening during the policy period then liability would fall more properly under this insurance." (*Id.*) Defendants, in disputing Plaintiffs' interpretation of this evidence, claim that this document refers to 1981-83 retrospective cover and not the coverage implicated in this action.

CSR also observes that it had more than A$50 million in coverage under its pre-1978 insurance program and expected that those policies would sufficiently cover what Plaintiffs saw as a remote possibility of incurring United States asbestos-related liabilities. Defendants dispute the fact that CSR had A$50 million in policy limits under the pre-1978 program. Plaintiffs certify that they did not pay any settlements or judgments on the United States asbestos-related claims prior to 1989 and that their defense costs until 1989 were relatively minimal. (Bertuch Certif. ¶ 5; Berry Certif. ¶ 3.) Defense and settlement costs, according to Plaintiffs, only grew dramatically beginning in 1990, but Defendants dispute Plaintiffs' rendering of their defense and settlement costs. (*Id.*) Ian Mutton, CSR's in-house counsel, testified that he "gave notice in November, 1991 following a view that I had formed that it was appropriate to make a claim for indemnity under the post-1978 program." (Berry Certif. Ex. 33 ("Mutton Dep. II") at 455:21-23.) Plaintiffs contend, based on this testimony, that CSR reached this view in 1991 because it was only at that time that CSR's defense and settlement costs grew so large that cover beyond the pre-1978 program became necessary.

Based on Mutton's testimony, Defendants claim that Mutton's alleged view of the pre-1978 coverage as 'first tier' and post-1978 coverage as 'second tier' was at best his personal view alone and not shared with any other CSR officials. However, an internal CIGNA memorandum

15

to Iles dated March 5, 1992, after Defendants rejected Plaintiffs' request for coverage, indicates

that Mutton alluded to these reasons for issuing the November 1991 letter:

> We met with Mr. Mutton the CSR in-house Legal Counsel at his request following our letter of rejection of their claims. . . . It was explained to us that CSR believes that the policy covering the period 1943-1966 will provide them with full protection against all claims and they will shortly be commencing legal action against the Insurer [NZI] on risk for that period.  Unfortunately, that Insurer has sought to take every point in their negotiations with the Insured, including questions as to the existence of a Policy and payment of premium. That is why they are resorting to litigation against that Insurer and is why, *to avoid falling foul of any claims notification trap should their action against that Insurer fail, they put us on notice by their letter of November 29 1991.*

(Berry Reply Certif., Ex. 4 (emphasis added).)  Similarly, a file note by CSR's insurance broker,

Peter King of Richard Oliver International Pty Ltd., dated February 11, 1992, states

> Mutton indicated that CSR's prime target was NZI as it had covered the critical period up to 1966 and he believed that they had an excellent chance of recouping any monies paid to previous claimants under NZI policies.  *This would then negate the necessity to issue any proceedings against Cigna* (which he assured me would in fact happen – in what he regarded as being the unlikely event – that the action against NZI did not succeed) but that this probably would not happen for at least another two years.

(*Id.*, Ex. 3 (emphasis added).)  In a file note by King after a meeting a few months later with

CIGNA's Iles, King memorialized Iles's comments that "Cigna were most unhappy at being

'embroiled' in the action against NZI" and Iles understood from Mutton that CSR "still regarded

Cigna and reinsurers as a fall back position," a stance which "is only inflaming Cigna further."

(*Id.*, Ex. 5.)

E.    Evidence Regarding CSR's Consultation with Its Pre-1978 Insurer

During the same period at issue in this matter regarding notice, 1978 to 1991, CSR

actively consulted with NZI (then known as SBU), the pre-1978 insurer to whom CSR first

looked for coverage of its asbestos-related liabilities.  The record contains letters and reports

from various CSR officials, including CSR's risk manager and several CSR in-house attorneys,

specifically informing SBU of various asbestos-related suits against CSR and their specific

progress and status, CSR's retention of counsel, CSR's meetings with counsel, CSR's defense

costs, and CSR's various defense strategies.  These records also contain evidence of CSR seeking

SBU's consent to various litigation strategic and settlement decisions.  Mutton testified that CSR

entered into an agreement with SBU "to keep them briefed on the actions in America."  (Mutton

Dep. I at 247:17-19.)  None of these various status reports appear to have been provided to the

Defendant post-1978 Insurers.  CSR concedes that "Plaintiffs formally sought coverage for the

U.S. Asbestos Claims from [SBU] before they formally sought coverage for the U.S. Asbestos

Claims from defendants here on November 29, 1991" (Pls.' Statement of Material Facts 31 ¶¶

66, 67) and that "they provided information about U.S. Asbestos Claims and suits to SBU" (*id.*

32 ¶ 74), but dispute both the materiality of these allegations and Defendants' characterization of

their dealings with SBU.


F.    CSR America

The parties also dispute facts concerning whether CSR America, rather than merely the

parent corporation CSR Limited, gave notice to Defendants of asbestos-related claims against it.

In addition to the same failure to provide the identified types of notice discussed above,

17

Defendants further allege that even the November 1991 request for coverage failed to notify Defendants of claims against CSR America and failed to specifically identify any claims against CSR America.  Defendants contend that the first notice Defendants had of claims against CSR America came by way of Plaintiffs' Complaint in the instant action.  Plaintiffs, in addition to relying on the same types of general notice discussed above and in this Court's prior Opinion, also notes that CSR's November 1991 request letter bears the title "CSR Limited *and Subsidiaries* - Asbestos Related Claims" and discusses "compensation by it and its subsidiaries." (Beirne Decl. Ex. 23 at 1 (emphasis added).)  Mutton testified at deposition that while the November 1991 letter provided a list of claims against only CSR Limited and Midalco, the letter was "seeking insurance cover on behalf of CSR Limited and its subsidiaries with respect to the claims that ha[d] been made" and that he could not recall any claims filed against CSR America as of November 1991.  (Mutton Dep. I at 791:21-792:17.)[7]


G.      Evidence Regarding Alleged Prejudice Suffered by Defendants from Late Notice

        Several officials of various Defendants testified on matters relevant to prejudice suffered by Defendants as a result of the alleged late notice.  Specifically, these officials offered testimony regarding what they would have done had they timely received the forms of notice of CSR's asbestos-related claims that Defendants highlight and the harm Defendants suffered from the lateness of such notice.  INA's Iles, who served as lead underwriter from 1979 to 1989, testified

_____

[7]Defendants concede that "it is not even clear that CSR America had been sued in any asbestos bodily injury actions by November 1991" (Defs.' Br. 16 n.5), thus undercutting their argument that formal notice of claims against CSR America was possible but "knowingly and intentionally" not given in the November 1991 letter or at any other time prior to filing the Complaint in this matter.

that had he known of CSR's asbestos exposure, and if the statements received from CSR were a
"true and accurate record of their underwriting exposures," "our whole underwriting approach
would have been completely different; terms, pricing, premium, et cetera." (Iles Dep. at 1253:2-
4.) According to Iles, full information, as he perceived such notice, would be important in
deciding whether to offer renewal or change the terms of insurance. (*Id.* at 1253:14-23.)
Michael Payne, a representative of certain Lloyd's, London underwriting syndicates,[8] was asked
by Plaintiffs' counsel at deposition:

> If in 1987 they had said, instead of what you recall they're saying,
> look, Mr. Payne, haven't had to pay a nickel so far in indemnities,
> we're winning the cases, things look great, but if, but if things turn
> very bad for us and waves of asbestos liability descend on us, then in
> that case, we will come around and give you a notice of claims, if
> they had done that, what would you have done?

(Beirne Decl. Ex. 34 ("Payne Decl.") at 533:17-25.) Payne responded, "I would have said
absolutely not.  I am in no way intending to cover U.S. liabilities anyway.  I've made that clear
right from the first time I wrote it in [1978]" (*id.* at 534:4-7), and later stated that if the above
hypothetical had occurred, "I would not have renewed the cover or I would have made it
absolutely clear and plain as they had done to me that I was not in any way going to entertain a
single asbestosis claim in the United States" (*id.* at 534:24-535:3.)  Plaintiffs deem this testimony
"self-serving."  (Pls.' Br. 33.)

Defendants also allege that CSR's delay in giving proper notice resulted in the loss or

---

[8]The Lloyd's Defendants, consisting of certain underwriters at Lloyd's, London, Excess
Insurance Company Limited and Stronghold Insurance Company, have reached a settlement with
CSR and have been dismissed from this case.  However, the conduct of the Lloyd's Defendants,
documents and other evidence created by them, and deposition testimony from officials of the
Lloyd's Defendants, remain relevant to this matter and will be discussed where appropriate.

destruction of important documents and other insurance records, including some of the policies themselves, relevant to the asbestos-related claims and Defendants' handling of those claims. They specifically allege that Plaintiffs themselves and/or their broker Marsh lost or destroyed various records, including records pertaining to operations at Wittenoom, documents concerning the pre-1978 SBU policies, records concerning Marsh's advice on switching from SBU to the Defendant Insurers in 1977-78, and files concerning the post-1978 policies.  For example, Iles testified that he understood that CSR or Marsh "had destroyed every piece of paper up until 1987" and that "all the documents associated with underwriting between CIGNA, Risk Management, and the broker, had been destroyed following the abandonment of the Risk Management Division in 1987."  (Iles Dep. at 1030:16-17, 1323:24-1324:4.)  According to Iles, CSR therefore "had no documents, whatsoever, other than the policies which I had sent to them in April, 1991."  (*Id.* at 1324:4-6.)  CSR's William Bennett testified that

> [t]here had been acknowledged within CSR that we did not have complete records of the South British United Insurance policies. Bearing in mind that they went back to the period of operation of the Wittenoom mine, which was, what, 40 years prior to the discussions. We didn't have the complete record of the policies.

(Beirne Decl. Ex. 24 at 151:1-8.)[9]

Plaintiffs dispute Defendants' allegations regarding loss of certain categories of documents.  With regard to Wittenoom documents, Plaintiffs stress that they have produced in discovery "voluminous materials" and "tens of thousands of pages" of documents relating to the

---

[9]Other evidence of lost or destroyed records advanced by Defendants is less direct.  For example, CSR's Mutton testified that in reviewing certain Wittenoom-related records in 1983, the records available to him "only showed the companies purchasing the fiber" and not additional information.  (Mutton Dep. I at 168:22-23.)

operation of Wittenoom.  (Pls.' Br. 19.)  Plaintiffs respond to Defendants' allegation that the lack of documents hampered Defendants' investigation by claiming that "CSR produced so many materials regarding the Wittenoom mine, Insurers felt it unnecessary to take further discovery on this topic and cancelled the scheduled depositions of several individuals that they had wanted to question about Wittenoom-related topics."  (*Id.* 20.)  Defendants dispute this assertion.

With regard to the alleged loss of post-1978 insurance records, Plaintiffs observe that CIGNA's Underwriting Manual requires the maintenance of underwriting files with sufficient information and asserts that "Insurers have presented no evidence that *they* did not have sufficient insurance records in their possession to determine the validity of CSR's claim for coverage."  (Pls.' Br. 36 (emphasis in original).)  Plaintiffs note that virtually all the insurance policies at issue have been produced and that "there is abundant secondary evidence of the material terms of those small number of policies that are missing."  (*Id.*)  Regarding the alleged loss of pre-1978 insurance documents, Plaintiffs state that "Insurers point to no evidence that CSR could have produced these records even if it tendered its U.S. Asbestos Claims to Insurers in 1980."  (*Id.* 38.)

Defendants also contend that several key witnesses died, otherwise became unavailable, or suffered from eroded memory during the alleged delay in providing notice, although, as Plaintiffs emphasize, Defendants do not specifically identify any of these witnesses.  These losses of records and witnesses, according to Defendants, prevented them from conducting a timely and contemporaneous investigation of the facts and circumstances concerning the asbestos-related claims against CSR and CSR America and Plaintiffs' later demands made to Defendants.

21

*** 

Plaintiffs filed their initial Complaint in the instant action on June 23, 1995.  In 2004, after extensive, international discovery under the supervision of two court-appointed special masters, the parties filed sixteen motions for partial summary judgment on various issues, including the instant motions.  In the instant motions, both Plaintiffs and Defendants cross-move for partial summary judgment on the validity of Plaintiffs' claims for coverage in light of Defendants' allegation of late notice.

### *Analysis*

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987).  Summary judgment may be granted only if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).  A fact is material if it influences the outcome under the governing law.  *Id.* at 248; *see also Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).

The substantive law will identify which facts are "material." *Anderson*, 477 U.S. at 247-48.  Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue.  *Id.*  A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).  It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary judgment stage.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Indeed, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Id.*

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.*  "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. Am. Tel. & Tel. Co.*, Civ. A. No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).  Therefore, to raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [nonmovant].").

## I.       Choice of Law

At the outset, this Court must determine whether New Jersey law or Australian law applies to the issues raised by the instant motions.  Plaintiffs argue that New Jersey law applies, while Defendants contend that the law of Australia should apply.

This Court must apply New Jersey choice-of-law rules in this matter.  *See, e.g.*, *Woessner v. Air Liquide Inc.*, 242 F.3d 469, 472 (3d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  New Jersey applies the "governmental interest" test.  Under this standard, a court must apply the law of the jurisdiction "with the greatest interest in resolving the particular issue that is raised in the underlying litigation."  *Gantes v. Kason Corp.*, 145 N.J. 478, 484 (1996).  The governmental-interest test involves a two-step inquiry.  "The first step in the analysis is to determine whether a conflict exists between the law of the interested states."  *Veazey v. Doremus*, 103 N.J. 244, 248 (1986); *see also, e.g.*, *Woessner*, 242 F.3d at 472.  "If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."  *Veazey*, 103 N.J. at 248; *see also, e.g.*, *Woessner*, 242 F.3d at 472.  This Court must begin its analysis by determining whether an actual conflict exists between the law of New Jersey and the law of Australia with regard to the issue presented in the instant motions: whether Plaintiffs' claims for coverage are barred due to late notice.

The Supreme Court of New Jersey has held that for a successful late notice defense, the insurer bears the burden to show a "breach of the notice provision and a likelihood of appreciable

prejudice." *Cooper v. Gov't Emp. Ins. Co.*, 51 N.J. 86, 94 (1968); *see also, e.g.*, *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976, 996 (3d Cir. 1996); *Gazis v. Miller*, 378 N.J. Super. 59, 64-65 (App. Div. 2005). "The determination of whether appreciable prejudice exists is made in a two-part inquiry: (1) whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim." *Am. Centennial Ins. Co. v. Warner-Lambert Co.*, 293 N.J. Super. 567, 574 (Law Div. 1995) (citing *Morales v. Nat'l Grange Mut. Ins. Co.*, 176 N.J. Super. 347, 355-56 (Law Div. 1980); *see also, e.g.*, *Chem. Leaman*, 89 F.3d at 996. As another court in this District has summarized:

> Under New Jersey law, an insurer cannot succeed on a late notice defense unless it can show that it has suffered appreciable prejudice by reason of the late notice. The burden of showing prejudice rests with the insurer. The question of whether appreciable prejudice exists is a factual question unique to each case. The court in *Morales* examined precedent in New Jersey as well as in other states and distilled two variables relevant to the determination of whether there has been appreciable prejudice: (1) whether substantial rights have been 'irretrievably lost' by the late notice and (2) whether the insurer can demonstrate that it would have had a meritorious defense had there been timely notification.

*Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1047-48 (D.N.J. 1993) (Barry, J.) (citations omitted).

Australian law, on the other hand, only requires the showing of "prejudice" by an insurer, rather than the New Jersey "appreciable prejudice" standard. *See, e.g.*, *Moltoni Corp. Pty. Ltd. v. QBE Ins. Ltd.* (2001) 205 C.L.R. 149, 161 (Austl.); *Ferrcom Pty. Ltd. v. Commercial Union Assurance Co. of Austl. Pty. Ltd.* (1993) 176 C.L.R. 332, 342 (Austl.). In *Ferrcom*, the High

Court of Australia stated that under Section 54(1) of the Insurance Contracts Act,[10] prejudice "will consist in the existence of a liability which, in whole or in part, would not have been borne by the insurer" if notice was timely and appropriately made.  *Ferrcom*, 176 C.L.R. at 342; *see also Moltoni*, 205 C.L.R. at 161 (stating that "relevant prejudice may be found to consist in the existence of a liability which would not have been borne if there had not been the relevant act or omission").

This Court need not delve into the fine points of interpretative difference between "prejudice" and "appreciable prejudice" to conclude that New Jersey and Australian law establish differing standards to govern the determination of whether a notice provision has been breached and the type and degree of prejudice a defendant must show to prevail on a late notice defense. New Jersey law, with its two-part test for appreciable prejudice, appears to impose a higher standard for the late notice defense than the more amorphous Australian formulation.  Based on the submissions of the parties and the Court's own review of the caselaw in the two jurisdictions, this Court finds that New Jersey and Australian law materially differ with regard to late notice. Thus finding an actual conflict of laws, this Court must determine which jurisdiction has the greater interest in having its law applied to the issues raised by these motions.

In its first partial summary judgment decision, this Court held that New Jersey law, and not Australian law, applied to the contract rescission issues raised in this matter.  *CSR*, 2005 WL 3132188, at *17.  In that Opinion, the Court engaged in an exhaustive choice-of-law analysis

---

[10]As discussed in this Court's prior Opinion, Australian insurance law "stems from a complex and shifting mix of decisional and statutory law."  *CSR*, 2005 WL 3132188, at *11. The parties agree that the Insurance Contracts Act applies to all policies issued after January 1, 1986.  *Id.*

with regard to the contract issues in this matter, and the Court incorporates and relies upon that prior discussion here.  *Id.* at *9-17.  Under New Jersey choice-of-law analysis, "[t]he evaluation of significant relationships and governmental interests takes place issue by issue and can lead to the application of different bodies of law."  *Johnson Matthey Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 250 N.J. Super. 51, 65 (App. Div. 1991).  However, the relevant relationships and interests here mirror those that informed the Court's prior choice-of-law analysis, as both concern application of contract law.  As this Court reasoned in its prior Opinion, "New Jersey's exceedingly strong interest in compensation of its residents, if CSR prevails on the merits, outweighs the strong interest Australia has in applying its law to this issue and the quantitatively high number of contacts Australia has with this litigation."  *CSR*, 2005 WL 3132188, at *16; *see also id.* at *17 ("New Jersey has an exceedingly strong interest in ensuring prompt compensation where warranted for its residents when they are injured by dangerous materials.").  This Court concluded that "the justified expectations of many parties, while a significant concern, do not outweigh New Jersey's 'paramount' interest in fostering prompt compensation of its residents through reimbursement for such claims."  *Id.* at *17.  The same concerns apply here.  For the same reasons as expressed previously, this Court will apply New Jersey law to the contract issues raised in the instant motions.

## II.     Disputed Issues of Material Fact Regarding Breach of the Notice Provisions Prevent Granting Summary Judgment in Favor of Defendants on Late Notice

New Jersey courts have held that "[t]he requirement for notice in accordance with the terms of the policy is regarded in this State as a condition precedent to coverage."  *Allstate Ins.*

*Co. v. Campbell*, 95 N.J. Super. 142, 147 (Ch. Div. 1967); *see also, e.g.*, *Mariani v. Bender*, 85 N.J. Super. 490, 499 (App. Div. 1964) ("Compliance with such notice provision is a condition precedent to the insurer's liability under the policy.")  As discussed above, to defeat an insured's claim for coverage with a late notice defense under New Jersey law, a defendant insurer must show a "breach of the notice provision and a likelihood of appreciable prejudice." *Cooper*, 51 N.J. at 94; *see also, e.g.*, *Fed. Ins. Co. v. Purex Indus., Inc.*, 972 F. Supp. 872, 880 (D.N.J. 1997) ("New Jersey law is clear that an insurer may deny coverage on the basis of a notice clause only after proving both that the insured breached the notice provision and that the insurer suffered a likelihood of appreciable prejudice as a result.").  "Appreciable prejudice" involves a two-part inquiry: "(1) whether substantial rights have been 'irretrievably lost' by the late notice and (2) whether the insurer can demonstrate that it would have had a meritorious defense had there been timely notification." *Cont'l Ins. Co.*, 836 F. Supp. at 1048; *see also, e.g.*, *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 561 (3d Cir. 2001).  In showing whether substantial rights have been irretrievably lost, "it is to be emphasized that the carrier must establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim.  Rather, it must show that substantial rights pertaining to a defense against the claim have been irretrievably lost." *Morales*, 176 N.J. Super. at 355.

The parties devote much of their argument to extended factual debate over when Plaintiffs gave notice of their United States asbestos-related claims to Defendants, the types of sufficient notice, and whether Defendants have shown the requisite prejudice from the asserted lack of notice.  However, before even reaching the prejudice question, the late notice defense

requires Defendants to prove a breach of the applicable notice provisions.[11]  An understanding of

the notice provisions and their interpretation under New Jersey law is necessary before this Court

may consider whether Plaintiffs breached the notice provisions and whether Defendants suffered

appreciable prejudice from such breach.


A.      Relevant Standards in Notice Provisions

        As discussed previously, all of the policies at issue contain some form of notice

provision.  The original, 1978-79 primary policy requires "notice in writing . . . as soon as

possible" of any claim, occurrence, or other proceedings "in relation of which there may arise

liability under the Policy."  (Beirne Decl. Ex. 1 at CSR000016.)  Subsequent policies required

notice to be "sent forthwith" when the insured "may reasonably conclude that an occurrence

covered" by the policy "involves injuries or damages" which, in the event of liability, "is likely to

involve th[e] policy."  (*Id.*, Ex. 2 at CSR 000114.)  This provision also allows that the failure to

give notice of a claim which "at the time of its happening did not appear to involve this Policy

but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such

claims."  (*Id.*)

---

[11] The parties, particularly Defendants, devote relatively little argument to consideration
of the actual language of the policies and the notice required by those policies.  Defendants
relegate the applicable policy language to an Appendix to their moving brief, and their entire
direct argument regarding the policy language consists chiefly of one sentence: "It is indisputable
that each and every primary, umbrella and excess policy invoked by Plaintiffs in this case
contains a provision that as a precondition to any coverage, specific notice be given to the
insurer."  (Defs.' Br. 2-3.)  Defendants do not provide any meaningful analysis of the policy
language itself beyond this conclusory gloss.  Plaintiffs offer some guidance regarding
construction of notice provisions under New Jersey law, with some limited attention to the actual
policy language at issue, but Plaintiffs' discussion nonetheless omits key details and fails to
analyze the varying language used in the policies in any extended fashion.

Notice provisions in policies beginning sometime in the mid-1980s change the timeliness requirement from "forthwith" to "as soon as practicable," and do not contain an express exception for claims which at first do not appear to involve the policy but later do so involve them.  (*Id.*, Ex. 3 at CAP 000228.)  Instead, these later notice provisions only explicitly allow that once notice is given of a particular occurrence or claim, any claim late made arising out of that initial occurrence or claim shall be deemed to have been properly made and noticed.  (*Id.*)  The umbrella liability policies from 1979-85 include the "as soon as practicable" standard and contain the exception for claims which do not appear to implicate the policy at the time they arise but later appear involve the policy.  (*Id.*, Ex. 5 at CSR 000031.)  Post-1985 umbrella policies mirror the mid-to-late 1980s primary policies and do not contain the broad exception for claims later found to involve the policy.  (*Id.*, Ex. 4 at 683 LDN 0956551.)  Finally, the 1978-89 excess liability policies generally follow form to the umbrella policies.

B.      Interpretation of Notice Provision Language under New Jersey Law

With the actual policy language in mind, the Court now turns to prior judicial interpretation of similar notice provision language under New Jersey law.  The policies utilize three varying phrases to define the notice required: 'as soon as practicable,' 'as soon as possible,' and 'forthwith.'  As will be seen, all three terms have been interpreted to establish an objective "within a reasonable time" standard that ordinarily presents a question of fact.

Several New Jersey courts have interpreted "as soon as practicable," as found in the policies from approximately 1985-89, to mean "within a reasonable time," and have held that application of the "within a reasonable time" standard is a factual issue ordinarily reserved for

the fact-finder.  The Appellate Division in *Figueroa v. Puter*, in construing a policy which

"provided for notice 'as soon as practicable,'" held that

> [t]his phrase has uniformly been construed to mean, 'within a
> reasonable time.'  "The question as to what is a reasonable time
> depends on the facts and circumstances of the particular case," and is
> a question of fact for resolution by the jury or fact-finder, unless the
> basic facts are undisputed and only one inference can reasonably be
> drawn therefrom.

84 N.J. Super. 349, 354 (App. Div. 1964) (citations omitted); *see also Sagendorf v. Selective Ins.*

*Co. of Am.*, 293 N.J. Super. 81, 94-95 (App. Div. 1996) (quoting *Figueora* and *Bass v. Allstate*

*Ins. Co.*, 77 N.J. Super. 491, 495 (App. Div. 1962)).  The "mere lapse of time 'is not

determinative.'"  *Sagendorf*, 293 N.J. Super. at 95 (quoting *Bass*, 77 N.J. Super. at 495).  Thus,

the *Sagendorf* court noted that, under the facts and circumstances of a particular case, a three-

week delay in notice could be deemed unreasonable while in another case a six-year delay in

notification "could create a fact question about prejudice to the carrier."  *Id.* (citing *Miller v.*

*Zurich Gen. Accident & Liab. Ins. Co.*, 36 N.J. Super. 288, 296-97 (App. Div. 1955) and *Hatco*

*Corp. v. W.R. Grace & Co.*, 801 F. Supp. 1334, 1371-73 (D.N.J. 1992)).

        In *Hatco*, a court in this District construed a notice provision exactly identical to the

1985-89 notice provisions in this matter.  801 F. Supp. at 1370-71 (noting that "[t]his notice

provision is typical of those included in policies of excess insurance").  The court commented

that this notice provision "sets out an objective standard to determine when notice must be given

to an insurer."  *Id.* at 1371.  Relying upon the Third Circuit's interpretation of an identical

provision in a case governed by Pennsylvania law, the *Hatco* court determined that this provision

required notice "'if the insured, acting on the basis of the knowledge [the insured] possessed at

the time, should have believed that the incident was likely to involve the policy if it had considered the matter reasonably.'" *Id.* (quoting *Trs. of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 896 (3d Cir. 1987)).  The court in *Hatco* also commented that the use of the phrase "likely to involve this policy" in the notice provision establishes a higher burden of proof for a defendant insurer than does a provision which uses the phrase "may involve this policy." *Id.*

With regard to the original 1978 notice provision, this Court has been unable to locate any cases under New Jersey law explicitly offering interpretation of a notice provision requiring notice "as soon as possible." *Cf. Metro. Cas. Ins. Co. v. Johnston*, 247 F. 65, 68 (3d Cir. 1917) (discussing cases containing judicial interpretations of "notice as soon as possible" and stating that such term is construed to mean "within a reasonable time").  However, many other jurisdictions have read "as soon as possible" to mean "within a reasonable time," just as New Jersey and other courts have read "as soon as practicable."  *See, e.g.*, *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 n.10 (4th Cir. 2005) (North Carolina law) (noting that Black's Law Dictionary defines "practicable" as "that which is . . . possible" and therefore policy provisions using either the terms 'practicable' or 'possible' "are substantially the same"); *Abner, Hermann & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 337 (S.D.N.Y. 2004) (New York law) ("Prompt notice provisions, like the one here which requires notice 'as soon as possible,' require that 'notice be given within a reasonable time under all the circumstances.'") (quotations omitted); *Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E. 2d 192, 203 (Ind. Ct. App. 2005) (Indiana law) ("We have said that when an insurance policy calls for notice 'as soon as possible' this means within a reasonable time."); *Whaley v. Underwood*, 922 S.W.2d 110, 113 (Tenn. Ct. App. 1995) (Tennessee law) ("A requirement in a policy for 'prompt' or 'immediate

notice,' or that notice must be given 'immediately,' 'at once,' 'forthwith,' 'as soon as
practicable,' or 'as soon as possible' generally means that the notice must be given within a
reasonable time under the circumstances of the case.") (quoting 44 Am. Jur. 2d Insurance §
1330).

      Finally, as might be expected, notice "forthwith" as used in the 1979-85 policies has also
been interpreted to mean "within a reasonable time." *Macchia v. Scottish Union & Nat'l Ins.
Co.*, 101 N.J.L. 258, 261 (1925) ("The words 'immediate,' 'forthwith,' and the like, are
ordinarily held to mean within a reasonable time, and it is elementary law that what is reasonable
time depends on the circumstances of the case, and is ordinarily a question for the jury."); *see
also, e.g.*, *N. Y. Life Ins. Co. v. Levine*, 138 F.2d 286, 289 (3d Cir. 1943) (Pennsylvania law)
(stating that Pennsylvania courts construing provisions requiring notice 'forthwith' "have held
that compliance within a reasonable time was sufficient and have determined what was a
reasonable time under the facts and circumstances of each case"); *W. Bend Co. v. Chiaphua
Indus., Inc.*, 112 F. Supp. 2d 816, 822 (E.D. Wis. 2000) (Wisconsin law) (stating that a notice
provision using the word "forthwith" requires notice "in a 'reasonable time'") (quotation
omitted); *Whaley*, 922 S.W.2d at 113; *State Auto. Mut. Ins. Co. v. Youler*, 396 S.E.2d 737, 742
(W. Va. 1990) (West Virginia law) (holding that "regardless of the language used, whether
'immediate,' 'prompt,' 'forthwith,' 'as soon as practicable' or words of similar import, the courts
are generally in agreement that reasonable notice is sufficient.").


C.      <u>Reasonableness of Plaintiffs' Notice Must Be Decided by the Finder of Fact</u>

      From the preceding review of caselaw in New Jersey and elsewhere, this Court concludes

that a "reasonable time" standard applies to all of the notice provisions at issue.  Courts in New

Jersey, and in other jurisdictions, agree that the "within a reasonable time" standard is objective,

depends on the facts and circumstances of a particular case, and ordinarily constitutes a factual

question for the jury.  Whether notice was given within a reasonable time is only amenable to

resolution by the court on summary judgment where "the facts are undisputed and different

inferences cannot reasonably be drawn therefrom."  *Sagendorf*, 293 N.J. Super. at 95.  This case

does not present such a situation.

Under all of the policies, determination of whether Plaintiffs breached the notice

provisions requires an inquiry into the reasonableness of the formal notice of the United States

asbestos-related claims provided by CSR in November 1991 and the varying forms of allegedly

"non-traditional" notice provided prior to 1991 by Plaintiffs and others.  As the preceding factual

discussion illustrates, the parties heatedly dispute many material facts concerning the type of

notice, time of notice, and reasonableness of notice provided by Plaintiffs.

Defendants, who bear the burden of proving breach of the notice provisions in advancing

their late notice defense, argue that no matter what general knowledge they might have had

regarding the United States asbestos-related claims against Plaintiffs, the formal notice and

related consultation required by the policies – as exemplified by CSR's notice to and consultation

with SBU from the inception of the first American asbestos-related claims – did not first occur

until November 1991, and that such untimely notice essentially did not constitute reasonable

notice 'forthwith,' 'as soon as possible,' or 'as soon as practicable.'  Plaintiffs largely concede

that until at least November 1991 they did not provide some of the specific types of notice

identified by Defendants, such as the provision of summonses, request for defense costs or

appointment of defense counsel, provision of status reports on the claims, and consultation and request for approval of settlement and other litigation decisions.

However, Plaintiffs instead argue that they complied with the notice provisions both by the formal notice in November 1991 and by providing other forms of notice well prior to 1991, such as provision of the annual reports and on the basis of less formal communications between CSR and Defendants, and Defendants and others, by which Defendants had learned of Plaintiffs' asbestos-related claims. Defendants argue that CSR's annual reports were insufficient and find some support in the record for the notion that the reports were not intended to serve as notice to Defendants of the asbestos-related claims. Yet Plaintiffs dispute Defendants' interpretation of this deposition testimony evidence, and more than one inference may be drawn from this testimony.

More than one inference may similarly be drawn from the extensive record regarding Defendants' alleged knowledge of Plaintiffs' asbestos-related liabilities prior to the November 1991 request for coverage. The record provides some support for the contention that Defendants knew of the asbestos claims even though they had not been formally tendered for coverage by Plaintiffs. The parties dispute the context and interpretation of nearly every piece of evidence on this subject, including various letters, internal memoranda, and the deposition testimony of key players. For example, with regard to the correspondence between NZI's McMurdy and CIGNA's Thoroughgood following Defendants' February 1992 denial of CSR's claims, the parties dispute the meaning and import of what McMurdy told Thoroughgood and what Thoroughgood admitted about CIGNA's prior knowledge. Furthermore, McMurdy's deposition testimony is not clear and lends support to multiple inferences that may be drawn from the correspondence. In

addition, the parties also vigorously dispute the meaning of various memoranda and notes which at least suggest that some post-1978 Insurers withdrew from the CSR insurance program during the 1980s due to concerns regarding asbestos liability.  These documents are susceptible to multiple factual interpretations and inferences which are not for this Court to resolve.

These and many other genuine disputes of material fact prevent this Court from entering summary judgment in favor of Defendants on late notice, as they have not met their burden of showing, on the basis of undisputed facts, that Plaintiffs breached the notice provisions.  Before even reaching the question of the reasonableness of the "alternative" forms of notice provided prior to November 1991 by Plaintiffs, disputed facts regarding the nature of those alternative forms of notice themselves require this Court to submit this question to the jury.  It is worth noting, however, that disputed facts indeed exist regarding the reasonableness of the notice allegedly provided prior to November 1991 and the reasonableness of the November 1991 formal notice.  Plaintiffs rely on their asserted initial belief that their pre-1978 coverage with SBU would sufficiently cover their American asbestos-related liabilities, and that notice to Defendants was reasonably required only when it became clear that coverage from Defendants would be needed for the claims, i.e., when, in the phrasing of some of the policies, claims which initially did not appear to involve the policies with Defendants later reasonably appeared to give rise to claims under the policy.  Plaintiffs argue that their initial belief that the pre-1978 SBU policies would sufficiently cover their American asbestos-related liabilities, and their subsequent determination that they would need to seek coverage under Defendants' policies, falls under this

exception.[12]  Defendants have not met their burden to show that no disputed facts exist regarding

the reasonableness of Plaintiffs' view of its asbestos-related claims and when they "involved" the

policies issued by Defendants.

The parties heatedly dispute the evidentiary support for Plaintiffs' allegedly reasonable

belief that formal notice was not required prior to November 1991.  They contest whether

Defendants knew that Plaintiffs considered SBU's coverage to be primary, and they dispute even

the seemingly easily determinable amount of coverage Plaintiffs had with SBU and how much

Plaintiffs expended in defense and settlement costs up to November 1991.  Under New Jersey

law, the mere lapse of time is not determinative, so these facts are highly relevant to resolution of

the breach issue.  *Sagendorf*, 293 N.J. Super. at 95.  With regard to the crucial testimony of

Mutton, CSR's in-house attorney, the parties draw multiple inferences regarding the extent to

which Mutton expressed the position of CSR or whether he effectively operated on his own and

did not share his view with others at CSR.[13]  Also, while Plaintiffs appear to concede that prior to

November 1991, they did not provide the kinds of notice and engage in the kind of consultation

with Defendants that they did with SBU, they dispute the materiality and interpretation of their

actions with regard to SBU.

---

[12]Even under the 1978-79 and 1985-89 primary policies and 1985-89 umbrella policies, which do not contain an explicit exception for claims later appearing to implicate the policies, Plaintiffs argue that their notice – both prior to November 1991 and in November 1991 – was reasonable under the circumstances, considering the timing of Plaintiffs' defense and settlement costs and their view of the coverage they enjoyed from their pre-1978 insurance program.

[13]Furthermore, nearly all of the pre-1985 primary and umbrella policies speak of notice being required where the insured reasonably believes that the claim is "likely to involve" the policy.  This standard only adds further subjective elements requiring resolution of disputed facts and not amenable to summary judgment on the facts of this case.

Finally, Defendants argue that, while the parent corporation CSR Limited's late notice was not made until November 1991, the subsidiary CSR America provided no notice until even later, namely in 1995 when Plaintiffs filed their initial Complaint in this matter, and thus at least CSR America's claims must be barred for late notice.  Yet disputed facts exist concerning this issue as well.  Plaintiffs point to certain portions of the November 1991 letter which specifically identify "subsidiaries," while Defendants stress that the letter's attached list of claims only contains claims against CSR Limited and Midalco, not CSR America.  Mutton's deposition testimony does not clarify this issue beyond dispute, and the reasonableness of CSR America's notice in light of when claims against CSR America were first lodged remains a disputed question of fact.

Because under all of the policy provisions, as interpreted pursuant to New Jersey law, this Court may not resolve the substantial factual disputes regarding the reasonableness of Plaintiffs' notice on summary judgment, Defendants' motion for partial summary judgment on late notice is DENIED.

III.     **Disputed Issues of Material Fact Regarding Appreciable Prejudice Prevent Granting Summary Judgment in Favor of Plaintiffs on Late Notice**

Although this Court may not grant summary judgment on whether Plaintiffs breached the notice provisions, summary judgment for Plaintiffs on late notice may still be appropriate if Defendants cannot meet their burden to raise a genuine issue of material fact as to its requisite showing of appreciable prejudice.  In *Continental Insurance Co.*, the insurer made just "one allegation of prejudice with scant support in the record," and the court found that the insurer's

38

claim was "far from sufficient to support a denial of coverage based on late notice."  836 F. Supp. at 1048.  The court concluded that because the insurer "would bear the burden of showing prejudice at trial, and because it has been unable to raise a genuine issue of material fact as to that element in response to [the insured's] motion for summary judgment . . . . summary judgment will be granted."  *Id.*

Here, however, Defendants make far more than one allegation of appreciable prejudice. They broadly claim that Plaintiffs' late notice resulted in the loss or destruction of evidence and the unavailability and eroded memory of witnesses, and that this spoliation hindered their availability to conduct a proper investigation and mount a defense.  They further contend that they were prejudiced by the loss of their opportunity to cancel prior policies, to deny renewal, or to otherwise address their concerns regarding coverage for asbestos-related liabilities.

Plaintiffs are correct in responding that actual prejudice, rather than mere speculation, must be shown.  *Transportes Ferreos*, 239 F.3d at 561 ("Under New Jersey law, mere conjecture or suspicions may not form the basis for establishing appreciable prejudice.") (citing *Molyneaux v. Molyneaux*, 230 N.J. Super. 169, 179 (App. Div. 1989)).  Indeed, the insurer must show more "'than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim, [r]ather it must show that substantial rights have been irretrievably lost.'"  *Id.* (quoting *Kitchnefsky v. Nat'l Rent-A-Fence of Am., Inc.*, 88 F. Supp. 2d 360, 368 (D.N.J. 2000)). Substantial rights under this framework, however, include the preservation of evidence and the availability of witnesses.  *Id.* (citations omitted).  Although the authorities are not clear, the loss of Insurers' rights to deny, revise, or otherwise address the asbestos issue after allegedly proper notice under the circumstances of this case may also constitute a loss of substantial rights.

Plaintiffs and Defendants, as with the breach issue, dispute the facts relevant to the determination of prejudice. For example, the parties vigorously contest the relevance of some of the evidence allegedly lost or destroyed, and Plaintiffs contest whether some of the claimed lost or destroyed documents are in fact lost or destroyed. Plaintiffs identify evidentiary support to contest the inferences Defendants draw regarding the impact of the allegedly lost or destroyed evidence on Defendants' investigation and defense against the claims, especially in light of the exhaustive discovery in this matter. Furthermore, the disputed issues regarding Defendants' pre-1991 knowledge of the asbestos-related claims also prevent summary judgment on the prejudice question. Plaintiffs argue that Defendants had ample opportunity to address their concerns regarding asbestos-related liability, but that they instead waited until the November 1991 request for coverage. Defendants respond that they did not move to cancel the policies or otherwise address their concerns because they had not received proper notice and thereby were misled by CSR into thinking that CSR would not seek coverage for asbestos-liabilities. Again, however, the facts supporting this theory are disputed. Because the extent of Defendants pre-1991 knowledge remains the subject of contentious dispute, the effect of that asserted knowledge on the prejudice question may not be decided at this stage.

This Court need not reach the second prong of the appreciable prejudice inquiry – whether Defendants can demonstrate that they would have had a meritorious defense had there been timely notification – because many genuine issues of disputed fact exist with regard to the first prong concerning loss of substantial rights. Defendants state at the end of their reply brief that "[a]t most – and Defendants do not concede the point – Plaintiffs have created a disputed issue of fact regarding prejudice and their cross-motion must be denied." (Defs.' Reply Br. 29.)

Defendants have certainly not conceded the point, but the Court agrees with their bottom-line assessment of Plaintiffs' motion.  Plaintiffs' cross-motion for partial summary judgment on late notice is DENIED.[14]

### Conclusion

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment on Late Notice (Docket No. 573) is hereby DENIED, and Plaintiffs' Cross-Motion for Partial Summary Judgment on Late Notice (Docket No. 574) is hereby DENIED.

Newark, New Jersey
Dated: February 10, 2006


/s Harold A. Ackerman
U.S.D.J.

---

[14]Both parties rely in part on their respective expert witnesses in making their arguments regarding the timeliness of notice, the sufficient form and type of notice required by the policies, the relevance of Defendants' alleged general knowledge of Plaintiffs' asbestos-related claims, and the prejudice suffered by Defendants from the alleged late notice.  (*E.g.*, Pls.' Br. 27 n.37; Defs.' Reply Br. 7- 9, 14-15, 27-28.)  Plaintiffs in particular strongly object to Defendants' extensive reliance in their reply brief on expert reports regarding the sufficiency of the annual reports and the prejudice allegedly suffered by Defendants.  (Pls.' Reply Br. 1-2, 8-9, 13-14.)  Plaintiffs' arguments against reliance on these reports appear to rehearse contentions they might later present regarding the admissibility of those reports and related testimony.  This Court need not resolve these issues at this time.  Many genuine issues of material fact prevent this Court from granting summary judgment on late notice, and the expert reports at best only add to the number of disputed issues.  Issues regarding the admissibility of expert testimony and the propriety of reliance thereon are best left to subsequent resolution upon proper motion.